Filed: December 12, 2012

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-14
(4:04-cv-22310-DCN)

EDWARD LEE ELMORE,

Petitioner – Appellant,

v.

JON OZMINT, Director, South Carolina Department of Corrections; HENRY MCMASTER, Attorney General, State of South Carolina,

Respondents - Appellees.

O R D E R

The Court amends its opinion filed November 22, 2011, as follows:

On page 2, attorney information section, lines 6-8, the names of "Marta K. Kahn, THE LAW OFFICE OF MARTA K. KAHN, LLC, Baltimore, Maryland; John Henry Blume, III, CORNELL LAW SCHOOL, Ithaca, New York" are added as counsel for Appellant.

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EDWARD LEE ELMORE,

*Petitioner-Appellant,*

v.

JON OZMINT, Director, South
Carolina Department of
Corrections; HENRY MCMASTER,
Attorney General, State of South
Carolina,

No. 07-14

*Respondents-Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Florence.
David C. Norton, District Judge.
(4:04-cv-22310-DCN)

Argued: September 22, 2010

Decided: November 22, 2011

Before WILKINSON, KING, and GREGORY,
Circuit Judges.

Reversed and remanded by published opinion. Judge King
wrote the majority opinion, in which Judge Gregory joined.
Judge Wilkinson wrote a dissenting opinion.

## COUNSEL

**ARGUED:** J. Christopher Jensen, COWAN, LIEBOWITZ & LATMAN, PC, New York, New York, for Appellant. Donald John Zelenka, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Diana L. Holt, DIANA HOLT, LLC, Columbia, South Carolina; Marta K. Kahn, THE LAW OFFICE OF MARTA K. KAHN, LLC, Baltimore, Maryland; John Henry Blume, III, CORNELL LAW SCHOOL, Ithaca, New York, for Appellant. Henry D. McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees.

## OPINION

KING, Circuit Judge:

For nearly thirty years, Edward Lee Elmore, a mentally retarded handyman, has been behind bars, mainly on South Carolina's death row, for the January 1982 murder of Dorothy Edwards, an elderly woman who had sporadically employed him. The 28 U.S.C. § 2254 petition now on appeal, however, is part of Elmore's very first effort to secure federal habeas corpus relief. The antecedent state proceedings — encompassing three trials and related appeals over eight years, followed by another fourteen years of state postconviction relief ("PCR") litigation — were, to say the least, excruciatingly protracted. And, unfortunately, these federal habeas proceedings have been prolonged, in part because of our stay of this appeal to await further state court action.

In these federal proceedings, the district court denied Elmore relief on multiple claims, previously exhausted in the South Carolina courts, challenging the constitutionality of his convictions for murder, criminal sexual conduct, and burglary, as well as his death sentence. The district court also

declined to stay the federal litigation pending a final state determination of Elmore's unexhausted claim that, because he is mentally retarded, his execution is prohibited by the Eighth Amendment under *Atkins v. Virginia*, 536 U.S. 304 (2002). The first oral argument in this appeal, conducted on March 21, 2008, focused primarily on the stay issue. Shortly thereafter, on March 24, 2008, we entered our own stay, abating any further federal action while Elmore exhausted his *Atkins* claim in the state courts. Nearly two years later, on February 1, 2010, the state PCR court granted Elmore relief on that claim, vacating his death sentence and ordering that a life sentence be imposed instead. On March 10, 2010, the respondents — Jon Ozmint, Director of the South Carolina Department of Corrections, and Henry McMaster, the State's Attorney General — advised us that the state PCR court's *Atkins* ruling would not be further contested. The following day, March 11, 2010, we lifted our stay. Finally, on September 22, 2010, we heard additional oral argument on the issues remaining before us, i.e., those involving claims relating to the constitutionality of Elmore's convictions, rather than his now-vacated death sentence.

Having scrutinized volumes of records of Elmore's three trials and his state PCR proceedings, we recognize that there are grave questions about whether it really was Elmore who murdered Mrs. Edwards. And we are constrained to conclude — notwithstanding the demanding strictures of § 2254(d) — that Elmore is entitled to habeas corpus relief on his Sixth Amendment claim of ineffective assistance of counsel premised on his trial lawyers' blind acceptance of the State's forensic evidence. All told, Elmore's is one of those exceptional cases of "'extreme malfunctions in the state criminal justice systems'" where § 2254 may appropriately be used to remedy injustice. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Accordingly, we reverse the district court's judgment denying relief and remand for the court to award Elmore a writ of habeas corpus

unless the State of South Carolina endeavors to prosecute him in a new trial within a reasonable time.

I.

Elmore is alleged to have raped and murdered Mrs. Edwards and burglarized her Greenwood, South Carolina residence on the night of Saturday, January 16, 1982. Elmore, an African-American who was then twenty-three years old, performed odd jobs in the area to earn money. Mrs. Edwards, seventy-five years old and white, was a wealthy widow who resided alone. She had hired Elmore several times — most recently on December 30, 1981 — to wash the windows and clean the gutters of her home. On Monday, January 18, 1982, the local police were alerted by Mrs. Edwards's neighbor, Greenwood County Councilman Jimmy Holloway, that he had just discovered Mrs. Edwards's body in her bedroom closet. Holloway immediately identified Elmore as a possible suspect and said that Elmore's name could be found in Mrs. Edwards's checkbook register. The following day, Tuesday, January 19, 1982, investigators matched a thumbprint on the exterior frame of the back door into the Edwards home — the murderer's likely entrance point — to Elmore. Relying on the thumbprint, the police obtained a warrant to arrest Elmore for Mrs. Edwards's murder. Elmore was arrested early the next morning, Wednesday, January 20, 1982, and has been imprisoned since that time.

The following is a summary of the extensive procedural history of this matter.

- The first trial was conducted in the Court of General Sessions for Greenwood County on April 12-19, 1982, within three months of Elmore's arrest. He was found guilty and sentenced to death.

- On November 1, 1983, the Supreme Court of South Carolina reversed Elmore's convictions,

vacated his death sentence, and remanded for a new trial because the trial judge had improperly entered the jury room during the sentencing phase of the trial, without counsel for either the State or the defense; requested periodic reports on the status of jury deliberations, in "violation of elementary hornbook law"; and directed a "highly prejudicial" and "unjustifiably coercive" supplemental instruction at a juror who was apparently voting against the death penalty. *See State v. Elmore*, 308 S.E.2d 781, 785-86 (S.C. 1983).

- The second trial was conducted in Greenwood County from March 26 to April 2, 1984, and Elmore was again found guilty and sentenced to death.

- On May 16, 1985, the state supreme court unanimously affirmed Elmore's convictions and death sentence. *See State v. Elmore*, 332 S.E.2d 762 (S.C. 1985). The court ruled, inter alia, that the trial judge had properly excluded sentencing-phase-only prison guard testimony offered by Elmore to show his adaptability to prison life. *See id.* at 764 (citing *State v. Skipper*, 328 S.E.2d 58 (S.C. 1985)). On May 5, 1986, however, the Supreme Court of the United States granted certiorari, vacated the judgment, and remanded for further consideration in light of its decision in *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (concluding that petitioner's evidence of good behavior in jail was "relevant evidence in mitigation of punishment" that "may not be excluded from the sentencer's consideration"). *See Elmore v. South Carolina*, 476 U.S. 1101 (1986).

- The third trial — which was limited to the sentencing phase — was conducted on February 23-

28, 1987, in Newberry County, as a result of Elmore's successful motion to transfer venue from Greenwood County. At the conclusion of the trial, Elmore was yet again sentenced to death.

- On August 21, 1989, the state supreme court affirmed Elmore's death sentence, *see State v. Elmore*, 386 S.E.2d 769 (S.C. 1989), and, on June 11, 1990, the Supreme Court of the United States denied certiorari, *see Elmore v. South Carolina*, 496 U.S. 931 (1990).

- On December 13, 1990, Elmore filed his PCR application in the Court of Common Pleas for Greenwood County. More than four years later, from February 27 to March 4, 1995, the state PCR court conducted an evidentiary hearing, and, on October 30, 1995, Elmore amended his PCR application for the final time. By order of July 3, 1997, the court denied the application in its entirety. *See Elmore v. Evatt*, No. 90-CP-24-1004 (S.C. Ct. C.P. July 3, 1997).

- While Elmore's appeal from the denial of his PCR application was pending in the state supreme court, the State revealed that items of physical evidence — previously sought by Elmore's lawyers in the PCR proceedings but claimed by the State to have gone missing — had recently been found. Consequently, the parties filed a joint motion to dismiss Elmore's appeal without prejudice and remand for further proceedings, which the state supreme court granted. *See Elmore v. Evatt*, S.C. Ct. C.P. No. 90-CP-24-1004 (S.C. Jan. 8, 1999).

- On remand, the state PCR court concluded that the once-missing evidence was of insufficient

help to Elmore and, thus, yet again denied him relief. *See Elmore v. Evatt*, No. 90-CP-24-1004 (S.C. Ct. C.P. Feb. 21, 2001).

- In 2004, the state supreme court granted a writ of certiorari to review the state PCR court's rejection of Elmore's PCR claims, but, after briefing and oral argument, dismissed the writ as improvidently granted. *See Elmore v. Evatt*, No. 2004-MO-036 (S.C. July 12, 2004).

- On July 5, 2005, Elmore filed his 28 U.S.C. § 2254 petition in the District of South Carolina, in which he asserted numerous exhausted claims, plus his unexhausted mental retardation claim pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002). The district court rejected Elmore's request to stay the federal proceedings pending exhaustion of his *Atkins* claim in the state courts. *See Elmore v. Ozmint*, No. 4:04-cv-22310 (D.S.C. Apr. 25, 2006) (order and opinion denying stay); *Elmore v. Ozmint*, No. 4:04-cv-22310 (D.S.C. Aug. 11, 2006) (order and opinion refusing to alter or amend stay ruling). Thereafter, the district court denied Elmore's § 2254 petition on the magistrate judge's recommendation. *See Elmore v. Ozmint*, No. 4:04-cv-22310 (D.S.C. Oct. 27, 2005) (report and recommendation of the magistrate judge); *Elmore v. Ozmint*, No. 4:04-cv-22310 (D.S.C. May 17, 2007) (order and opinion denying petition); *Elmore v. Ozmint*, No. 4:04-cv-22310 (D.S.C. Aug. 3, 2007) (order and opinion refusing to alter or amend judgment). Nevertheless, the court granted Elmore a certificate of appealability, thereby authorizing this appeal. *See Elmore v. Ozmint*, No. 4:04-cv-22310 (D.S.C. Oct. 9, 2007).

In his initial appellate brief, submitted to this Court in December 2007, Elmore pursued five issues. As explained above, we conducted oral argument in March 2008 and then stayed our proceedings pending Elmore's exhaustion of his *Atkins* mental retardation claim in the South Carolina courts. *See Elmore v. Ozmint*, No. 07-14 (4th Cir. Mar. 24, 2008). Nearly two years later, the state PCR court rendered its unappealed *Atkins* ruling in Elmore's favor, *see Elmore v. State*, No. 05-CP-24-1205 (S.C. Ct. C.P. Feb. 1, 2010), and, soon thereafter, we lifted our stay of this appeal, *see Elmore v. Ozmint*, No. 07-14 (4th Cir. Mar. 11, 2010). On April 1, 2010, Elmore was formally resentenced in the state trial court to a life term of imprisonment.

As the parties asserted in their subsequent briefs and during the latest oral argument, the state *Atkins* ruling nullified our review of two of the five issues pursued by Elmore — whether he was entitled to a stay of the district court proceedings pending exhaustion of his *Atkins* claim, and whether he was due resentencing relief on his Sixth Amendment claim of ineffective assistance during his 1987 sentencing-phase-only trial. The remaining three issues encompass the question of whether Elmore is entitled to habeas corpus relief on a claim challenging the constitutionality of his 1984 convictions. Our opinion focuses on two of those claims — Elmore's Sixth Amendment claim of ineffective assistance in the guilt phase of his 1984 trial, and his Fourteenth Amendment claim that the State suppressed exculpatory evidence and knowingly presented false testimony material to his convictions.[1]

---

[1]Elmore's Sixth Amendment ineffective assistance claim and Fourteenth Amendment due process claim are premised on much of the same evidence and, thus, discussed together. "[T]he two claims are nonetheless distinct, both in nature and in the requisite elements of proof." *Cf. Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) (distinguishing Sixth Amendment ineffective assistance claim from Fourth Amendment illegal search and seizure claim). Because Elmore so clearly deserves relief on his ineffective assistance claim, we do not decide his due process claim today. We also do not reach the third claim in issue, which is Elmore's Sixth Amendment claim that the 1984 trial was not conducted before an impartial jury.

## II.

In assessing Elmore's claims, we first examine the record of the 1984 trial proceedings. Significantly, the State's case during the 1984 trial was nearly identical to the case it had presented in 1982. Elmore was represented at both trials by Geddes D. Anderson, the part-time Greenwood County Public Defender, and John F. Beasley, a local lawyer and former public defender who was appointed to assist Anderson.

### A.

The seven-day trial began on Monday, March 26, 1984. During a pretrial hearing conducted on Friday, March 23, the state trial court took up Elmore's pending motions, including his pro se request for new defense counsel (a request Elmore had made to the court by letter a few months earlier). His lawyer, Mr. Anderson, acknowledged at the hearing that the request for replacement counsel had been made, but indicated opposition to being replaced. As Anderson explained to the court,

> I would at this time tell [Elmore] that Mr. Beasley and I are thoroughly prepared. I have been going over the old transcript. I had Mr. [Bruck][2] send it to me, and he did about six weeks ago. I've been going over the trial, and I frankly told [Elmore] that it was Mr. Beasley and I making the record that they used to get him a new trial, and we feel like we're prepared to go. I'd like the Court to make inquiry as to what he wants to do about it and what if anything can be done.

[2]The "Mr. Bruck" referred to in the pretrial hearing transcript — misidentified therein as "Mr. Brooks" — was David I. Bruck of the South Carolina Commission of Appellate Defense, Elmore's lawyer in his successful appeal of the 1982 verdict. *See State v. Elmore*, 308 S.E.2d 781, 783 (S.C. 1983).

J.A. 511-12.[3] When the court asked Elmore to explain why he had made the request for replacement counsel, Elmore advised only that "I think it would be in my best interest to have some new attorneys." *Id.* at 513. The court responded that Anderson and Beasley

> are already familiar with the case and the facts and your defense. Both of them are experienced attorneys; both of them have represented defendants in many criminal trials as well as in trials in which the State sought the death penalty. The Court is of the opinion that you are represented by two competent attorneys, and I would need, Mr. Elmore, something other than simply a request for a change of attorneys to consider any such change.

*Id.* Elmore then stated that "Mr. [Bruck] said he could . . . explain it to you more better than I could. He's supposed to have came down and talked to you. He told me he had talked to you about it." *Id.* The court recalled only receiving a letter from Elmore requesting new counsel, "but without any reason being stated." *Id.* Elmore then asked the court to "hold off on [ruling on the request] until [Mr. Bruck] talks to you about it," but the court refused to delay ruling and denied the request. *Id.* at 514.

Thereafter, the pretrial hearing turned to Elmore's pending counseled motion for a competency hearing. With respect to that motion, his lawyers promptly conceded that Elmore was competent to stand trial. *See* J.A. 515 (Anderson explaining that, four to five weeks earlier, Elmore had advised him "that he [Elmore] felt emotionally stable and he knew what was going on"). Nevertheless, the state trial court ordered a competency hearing, to be conducted the following Monday, March 26, 1984, at the outset of Elmore's trial.

---

[3]Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

By agreement of the parties, Elmore was examined that Monday morning by a private psychiatrist, Dr. Harold Morgan, who had previously examined Elmore in 1982, at the behest of the defense, in preparation for the first trial.[4] Within a few hours of examining Elmore to determine his competency for the 1984 trial, Dr. Morgan testified on direct examination by the State that Elmore "does not show signs of any mental disease, nothing that would interfere with his ability to understand the charges against him or to assist counsel in his own defense." J.A. 519. After Elmore's counsel declined to cross-examine Dr. Morgan, the state trial court ruled, based upon Dr. Morgan's testimony, that Elmore was competent to stand trial. Shortly after its competency ruling, the court completed discussion of preliminary trial matters, and the jury selection proceedings began that afternoon.

B.

The State's theory of the case at the 1984 trial was (as it remains today) that Elmore raped and murdered Mrs. Edwards and burglarized her home in the time period between approximately 10:00 p.m. and midnight on Saturday, January 16, 1982, a period for which Elmore does not have a corroborated alibi. Under that theory, Elmore drove his car to the Edwards residence after failing in that day's efforts to reunite with his former girlfriend. According to the prosecutor, Elmore may have peered through the living room window, where he would have seen Mrs. Edwards sitting on the couch, watching television. The prosecutor more assuredly theorized that Elmore approached the house at its back door, adjacent to the carport, and left his thumbprint on the exterior door

---

[4]In his appeal from the 1982 verdict, Elmore had contended "that the trial judge erred in not holding a hearing to determine his competency to stand trial." *Elmore*, 308 S.E.2d at 783. The Supreme Court of South Carolina rejected that contention, explaining that a competency hearing was unnecessary because, inter alia, Elmore "underwent psychiatric examination on two occasions prior to the commencement of trial and was adjudged competent." *Id.*

frame while waiting for Mrs. Edwards to answer. *See* 1984 Trial Tr. 542 (prosecutor's opening statement that the thumbprint was "about the height that one would be if they were standing there with their hand up there waiting at the door after knocking or whatever").[5]

The prosecutor also posited that, when Mrs. Edwards opened the back door, Elmore forced his way inside the house. In the immediate kitchen area, a violent altercation with Mrs. Edwards ensued, during which she sustained bloody injuries and suffered a blow so powerful that a partial denture plate was dislodged from her mouth. The prosecutor surmised that Elmore then propelled Mrs. Edwards to her bedroom, where he raped her on her bed. Additionally, the prosecutor deduced that Mrs. Edwards, acting on repulsion at what was happening to her, reached out and pulled more than forty pubic hairs from Elmore's exposed groin area.

Following the rape, under the State's theory of the events, Elmore inflicted dozens of antemortem and postmortem injuries on Mrs. Edwards in the area of the bedroom's west wall, using such items as needle-nosed pliers, a paring knife, a broken metal-and-glass ashtray, a serrated cake knife, and bottle tongs. Despite her small stature — she stood well under five feet tall and weighed only about 130 pounds — Mrs. Edwards had fought her attacker, as evidenced by the defensive wounds she sustained and the blood under her fingernails. Brutalized, however, Mrs. Edwards succumbed to "exsanguination, or bleeding, and crush chest trauma." *See* J.A. 644 (testimony of medical examiner Dr. Sandra Conradi). According to the prosecutor, Elmore concealed Mrs. Edwards's body, clad only in a robe, in her nearby bedroom closet. He then wiped the scene clean of fingerprints and other evidence, leaving behind bloody paper tissues. Some of the scene was left in disarray — for example, Mrs. Edwards's bed was

---

[5]Citations herein to "1984 Trial Tr. __" refer to portions of the transcript of Elmore's 1984 trial that were not included in the Joint Appendix.

askew and several of her belongings were scattered on the bedroom floor — though Elmore returned the tongs to a drawer in the kitchen. Finally, the prosecutor theorized that Elmore exited the Edwards home with Mrs. Edwards's small clutch bag of cash in hand, got into his waiting car, and drove to the apartment of his former girlfriend.

1.

Jimmy Holloway testified for the State in the 1984 trial that he and his wife had been friends and neighbors of Mrs. Edwards (and her late husband) since the 1940s. The Holloways sometimes "had meals" with Mrs. Edwards, provided "most of her security," helped her with "minor repairs around the house," and acted as "someone to talk to when she needed someone to talk with." J.A. 661. According to Holloway, he had last spoken with Mrs. Edwards during the afternoon of Saturday, January 16, 1982, and she had planned to leave town at 6:00 a.m. the following day. Holloway saw Mrs. Edwards's car parked outside her house later that Sunday, but it did not cause him concern. After calling Mrs. Edwards shortly after noon that Monday and not receiving an answer, however, Holloway decided to walk to Mrs. Edwards's house to check on her. As he approached the back door (his usual entrance point), Holloway noticed that both the Sunday morning and Monday morning editions of *The Greenville News* were lying outside the house. Holloway knocked on the back door, and the door came open. Just inside the residence, Holloway noticed signs of a disturbance and saw a partial denture plate on the floor, alongside a pair of needle-nose pliers. Holloway proceeded through the house, looking for Mrs. Edwards, and ended up at her bedroom.

According to Holloway, as he approached the bedroom, he noticed that the bed had been turned down. Holloway testified that, after entering the bedroom, "I turned to the left to see if by chance [Mrs. Edwards] had fallen or hurt herself in the [en suite] bathroom." J.A. 673. "The bathroom door was open,

and as I looked down, I saw reddish stains on the lavatory and on the commode which had been wiped." *Id.* After turning around to face the west wall of the bedroom, Holloway "only then . . . saw the large amount of blood, the knife on the floor, and the empty bag to the left, with a penny laying on the floor, and the disturbance. It looked like somebody had been through something." *Id.* at 674.

At that point, Holloway did not open the adjacent closet door. Rather, being "very excited," Holloway "wanted to go and get a neighbor to come with [him], or better still, try and call the hospital and see if something had happened to [Mrs. Edwards] and she was in the hospital." J.A. 674. Holloway went to the home of another neighbor, a Mrs. Clark, where he called the hospital. Holloway and Mrs. Clark then returned together to the Edwards home and went directly to the bedroom. Once there, Mrs. Clark waited in the hallway while Holloway "took a pair of gloves out of [his] back [pants] pocket in order to open the closet door, which was standing about two and a half to three inches open." *Id.* at 675. As Holloway described it, "I took my glove and gently opened the door, and I found the body of Mrs. Edwards." *Id.* Holloway then "turned around and placed the door back in its position for the law enforcement." *Id.* Holloway and Mrs. Clark left the Edwards home, Mrs. Clark called the police, and Holloway waited for the officers in Mrs. Edwards's driveway.

The State relied on Holloway's testimony to show that Mrs. Edwards's small clutch bag of cash was missing from the residence. *See* J.A. 675-76 (Holloway's testimony that, "[a]s [Mrs. Clark and I] came out of the house, it was concerning me, 'Now, what all did happen?' and being of an inquisitive mind, I looked over on the . . . drop-leaf table to see if robbery had been, and I missed [Mrs. Edwards's] clutch").[6] The State

---

[6]The trial evidence reflected that the missing clutch bag matched the larger Aigner-brand bag found on Mrs. Edwards's bedroom floor. The clutch bag was never found, either in Elmore's possession or anywhere else. Furthermore, Elmore was not found with currency, between $50 and $150, estimated to have been in the clutch bag, or with a firearm thought to also be missing from the Edwards home.

also relied on Holloway's testimony to establish that the crimes had occurred on Saturday night. In addition to testifying that Mrs. Edwards had planned to leave town at 6:00 a.m. Sunday and that the Sunday and Monday morning newspapers were lying outside her house, Holloway stated the following:

> [A]s I came back through the kitchen [after finding Mrs. Edwards's body], her coffeepot was on, this little automatic coffeepot that you can set at night to come on at [the] designated hour the next morning.
>
> . . . .
>
> . . . This automatic coffeepot was one exactly like the one I have. It's a G.E., and I noticed that all the moisture, or water, had evaporated out and only the residue from the coffee was at the bottom of the Pyrex pot.

*Id.* at 676. Holloway initially testified that the coffeepot was set for "[s]ix o'clock a.m.," but then clarified that he "shouldn't have used the word 'a.m.,' because if you set it at six o'clock before six o'clock in the afternoon, it's going to go off at six o'clock in the afternoon." *Id.* at 680. Nevertheless, Holloway agreed that it was his "judgment that [the coffeepot] was set for six a.m." *Id.* at 681. While testifying about the coffeepot, Holloway also noted that Mrs. Edwards's alarm clock was sounding at the time he discovered her body. *See id.* at 676 (Holloway's testimony that "I would like to go back and say that as I went into the bedroom the first time, as well as the second time, the alarm clock was running"). Holloway — who was not cross-examined by Elmore's trial counsel — testified on direct examination that he did not turn off the coffeepot or the alarm clock.[7]

---

[7]Holloway had testified during Elmore's 1982 trial that, when the police first arrived at the Edwards home, he met the responding officers in the driveway and told them that the coffeepot was on. The next day, the police gave Holloway the key to the Edwards home, and he then hired cleaners to remove fingerprinting dust and bloodstains from the premises.

Other evidence that the crimes had occurred on Saturday night was provided by Lieutenant Alvin Johnson of the Greenwood City Police Department. Johnson corroborated that, in the kitchen, "[t]he coffeepot was on" and "[t]he liquid had evaporated." 1984 Trial Tr. 600. Johnson turned off the coffeepot "for . . . safety purposes." *Id.* at 601. Johnson also testified that the alarm clock in Mrs. Edwards's bedroom was sounding when he arrived at the residence, and that the clock was set for 6:00 (though he did not specify a.m. or p.m.). Additionally, Johnson testified that the television in the living room was on, and a *TV Guide* magazine on the coffee table was open to the listings for 8:00 and 9:00 on Saturday night.

2.

Also during Elmore's 1984 trial, the State presented law enforcement officers and forensic analysts to testify about the murder investigation and their collection and testing of physical evidence.

a.

Medical examiner Dr. Sandra Conradi, the forensic pathologist who performed the autopsy at approximately 11:00 a.m. on Tuesday, January 19, 1982, in Charleston, South Carolina, testified in considerable detail about Mrs. Edwards's horrific injuries, including vaginal abrasions evidencing a sexual assault, plus defensive wounds on her arms and hands. Dr. Conradi opined that the time of death was between twelve hours and three days before the autopsy — as late as 11:00 p.m. on Monday, January 18, and as early as 11:00 a.m. on Saturday, January 16. When asked if she could be more specific, Dr. Conradi testified:

> The only way I could do that is basing my findings also on history as provided me by the coroner as to when she was . . . last seen alive, when she was last talked to, but as far as on a scientific basis, from the

autopsy, I couldn't be any more specific than the twelve hours to three days.

J.A. 651. Based on the "history," Dr. Conradi "estimate[d] the time of death to be the night of the 16th, Saturday night." *Id.* On cross-examination, she acknowledged that the scientific indicators of time of death "are very variable." *Id.* at 653. She reiterated that, based on "the autopsy itself," Mrs. Edwards had been dead "twelve hours to three days." *Id.* "From the historical information," the time of death was "probably closer to three days than twelve hours." *Id.* at 653-54.

b.

Lieutenant Frank Dan DeFreese of the South Carolina Law Enforcement Division ("SLED"), a fingerprint analyst, testified that he arrived at the Edwards home shortly after 3:00 p.m. on Monday, January 18, 1982. According to DeFreese, he noticed an area on the exterior frame of the back door with "a certain shine to it that the surrounding paint did not have," and he "subsequently treated that area with contrasting fingerprint powder to make a fingerprint visible." J.A. 552. Because "[t]he powder bonded readily," DeFreese concluded "[t]hat the print was relatively moist" and, thus, "relatively fresh." *Id.* at 554. DeFreese photographed and lifted the print from the door frame and, the following day (Tuesday, January 19, 1982), matched that print to the left thumb impression on a fingerprint card bearing Elmore's name.

On cross-examination, Lieutenant DeFreese agreed that the print "could have been there [on the exterior door frame] a month." J.A. 579. He explained that "[i]t's very difficult to say with any degree of precision when it was placed there. We can say for certain who it was put there by . . . , but telling it like it is, I can't say for sure it was put there two days before." *Id.* Nonetheless, DeFreese restated the indicators that the print was "fresh," i.e., "that there was moisture present, and the powder did readily adhere to the print." *Id.*

Four officers of the City of Greenwood Police Department had earlier testified that the print on the door frame was visible to the naked eye and appeared (to the naked eye) to be "recent" or "fresh," without explaining why this was so. *See* 1984 Trial Tr. 561, 567, 576, 590. Elmore's defense counsel objected to the testimony of the third and fourth witnesses. *See id.* at 575 ("[W]e have allowed that once or twice. He is drawing a conclusion as to the appearance of the prints. I think he can testify as to what he saw and not what his conclusion is as to recent vintage or several days old."); *id.* at 590 ("Same objection, same grounds."). Those objections were overruled.

During his time on the witness stand, Lieutenant DeFreese testified to finding and identifying only two other prints at the crime scene. The first was a print lifted from the swinging door between the kitchen and dining room. DeFreese described "compar[ing] it with these post-mortem inked fingerprints from Mrs. Edwards' body," and concluding that the print was made by her right thumb. J.A. 571. The second was a palm print found on top of the toilet tank in Mrs. Edwards's en suite bathroom, which also was matched to Mrs. Edwards. *See id.* at 580. DeFreese testified that "blood . . . was smeared, noticeably smeared on the commode and on a portion of the lavatory." *Id.* "There [was] both some unsmeared blood and some smeared blood across the top of the toilet seat." *Id.* at 581.[8]

---

[8]At the 1982 trial, Lieutenant DeFreese had explained why few fingerprints were found at the crime scene:

> Mrs. Edwards, or whoever kept her house, was a very meticulous housekeeper. The place was extremely clean and extremely neat . . . . [T]here was simply no other identifiable latent fingerprints found that we could do anything with. There were a few other partial latent fingerprints, which were not identifiable[,] some of them consiste[nt] in their size with the size of fingers that women generally have. But there were no other fingerprints that were identifiable found in the areas of activity.

J.A. 83.

c.

SLED Agent Ira Byrd Parnell, Jr., testified that he assisted Lieutenant DeFreese in examining the crime scene and preserving evidence. According to Parnell, he discovered "a number of hairs" in the bed in Mrs. Edwards's bedroom. J.A. 544. As Parnell described it, "[t]he bottom part of the bed had been moved," "[t]he main covers, the spread, or quilt, were folded down," and "the sheets underneath were rumpled and in a wrinkled condition." *Id.* at 543. Parnell testified that, "in an area just past the middle of the bed from top to bottom," he found the hairs arrayed in "almost a band, approximately eighteen inches deep by approximately three feet wide." *Id.* at 544. Parnell, who was not cross-examined by the defense, stated that he collected the hairs in DeFreese's presence.

Lieutenant Earl Wells, the Assistant Chief Chemist of SLED's Forensic Chemistry Department, testified that he received a collection of forty-nine hairs found on Mrs. Edwards's bed. Of those hairs, according to Wells, two were consistent with Mrs. Edwards's pubic hairs, two with her head hairs, and the remaining forty-five with Elmore's pubic hairs. Of the latter forty-five hairs, four looked to be of the type that would have normally fallen out, and forty-one appeared to have been forcibly removed. Wells testified that "[t]he racial origin of the [forty-five hairs] was Negroid," and that the hairs had two "outstanding characteristics" that rendered them "consistent with Mr. Elmore" and "somewhat inconsistent with normal [N]egroid hair": a certain rare "banding effect" and "a reddish cast to the color of the hair." *Id.* at 622-23. Wells opined on direct examination that there was "a very high degree of probability that the hairs found on the bed" came from Elmore. *Id.* at 624. On cross-examination, the defense elicited that it was "not a certainty," i.e., "[n]ot 100 percent," that the hairs matched Elmore. *Id.*

d.

The trial evidence reflected that the crime scene was a particularly bloody one. The bedroom carpet was saturated with

blood in the area near the closet where Mrs. Edwards's brutalized body was stashed. Two bloody footprints were found: one in the carpeted dining room just off the hallway leading from Mrs. Edwards's bedroom, and one in the carport leading away from the house. There was also blood on several of the weapons used against Mrs. Edwards, as well as on the kitchen carpet, the bedroom wall, the toilet and sink in Mrs. Edwards's en suite bathroom, and tissues apparently used by the murderer to wipe away fingerprints and other evidence.

Lieutenant Thomas W. Henderson, Jr., of SLED testified that blood was found on several items of Elmore's clothing that he admittedly had been wearing on the night of Saturday, January 16, 1982: a pair of shoes, a brown corduroy coat, and a pair of blue denim pants. According to Henderson, he questioned Elmore about the blood on the shoes, which Elmore was wearing at the time of his arrest. In that regard, Henderson testified:

> I pointed out to [Elmore] there were stains on the shoes which appeared to be blood, and I asked him if he had any idea where the blood had come from. He said no, he hadn't. I went on to ask him, "Have you been killing any animals in the recent past while wearing the shoes, such as a cow or dog or hog or any kind of animal?" He said no, he had not. I asked him if he had been walking anyplace wearing those shoes where blood might have been on the ground or floor, or anyplace he had been walking and got it on his shoes. He said no, he had no idea where the blood came from.

J.A. 750. The coat and pants had been obtained during a search of Elmore's mother's home in nearby Abbeville, South Carolina, where Elmore resided. Elmore's car also was "thoroughly" searched, "even vacuumed," but no blood or other incriminating evidence was recovered. *See* 1984 Trial Tr. 726

(testimony of Greenwood city police officer Gary Vanlerberghe).

SLED's John C. Barron, a forensic serologist, testified that Elmore had Type B blood (in common with about 10% of the population), and Mrs. Edwards had Type A blood (along with approximately 40-45% of the population). Barron was able to identify Type A blood on Elmore's left shoe, but was unable to ascertain the type of blood on his right shoe. Elmore's coat contained three areas of human blood, two identifiable (both Type B). There were ten areas of human blood on his pants, five identifiable (three Type A and two Type B). All of the identifiable blood in Mrs. Edwards's house was Type A. Among the unidentifiable samples was blood scraped from beneath Mrs. Edwards's fingernails. Barron acknowledged on direct examination that it took "a period of at least two weeks" to complete his tests on the blood, and he conceded on cross-examination that, because the blood on Elmore's shoes, coat, and pants was dry, it was "an impossibility" to determine the blood's age. *See* 1984 Trial Tr. 812-14.

3.

Greenwood resident James Gilliam testified for the State that he was arrested around April 2, 1982, and held in the Greenwood Law Enforcement Center, where fellow inmate Elmore approached him two or three days later in a jail common area and spontaneously confessed to murdering Mrs. Edwards. According to Gilliam, Elmore "said he went there to rob the lady, and she started screaming, so he had to kill her," and that "he knowed police couldn't have no fingerprints because he had cleaned up before he left." J.A. 793-94. Elmore also asked Gilliam "if he had sex with anybody and you washed up afterward, could you be able to tell that you have had sex with that person." *Id.* Gilliam testified that he had multiple convictions for writing bad checks and receiving stolen goods, and that he had been arrested and incarcerated with Elmore as the result of a probation violation. Gilliam

"[k]new [Elmore] by sight," because they had both once resided in the same Greenwood apartment complex, but had not previously spoken to him. *Id.* at 792. "[W]ant[ing] to do what was right," Gilliam wrote a letter on April 6, 1982, to Lieutenant Johnson of the Greenwood City Police Department concerning his conversation with Elmore. *Id.* at 796. Gilliam further testified that no one had talked to him about Elmore's case — including any police or other government official — before he wrote the letter to Johnson.

The defense's cross-examination of Gilliam was aimed at establishing that he fabricated Elmore's confession in order to obtain favorable treatment at sentencing on his probation violation. The defense had also made a motion to exclude Gilliam's testimony in advance of his appearance before the jury. After hearing from several witnesses outside the jury's presence — including Gilliam and Captain Arlie Capps, the Greenwood jail administrator — the state trial court denied Elmore's motion premised on findings that "any statement that the Defendant made to the Witness Gilliam was not the result of any plan on the part of any law enforcement agency, and Mr. Gilliam was not put there for the purpose of interrogation or asking any questions." J.A. 788.

### 4.

Elmore testified on his own behalf that he "didn't have nothing to do with" the death of Mrs. Edwards. J.A. 851. He also denied "hav[ing] any discussion with [James Gilliam] such as [Gilliam] testified to here." *Id.* at 848. Rather, according to Elmore, Gilliam approached him and asked "[q]uestions about Mrs. Edwards['s] death," and Elmore responded that he "didn't know nothing about it." *Id.* at 849. On direct examination, Elmore testified that — hoping to get back together with his former girlfriend, Mary Alice Dunlap — he had met up with and talked to Dunlap several times on Saturday, January 16, 1982. At about 9:30 p.m., Elmore saw Dunlap leave work and get into her brother's automobile. In

his own car, Elmore stopped for gas at "the Pantry," and then drove to Dunlap's apartment, but no one was there. *Id.* at 836-37. Elmore then drove back to the Pantry, where he stayed for an unknown period of time before returning to Dunlap's home to look for her. *See id.* at 837 (Elmore's testimony that he did "not exactly" know how long he stayed at the Pantry, but "I think it was around ten-thirty or eleven or somewhere in there. I'm not sure what time").

On cross-examination, the State confronted Elmore with a written statement — made on the day of his arrest (Wednesday, January 20, 1982) to Lieutenant Henderson of SLED — asserting that Elmore had been with Dunlap and her family members between 9:30 p.m. and midnight that Saturday. Although Elmore acknowledged that he signed the statement, he denied that he had actually read it. He also explained:

> When I was down there at the law enforcement center [during the morning of his arrest], they kept, you know, asking me all kinds of questions and stuff. I didn't know what was going on. I just might have said anything, but I know what happened. . . . When I got there [to Dunlap's apartment] first, wasn't nobody there, so I went up to the store.

J.A. 876-77. Anticipating rebuttal testimony of Dunlap and her family members that Elmore did not arrive back at the apartment until about 12:30 a.m. — and then with an unexplained lacerated lip — the State asked Elmore if it was not "[t]he truth of the matter . . . that when you got finished with your business there at [Mrs. Edwards's house] on that night a little bit after twelve-fifteen, you [only then] got down yonder to where those people [Dunlap and her family] were." *Id.* at 890. Elmore responded, "No, sir," and stood by his testimony that he had told Dunlap that night that he injured his lip by slipping on ice on the outside stairs to her apartment. *Id.*

### 5.

In their rebuttal testimony for the State, Dunlap and her family members asserted that they had encountered Elmore around 9:45 p.m. on Saturday, January 16, 1982, and then did not see him again until he appeared at Dunlap's home nearly three hours later, at about 12:30 a.m. During its case-in-chief, the State had also questioned Dunlap about Elmore's attire when he arrived at her apartment:

Q. Now, did he [Elmore] take off this coat?

A. Yes, sir.

Q. When he took off the coat, what if anything did he do with his shirt?

A. Well, he took his coat off and asked me did he have any clothes at my house, and I told him no, so he unbuttoned on the button on his shirt.

Q. Unbuttoned on his shirt?

A. He unbuttoned on one button on his shirt and then ripped it the rest of the way.

* * *

Q. Then what did he do with it?

A. Threw it on the floor.

* * *

Q. What did you do?

A. I picked it up and threw it in the trash.

Q.   Did he have on any undershirt?

A.   Yes.

1984 Trial Tr. 867-68. Dunlap was not asked and did not
explain why she "threw [Elmore's button-front shirt] in the
trash." Neither Dunlap nor her family members testified to
seeing (or not seeing) any blood on Elmore's button-front
shirt, undershirt, coat, pants, or shoes, and not one of those
witnesses was specifically questioned as to whether blood was
visible on any of Elmore's clothing.

6.

The State presented other evidence to undermine Elmore's
credibility and to demonstrate that he had a guilty conscience,
including testimony establishing that Elmore broke his prom-
ise to return to Mrs. Edwards's neighborhood the Monday
after the crimes (January 18, 1982) to finish cleaning another
customer's windows — though he finished the job that Tues-
day. There was also testimony about statements Elmore made
on Wednesday, January 20, soon after his arrest. Late Tues-
day night or early Wednesday morning, during an argument
at her apartment, Dunlap had told Elmore that, if he did not
leave the premises, she was going to report him to the police.
Elmore accompanied Dunlap to a convenience store to make
the call, and then they returned to the apartment, where
Greenwood police officers arrived minutes later. After being
advised by the officers that they wanted to talk to him, Elmore
agreed to go with the officers to the Greenwood Law Enforce-
ment Center. There, around 2:45 a.m. on Wednesday, January
20, Perry A. Dickenson, a city police detective, informed
Elmore that he had been charged with murdering Mrs.
Edwards, advised him of his rights, and began questioning
him about the murder. As Dickenson described the interroga-
tion, "I . . . asked [Elmore] if he knew who Mrs. Dorothy
Edwards was. He said no, he did not. I explained she lived at

209 Melrose Terrace. He then expressed that he did not know where Melrose Terrace was at." 1984 Trial Tr. 924.

The trial evidence reflected that, a short time later, at approximately 3:15 a.m., Major James T. Coursey and Lieutenant Johnson of the Greenwood City Police Department arrived at the law enforcement center with the warrant authorizing Elmore's arrest for Mrs. Edwards's murder. Johnson read Elmore the warrant, and Coursey again advised Elmore of his rights. Thereafter, according to Coursey,

> I asked [Elmore] if he knew Mrs. Dorothy Edwards over at 209 Melrose Terrace. He stated he did not. Then I asked him, "Do you mean to tell me that you do not know Mrs. Edwards, the elderly lady who lives at 209 Melrose Terrace? That's the street behind the First Baptist Church, which is off of Grace Street." Again, he told me he did not know her. I said, "You're telling me that you did not do any gutters or windows for Mrs. Edwards?" He said, "I do windows and gutters, but I did not do any for Mrs. Edwards." I said, "Well, I have a check from her to you, made out to you and endorsed by you, cashed by you, for forty-three dollars. I'll go get the check if you want to see it." He hesitated briefly, and then told me that he did know Mrs. Edwards.

J.A. 746. Later that day, Elmore was transported to SLED headquarters in Columbia, where he made the written statement to Lieutenant Henderson. That afternoon, according to Henderson, Elmore verbally stated that, "[i]f in fact he did kill Mrs. Edwards, that he did not remember doing it." *Id.* at 757.

## C.

The closing arguments proceeded as follows: lawyer Beasley argued for Elmore, the prosecutor then argued for the State, and, finally, lawyer Anderson spoke for Elmore. The

State's closing argument emphasized evidence that the crimes had occurred on the night of Saturday, January 16, 1982. *See, e.g.,* J.A. 924-25 ("Was that house broken into that night? What time does the paper get there? Between five-thirty and six in the morning. . . . Did [Mrs. Edwards] get her paper? Huh-uh."); *id.* at 946 (describing Mrs. Edwards as "a little lady seventy-five years old, . . . in her home, with her alarm clock set, with her coffee maker set, there watching T.V. with just a housecoat on . . . ; and then for her not to take that trip she was planning the next morning; and then for that neighbor to come over there and to find her with her little body battered as bad as you'll ever hear tell of a body being battered, dead, with her pocketbook on the floor, . . . the clutch bag gone and no money left in the house"). The prosecutor also observed that, although SLED Lieutenant DeFreese had acknowledged that Elmore's thumbprint on the exterior back door frame may have been as much as a month old, "what he told you was that his impression when he put on the fingerprint dust and his impression when he looked at it was that it was of recent origin." *Id.* at 943-44.

The prosecutor addressed the hairs found on Mrs. Edwards's bed in the course of arguing that she had been the victim of rape:

> [L]et's go in there to her bed. Turned down, little pillow, but down below, slightly diagonally towards the bottom, was rumpled and crumpled; and over there on that bed — and if you doubt anything that I'm saying to you on this, as far as testimony, come out and have it read back to you, because Mr. Parnell [SLED Agent Parnell] — remember that name — said that in an area eighteen inches wide by about three feet long, he gathered up what? The hairs. How many of them? Two or three? Oh, Lord, no. Oh, Lord, no. How many? Forty-something. Forty-something. Forty-nine. Forty-nine. Two of them were her head hairs, two of them were her pubic

hairs, and then forty-five of them were those red hairs; and [forty]-one of the forty-five were what shape? Forty-one of the forty-five had been pulled out by their roots. . . . [Y]ou heard him [SLED Lieutenant Wells] say something else about this red hair that was there, and when we speak of the origin, be it Oriental or Caucasian or Negroid, it is of necessity that we do, and I beg none of you to feel as if that we might be leaning one way or the other. Please don't. It's just that we are pointing out to you what this specialist said that it was. It was a Negroid hair, of Negroid origin, it was red; and what else did he say? He said that there was banding. . . . He said that was a very rare thing. What else did he say about it? He said he'd been down there for eight or nine years examining hairs on top of hairs on top of hairs on top of hairs, and that what? Had never seen this before. Gosh, how coincidental. How singular it is for this man and — listen — this Defendant to have identical hairs. This specialist up on the stand said that his conclusion was that there was a high degree of probability that those forty-one hairs — forty-five, forty-one pulled out by their roots — came from this Defendant.

J.A. 930-32. Tying the presence of the hairs to rape, the prosecutor argued:

Could it have been that it was just plumb horrifying to her whole psyche, to the gentleness of womanhood, that there on her bed she was being penetrated? The act alone, to say nothing of the actual physical pain, would be so repulsive. Aren't we quite sure that maybe she could not help but reach and grab a handful of anything she could grab? And it turned out to be the pubic hairs, the red ones, with banding . . . .

*Id.* at 936.

Turning to the blood evidence, the prosecutor referred to blood "[a]ll over those shoes; it had ridden up high. What kind? Type A." J.A. 945. The prosecutor also alluded to "a bloody shirt" in discussing the testimony of Elmore's former girlfriend, Mary Alice Dunlap, and her family members. *Id.* at 935 ("They may go far enough to not want to get involved with a bloody shirt. Only God knows how that shirt disappeared.").[9]

The prosecutor remarked that the case against Elmore was not built entirely on circumstantial evidence, invoking direct evidence such as Elmore's jailhouse confession to James Gilliam. *See* J.A. 921 ("Is it circumstantial evidence when the Defendant tells Mr. Gilliam what he did? Huh-uh. That's direct evidence. That's coming from the horse's mouth."). The prosecutor lamented that Gilliam himself "was put on trial here today because he came and told you" what Elmore had confessed. *Id.* On the substance of that confession, the prosecutor recounted: "What all did [Elmore] say to this Mr. Gilliam over here? He said, 'If you have sex with somebody and then clean yourself up, can they tell it?' Mr. Gilliam says [Elmore] also told him that they wouldn't find no fingerprints there, because he rubbed down, cleaned off things." *Id.* at 942. The prosecutor also discussed Gilliam's testimony that Elmore had told him Mrs. Edwards "started screaming and

---

[9]Although Dunlap and her family members did not testify that Elmore's shirt was "bloody," and Dunlap explained how it "disappeared" (i.e., she "threw it in the trash"), Elmore's trial counsel did not object to the prosecutor's closing argument. In the initial argument on behalf of Elmore, however, lawyer Beasley had underscored that "there has been no testimony by anyone as far as blood being seen on Edward when he went over to [Dunlap's] house, when they saw him there that night, after the State says this horrible crime happened. No testimony whatsoever as to him being splattered with blood or anything." J.A. 911. Lawyer Anderson reemphasized that point in the final argument, when he argued that neither Dunlap nor her family members "said they saw any blood." *Id.* at 954.

she wouldn't stop, 'so I had to kill her.'" *Id.* at 947 (arguing that Mrs. Edwards "[d]one had part of her teeth knocked out in the kitchen, done had blood brought and was dripping it on the floor, and being taken to her bedroom, certainly against her wishes, who wouldn't scream, who wouldn't cry out, 'God Almighty, help me'").

Additionally, the prosecutor pointed out that Elmore's alibi for Saturday night had been refuted by Dunlap and her family members, even though Dunlap must once have had, and likely yet possessed, "emotions for [Elmore]." J.A. 934. And, the prosecutor excoriated Elmore for initially denying to police that he knew Mrs. Edwards. *See id.* at 933 ("There's an old Latin phrase [meaning] 'False in one, false in all.' What's he trying to hide there? Why is he denying that? . . . Why is he telling a falsehood when he said, 'I do not know her.'"). The prosecutor also reminded the jury of Elmore's statement that "if he killed Mrs. Edwards, he couldn't remember," suggesting that such statement was inculpatory. *Id.* at 934.

In his initial argument on behalf of Elmore, lawyer Beasley identified arguable areas of reasonable doubt, including Lieutenant DeFreese's acknowledgement that Elmore's thumbprint could have been on the back door frame "a month or longer." J.A. 914 (adding that, "[o]f course, [Elmore] testified to the fact that he'd been working around there back the latter part of December, . . . [s]o his prints could have been anywhere"). Beasley also noted the lack of certainty that the hairs found on Mrs. Edwards's bed belonged to Elmore or that the Type A blood found on Elmore's clothing came from Mrs. Edwards. *See id.* at 911 ("They can only say that [the hair is] consistent with [Elmore's], so that within itself would definitely not be sufficient."); *id.* at 912 ("I think forty-two, forty-three percent or forty-five percent — I don't recall exactly, but I'm sure you will — have A type blood, so it's a very

common type blood. . . . So far as what length of time [the blood was] there, we don't know . . . .").[10]

Additionally, Beasley underscored that the extensive search of Elmore's car, which included a thorough vacuuming, yielded no inculpatory evidence. Beasley also noted that, contrary to the State's theory that Elmore had a guilty conscience, he both worked in Mrs. Edwards's neighborhood the day after the body was discovered and willingly met up with the police that night. As Beasley recounted the evidence,

> when [Elmore] went down to his girlfriend's house on . . . the Tuesday night that he got arrested, he was there and his girlfriend said, "I don't want you here. Leave. If you don't leave, I'm going to call the police." Rather than leaving, he even gets in the car with her and rides down — she didn't have a telephone — and rides down to the Quick Way or whatnot while she uses the telephone and calls the police department. He knows she's called the police to come to her house. He stays there, knowing the police are coming. They come and arrest him. He knows they're coming.

J.A. 912-13. Beasley deemed it significant that, once arrested for Mrs. Edwards's murder, Elmore was subjected to dogged interrogation by the city police and SLED agents, but "kept denying he had anything to do with it." *Id.* at 913-14.

Although he identified those areas of arguable reasonable doubt, Beasley also vouched for the investigators, proclaim-

---

[10]In addressing "the footprint that the State kept talking about" — a reference to one of the two bloody footprints found at the scene — Beasley argued that there was a notable absence of "any match up of the footprint with the boots which [Elmore] has admitted that he was wearing," in that "we all know that you can take footprints and match them . . . with the sole of a shoe." J.A. 910.

ing: "I think at SLED they are recognized as being one of the best departments or probably as good as the F.B.I. They have a very fine department, and they have very good personnel, and they are experts at everything they do." J.A. 913. Further-more, Beasley acknowledged that his presentation may not have been comprehensive, advising the jury:

> So if you take all of these that I've gone over, now — and I'm sure there's several more — but you can see from all this that this isn't enough to really con-vict anybody on. Of course, that's in your province. Of course, I'm just reviewing these few with you. There's probably a lot more.

*Id.* at 915.

In the final argument on Elmore's behalf, lawyer Anderson alluded to the uncertainty surrounding the forensic evidence. *See* J.A. 949 ("There was never any expert testimony from individuals from SLED that pinpointed Edward Lee Elmore as the wrongdoer in this case. . . . The most I heard was high probability, a high degree of probability."). Anderson expressed the view that "the most damaging thing about the case" was not the forensic evidence, but rather James Gil-liam's testimony about Elmore's jailhouse confession. *Id.* ("[C]ertainly it's going to be hard to go back there and try to deliberate in a reasonable fashion with Mr. Gilliam's testi-mony staring you in the face."). Anderson then outlined the various reasons that Gilliam's story "makes absolutely no sense at all." *Id.* at 951.

Thereafter, Anderson attempted to poke a few more holes in the State's case, pointing out the inconsistency between Elmore's alleged eradication of evidence inside Mrs. Edwards's home, but failure to wipe away his thumbprint on the exterior door frame or to destroy the clothes he had been wearing that Saturday night. *See* J.A. 953 ("Of course, they tried to imply that he wiped off all the inside prints. If he had

that much sense, why wouldn't he know where the prints were on the outside? They want you to believe he was pushing up against there when he went in."); *id.* ("[W]hy in the Lord's name wouldn't he get rid of his clothes, instead of taking them on home and leaving them down in the closet? Or wherever they were found in his room in Abbeville with his mother back there."). Anderson also provided an explanation for the blood on Elmore's clothing: "This fellow climbed around houses all the time. It's what he did for a living, been doing it for years. . . . You're going to have some nicks and cuts working, if you ever work with your hands. You can't help it." *Id.* at 954.

Referring to the police investigators, Anderson conceded that

> I left them people alone. I don't know anything about that. I couldn't come in here and cross-examine that fellow [specifically referring to the SLED blood examiner, Agent Barron]. He would have tore me up, and tore me up anyway, I reckon. All I did was talk about the [unknown age of the blood]. You noticed that. I stayed away from him. Man, they're trained. They're ready for me. They've been here every day. They're ready for me. Loaded for bear. I stayed away from them. I can't cross-examine them. Nobody can. They do this every week.

J.A. 955. Anderson nonetheless requested the jury to "think long and hard about . . . the [Type A] blood on the shoe," warning that "[a]ll we have is that fellow's [Barron's] word, and I certainly hope and pray for [Elmore's] sake that [Barron is] telling the truth." *Id.* at 956. Finally, Anderson implored the jury to "[l]isten to the others, but if you feel like there is reasonable doubt, stick by your convictions." *Id.* at 958.

Following the closing arguments, the twelve jurors received their instructions and deliberated for approximately two hours

before unanimously finding Elmore guilty of murder, criminal sexual conduct, and burglary. Thereafter, in the sentencing phase of the 1984 trial, and again in the 1987 sentencing-phase-only trial, the jury recommended and the trial court imposed the sentence of death.

III.

Significantly, in his state PCR proceedings, Elmore — represented by new lawyers — challenged each of the key pieces of the State's case against him in the 1984 trial. In pertinent part, Elmore asserted the following:

- The illogical statements and bizarre conduct of Mrs. Edwards's neighbor, Greenwood County Councilman Jimmy Holloway, rendered him the probable murderer, and indeed he was an unpursued and undisclosed early suspect;

- As a matter of science, there was less than a 1% chance that Mrs. Edwards died on the night of Saturday, January 16, 1982, contrary to the State's theory and the (evidently staged) circumstantial evidence that the murder occurred that night. It was vastly more likely that Mrs. Edwards died on Sunday afternoon, when Elmore had a corroborated alibi;

- The forty-five pubic hairs matched to Elmore and allegedly found on Mrs. Edwards's bed were never there, as demonstrated by irregularities such as the investigators' baffling failure to photograph the hairs while still on the bed, to collect the bedcovers and sheets for further laboratory analysis, or to package the hairs like other evidence taken from the scene;

- The scant amount of blood on Elmore's clothing — no blood was observed on his white button-

front shirt, and there were just a few areas of blood on his coat, pants, and shoes — tended to demonstrate both that Elmore was not the perpetrator of the gruesome murder and that the blood was planted on his clothes (a possibility further suggested by a dubious link in the chain of custody);

- A Caucasian hair recovered from Mrs. Edwards's bloody abdomen during her autopsy — a hair that belonged neither to the victim nor Elmore, and that had been wrongly suppressed by the State — pointed away from Elmore and toward a white perpetrator such as Holloway;

- A fingerprint lifted from the blood-smeared toilet in Mrs. Edwards's en suite bathroom was falsely reported to be unidentifiable, and it had secretly been determined that neither the victim nor Elmore was the source of the print, further exculpating Elmore and incriminating someone else;

- Critical prosecution witness James Gilliam had fabricated Elmore's alleged jailhouse confession — as Gilliam himself now admitted — after being approached by the jail administrator and asked for "help" on the "Elmore thing"; and

- Elmore's low IQ and severe memory deficits not only explained inconsistencies in his statements to police and court testimony, but also made it highly improbable that Elmore was responsible for the state of the Edwards crime scene, including the concealment of Mrs. Edwards's body.

Elmore's PCR application included claims — some of which are encompassed in the Fourteenth Amendment due process claim now before us — alleging that the State sup-

pressed exculpatory evidence and knowingly presented false testimony with respect to Holloway's possible culpability for the crimes, the hairs allegedly found on Mrs. Edwards's bed, the undisclosed hair recovered from her abdomen, the fingerprint left on Mrs. Edwards's toilet, and Gilliam's since-repudiated account of Elmore's confession. The PCR application also included a multi-faceted claim of ineffective assistance of counsel — a broader version of the Sixth Amendment ineffective assistance claim in these proceedings — asserting that "trial counsel failed to conduct an adequate and independent investigation of [Elmore's] case in order to develop and present evidence to create a reasonable doubt as to [Elmore's] guilt or to effectively cross-examine the state's witnesses." J.A. 3122-23. The PCR application specified numerous instances of ineffective assistance, including trial counsel's performance with respect to the testimony of Holloway, Gilliam, and Elmore himself, as well as the time-of-death, hair, blood, and fingerprint evidence. The state PCR court rejected each of those claims by its orders of July 3, 1997 (the "First PCR Order"), and of February 21, 2001 (the "Second PCR Order").[11]

## IV.

## A.

During the proceedings culminating in the First PCR Order, the state PCR court conducted its evidentiary hearing from February 27 to March 4, 1995, and the parties submitted additional evidence for the court's consideration, including transcripts of pre- and post-hearing depositions. Following is a

---

[11]At the time of the First PCR Order and the Second PCR Order, the named respondent in the PCR proceedings was Parker D. Evatt, then-Commissioner of the South Carolina Department of Corrections, referred to as the "State" in our discussion of the PCR proceedings. (The First PCR Order is found at J.A. 3136-3319, and the Second PCR Order at J.A. 3679-84.)

review of the evidence adduced during those proceedings relevant to Elmore's Sixth Amendment claim of ineffective assistance of his 1984 trial counsel, as well as his Fourteenth Amendment claim of due process violations committed by the State.[12]

### 1.

Elmore presented five expert witnesses to the state PCR court who were profuse in their criticism of the Edwards murder investigation. Indeed, Vincent J. Scalise — a self-employed consultant and retired New York City police detective certified by the American Board of Forensic Examiners as a forensic examiner and behavioral profiler — testified to his impression that "there wasn't much of an investigation conducted at all." J.A. 2930. Rather, as Scalise described it, "Mr. Holloway [Mrs. Edwards's neighbor] arrived on the scene at approximately 12:10, and within an hour or two . . . there was a suspect in this case, namely Mr. Elmore, and . . . from that point in time the whole case was built around Mr. Elmore to the exclusion of anyone else." *Id.*

### a.

According to Scalise, "[t]he most likely suspect that should have been investigated would be the person who found the body": Jimmy Holloway. J.A. 2931.[13] Scalise deemed "some

---

[12]This review excludes the undisclosed Caucasian hair that the authorities recovered from Mrs. Edwards's bloody abdomen during her autopsy, which is discussed in conjunction with the Second PCR Order. *See infra* Part V.

[13]By all indications, Scalise's opinions were principally drawn from his review of transcripts and evidentiary records of Elmore's three trials, although he also was provided with an affidavit of one of Elmore's PCR lawyers, Diana Holt, detailing her interview of Holloway in July 1993, while Holt was a law student interning with the South Carolina Death Penalty Resource Center. According to Holt's affidavit, Holloway told Holt during their initial conversation, inter alia: that he was "'the only one who

of the statements that [Holloway] made" to be "rather incon-
sistent and strange," including that Holloway — Mrs.
Edwards's self-described protector — did not check on Mrs.
Edwards until mid-day Monday despite observing signs that
she had not left town early Sunday morning as planned. *See
id.* at 2931-32. Scalise also noted Holloway's "very, very
detailed observations" about the state of Mrs. Edwards's
home as he walked through it looking for her, including his
emphasis on details suggesting a Saturday night murder, such
as the newspapers lying outside the house, the pre-set coffee-
pot, and the ringing alarm clock. *See id.* at 2933-36 (explain-
ing that "[i]t would seem to me that he's trying to set up a
time frame"). Additionally, Scalise pointed out that — after
seeing signs of a disturbance in the kitchen area (including
Mrs. Edwards's partial denture plate and the needle-nose pli-
ers on the floor), blood smears in the en suite bathroom, and
significant amounts of blood in the area near the bedroom
closet — Holloway simply "left the scene" without opening
the closet door. *See id.*

---

could kill [Mrs. Edwards] and get away with it, the way she trusted me,'"
J.A. 3059; that "he was 'under suspicion at first,'" but told the police he
did not murder Mrs. Edwards and pointed them toward Elmore, *id.* at
3061; and that "SLED allowed him 'to come in and watch while they did
the crime scene investigation,'" *id.* at 3062. During subsequent conversa-
tions, Holt's affidavit reflects, Holloway noted that he had been chastised
by SLED's Thomas W. Henderson, Jr., "'for telling someone else they had
a suspect by 3:00 p.m.'" *Id.* at 3063. Holloway also revealed that "'[o]ne
of the reasons the cops questioned me is the neighbors probably told them
me and Dorothy [Edwards] were having an affair.'" *Id.*

As a result of his death in the summer of 2004, Holloway could not be
called to testify during the PCR proceedings. *See* J.A. 2942-43. Accord-
ingly, the State objected to Holt's affidavit as hearsay and moved to strike
Scalise's testimony for being premised thereon. It does not appear from
the record that the state PCR court ever ruled on the State's motion to
strike. *See, e.g.*, First PCR Order 75 n.1 (referring to motion as "still pend-
ing"). Moreover, the First PCR Order takes into account Scalise's evi-
dence.

Scalise characterized it as "very, very strange" that, rather than immediately calling police, Holloway went to Mrs. Clark's house "and started to call hospitals." J.A. 2935. Scalise also referred to Holloway "more or less conveniently [getting] a witness" before returning to Mrs. Edwards's house. *Id.* at 2934. And, Scalise used the word "bizarre" to describe Holloway's act of putting on a pair of gloves before finally opening the closet door. *Id.* at 2935. Scalise further testified on direct examination as follows:

> Q: What is the significance to you of the fact that Mr. Holloway before discovering the body in the presence of a witness put on gloves?
>
> A: It is extremely suspicious. Why would Mr. Holloway put on gloves to open the closet door? It was obvious, first of all, when he donned the glove[s], he knew what was behind the door. Why else would you open the door with gloves on so as not to leave his prints on the closet door?
>
> Q: To your knowledge, was any effort made to investigate whether or not Mr. Holloway had articles of clothes, shoes or other articles of clothes, that had evidence of blood on them?
>
> A: I saw no indication of that whatsoever. Neither the shoes nor the clothes nor the gloves.
>
> Q: So that even the gloves that he donned before discovering the body, those were not taken or examined.
>
> A: Nothing.
>
> Q: In your opinion, would it have been customary for those articles to have been located and investigated?

A:    Surely they should have been examined.

*Id.* at 2947-48.

On cross-examination, the State sought to establish that Holloway's conduct was consistent with that of an innocent and concerned — but self-protective — neighbor. The following exchange is representative:

Q:    It's not unusual for people when they come upon such things will seek out witnesses who will also be involved in that situation to protect themselves? That's not unusual, is it?

A:    If you are looking to protect yourself, it's not unusual, but I feel if you didn't have any motive to protect yourself, I don't think that would be the first thing that would come to mind, that I would need a witness.

Q:    It's not unusual; that's why people have somebody else frequently go through crime scenes or potential crime scenes or unusual situations with them?

A:    If we go along with that line of thinking, I would be expecting Mr. Holloway as soon as he saw the dentures and [needle-nose pliers][14] on the [kitchen] floor . . . to leave and not go all the way through the house until he gets to one place where he's most likely to find the body.

---

[14]In this portion of his testimony, Scalise mistakenly referred to the bottle tongs — rather than the needle-nose pliers — as being found on Mrs. Edwards's kitchen floor. Elsewhere, however, Scalise correctly noted that the tongs were found protruding from a kitchen drawer. *See* J.A. 3014-15 (testifying that it was "obvious" that the tongs were "deliberately" left in that position "so that they would be discovered").

Q: That's not all he did. He also called the hospital to see if Mrs. Edwards was there.

A: Yes.

Q: Resolving that Mrs. Edwards wasn't in the hospital, then he resolved to look in the location.

A: I sort of feel he did things backwards.

Q: You do?

A: Yes.

Q: You think he should have immediately gone to the closet and open[ed] the closet door expecting to find a dead body there?

A: Why would he expect to find a dead body? . . . Mrs. Edwards may have been injured behind the closet door, and by the time he called the hospital and [came] back, Mrs. Edwards could have been dead. If I was concerned about Mrs. Edwards' security and was a friend of the family, my first thought would have been to render first aid to Mrs. Edwards if she could possibly have been injured before I go and call the hospital and get another witness and come back.

J.A. 2992-94. Scalise acknowledged that he was "not saying" that Holloway murdered Mrs. Edwards; nonetheless, he found Holloway's statements and conduct "[s]uspect" and "worthy of inquiry." *Id.* at 2997. Indeed, on redirect examination, Scalise deemed it "inconceivable" that Holloway did not immediately open the closet door. *Id.* at 3017.

Also during his testimony, Scalise underscored that "it was Mr. Holloway who actually . . . pointed the finger at Mr.

Elmore. Mr. Holloway stated that he felt Mr. Elmore was a suspect in this case, and Mr. Elmore became not only the suspect but the defendant in very, very short order on the basis of information supplied by Mr. Holloway." J.A. 2938. According to Scalise, however, it was "highly unlikely that Mr. Elmore was the perpetrator of this crime." *Id.* at 2944. Scalise explained:

> I would have suspected if someone like Mr. Elmore had committed the crime, number one, I would see no reason why he would have secreted the body in the closet. The body would have stayed where it fell. And certainly if he was bent on larceny, I am sure he would have taken more than a clutch bag when jewelry was visible and silverware was visible and many other things were visible. There weren't that many drawers open and not that many things disturbed. It just didn't fit, as far as I am concerned, a crime that would have been committed by Elmore in any manner, shape or form.

*Id.* at 2939. Elaborating on that testimony, Scalise further explained that he could not "conceive of Mr. Elmore . . . , with an IQ of apparently 70, picking up the body and secreting it. I would see no reason. If Elmore had been the perpetrator . . . , I would expect that he would just leave the body where it fell and flee the scene." *Id.* at 2945; *see also id.* at 3001 ("Normally when you get a break-in, particularly a break-in with somebody with a very, very low IQ, they are in there for one purpose, to do damage and to take money, and they don't take time to stop and start to conceal bodies.").

Rather than suggesting Elmore as the culprit, Scalise opined, the evidence signified "an organized crime that was made to look like a disorganized crime." J.A. 2945 (adding that "some planning went into this, let's put it that way. I don't think it was a random act"). On cross-examination, Scalise explained that, "[b]asically, the fact that the body was

secreted in the closet leads me to believe someone felt they had to hide this body in preparation for finding it as opposed to someone who would just go in, beat an elderly woman to death and then leave the premises." *Id.* at 2998-99. He further testified:

> A:   . . . . Where you do find evidence of conceal-
>        ment is . . . in cases of serial murders or cases
>        of people who have a reason for not having a
>        body found, so it would not be traced back to
>        them. People who are likely possible to become
>        under suspicion. It i[s] extremely rare to find a
>        scene of a rape or a scene of some sort of homi-
>        cide where the victim is unknown to the perpe-
>        trator for the perpetrator to secret a body. There
>        is no reason for it.
>
> Q:   But the victim was not unknown to the perpe-
>        trator here, was it, under the state's theory of
>        the case? Mr. Elmore knew Mrs. Edwards?
>
> A:   Right. I really don't know, but I take for
>        granted that Mr. Elmore did not frequent Mrs.
>        Edwards' house. He had been there once, I was
>        informed, to do chores. It's not like he was
>        going to come back the next day.

*Id.* at 3001-02.

In his testimony during the PCR proceedings, SLED's Thomas W. Henderson, Jr., a lieutenant and general investigator at the time of the Edwards murder investigation, confirmed that Holloway had been an early suspect. *See* J.A. 1709, 1722-23. Henderson had set off alone from Columbia on Monday, January 18, 1982, shortly after the reported discovery of Mrs. Edwards's body, to assist the Greenwood City Police Department, and met up with SLED forensic specialists already on the scene. *See id.* at 1711-12, 1715. According

to Henderson, "we [referring to himself and the city police] did consider the man who had found [Mrs. Edwards's] body," but "had no evidence to say he was [the perpetrator] except he's the one who found the body." *Id.* at 1722. Henderson ruled out that man (Holloway) as a suspect "at some point," *id.* at 1723, and quickly became convinced that Elmore was the guilty party.

Henderson conceded that, at least by Friday, January 22, 1982, "we had firmly reached the conclusion that [Elmore] was the person who had murdered Dorothy Edwards." J.A. 1743. On that date, Henderson had completed a written request for SLED laboratory analysis of evidence, including "'[v]acuum bag samples from floor of car driven by Edward Elmore on day he murdered Dorothy Edwards.'" *See id.* at 1787. Thirteen years later, Henderson acknowledged that "[i]t's probably a bad choice of words I put on there." *Id.* at 1743. And he explained that, although "[m]y conclusion at that point was that, yes, [Elmore] had murdered Dorothy Edwards," "the investigation was not over [a]nd I'm always open to new evidence or conclusions to change my mind." *Id.* at 1744. Pressed to specify when he concluded that Elmore was the murderer, Henderson responded that he "probably" reached that conclusion by Wednesday, January 20, 1982, the day that he interrogated Elmore first at the Greenwood Law Enforcement Center and then at SLED headquarters in Columbia. *Id.*

Henderson revealed in his PCR testimony that he was "[n]ot necessarily assigned" to the Edwards murder investigation, but rather went to Greenwood within hours of the discovery of Mrs. Edwards's body "[b]ased upon my own initiative." J.A. 1709. Asked "[h]ow did this homicide come to your attention," Henderson responded that, while he was at home in Columbia that day, he received a telephone call from his mother reporting the murder. *Id.* at 1710. "Dorothy Edwards," Henderson explained, "was my mother's neighbor." *Id.* Henderson's parents had built a house across the

street from the Edwards home when Henderson was in the eighth grade, and he had known Mrs. Edwards, a friend of his mother as well as a neighbor, since then. *See id.* at 1761. Asked whether Holloway was "also an acquaintance of your mother[ ]," Henderson responded simply, "Yes." *Id.* at 1723. During the questioning by Elmore's PCR counsel about how he came to be involved in the Edwards murder investigation, Henderson acknowledged that "I know where you're headed," and sought to explain that "I'm a state police officer and I have jurisdiction statewide. It's policy at SLED that agents that achieve a certain rank, which I had, could assume cases on their own initiative." *Id.* at 1711.[15]

b.

Dr. Jonathan Arden, the Acting First Deputy Chief Medical Examiner for the City of New York, identified various deficiencies in the autopsy performed by Dr. Sandra Conradi and her reporting thereof. Dr. Arden's most significant testimony, however, related to his opinion that it was "extraordinarily unlikely and improbable really in the extreme" that Mrs. Edwards had died on the night of Saturday, January 16, 1982. *See* J.A. 2252. Rather, Dr. Arden's "best estimate" was that Mrs. Edward's death occurred between 11 a.m. and 3 p.m. — or even "a little later" — on Sunday, January 17. *Id.* at 2251. Dr. Arden acknowledged that "[i]t would be unfair and unreasonable for me to say that [a Saturday night death] is physically impossible," but he emphasized that "it is so incredibly unlikely that I cannot believe that that was the case." *Id.* at 2252 (adding that "I strongly hold the opinion that Mrs.

---

[15]Henderson testified in a deposition conducted prior to the state PCR court's evidentiary hearing and noticed by Elmore's counsel, who also took pre-hearing depositions of SLED's Ira Byrd Parnell, Jr., Frank Dan DeFreese, Earl Wells, and John C. Barron. The State called Parnell, DeFreese, Wells, and Barron — but not Henderson — as hearing witnesses. Other forensic witnesses discussed herein (both for Elmore and for the State) testified during the hearing, except Scalise, who was unavailable and instead gave a post-hearing deposition.

Edwards was not killed Saturday night as claimed"). He also testified on direct examination as follows:

> Q: If you are not comfortable doing this I understand, but could you give us at least an approximate range of possibility? Is there a twenty percent change that she was killed on Saturday night, a ten percent chance? What would you assign if I forced you to assign a percentage?

> A: If you forced me to assign a number to something that is really not numerical, I cannot imagine going as far or any farther than one percent possibility. I think one percent may be overestimating.

> Q: So it would be less than a one percent chance that that body could have remained all that time and still have the rigor and the other signs, no decomposition and the other things that you observed on the autopsy findings?

> A: Yes, sir.

*Id.* at 2252-53.

On cross-examination, the State established that Dr. Arden was aware of the "historical information" concerning Mrs. Edwards's time of death, including the Sunday and Monday newspapers lying in the driveway, the burning coffeepot, the ringing alarm clock, the *TV Guide* left open to the listings for Saturday night, and Mrs. Edwards's unfulfilled plan to leave town Sunday morning. *See* J.A. 2288-89. On redirect examination, however, Dr. Arden questioned the value and interpretation of that circumstantial evidence, explaining:

> I am aware of the newspaper. I am aware of the other factors, of the coffeepot. I vaguely remember being

aware of the alarm. I was made aware of the T.V. Guide open to the telltale date. All of those are interesting. All of those may turn out to be valuable. I don't discard any information lightly or without reason. But most of those conflict, seriously conflict, with the information provided by the body. I cannot explain away her rigor mortis. I cannot explain away her postmortem condition. I cannot explain away what the body is telling me because the T.V. Guide was open to a certain page.

*Id.* at 2291-92.

In her testimony for the State, Dr. Conradi stood by her earlier finding that "the absolute outer limits of the time of death . . . was twelve hours prior to the time of autopsy to three days." J.A. 2675-76. She further testified that, "[f]rom the autopsy itself, I think the most likely range in that time frame is two to three days. From the historical information — in other words, all the information that was given to me [by the police] — three days seems more likely than two days." *Id.* at 2676. According to Dr. Conradi, because time of death was a "very controversial area in forensic pathology" and "very fraught with hazards," she "tend[ed] to give a wide range to just make it all-inclusive and make sure that [she was] including the probable area of the time of death." *Id.* She also explained: "I prefer to give a broader range. And let the police work out where in that range the actual time of death was." *Id.* at 2677.

On cross-examination, Elmore's counsel pointed out to Dr. Conradi that, based on her testimony as to "the usual case," Mrs. Edwards "would have died sometime on Sunday afternoon." J.A. 2720. Dr. Conradi explained that "there are too many unusual cases to fall into that category each and every time." *Id.* She also reiterated that, "I think, based on the autopsy findings, two to three days is probably a good estimate, but within that two to three days, I [scientifically] can't

be more specific. I put the sixty-five hours down [estimating that Mrs. Edwards died on Saturday night] purely from what the police and the coroner thought was the most probable time of death." *Id.* Dr. Conradi's testimony prompted the following exchange:

> Q: Dr. Conradi, if the police give you their guess or their estimate as to when the time of death occurred and you have evidence, direct evidence, from looking at the body, based on your expertise and your knowledge of these things, like the rigor and the lividity, and it tells you that this murder could not have occurred as long ago as sixty-five hours, which is well outside what you said is the usual range, wouldn't you report that? Wouldn't that be significant to you, that the police are telling you a time that seems to you to be beyond what normally would occur here?
>
> A: Not if it was within my range. It was compatible with my findings.
>
> Q: But it was the absolute outside extreme of this range?
>
> A: Close to it. Within six, eight hours of the outside limit, but within possibility or probability of my range.

*Id.* at 2721.

### c.

Elmore's forensic experts gave testimony tending to cast doubt on the SLED agents' assertion that they had recovered the forty-five damning pubic hairs from Mrs. Edwards's bed.[16]

---

[16]Significantly, Elmore has conceded that the hairs are his. Nevertheless, he maintains that, rather than being recovered from the bed during the

The expert testimony focused on, inter alia, the agents' account of simply picking up the hairs and placing them in an evidence bag, without first taking a single photograph of the hairs and without discerning any need to collect the bedcovers and sheets to examine them for further evidence. For example, Hayward R. Starling, a self-employed forensic scientist with nearly thirty-eight years of experience working for the North Carolina State Bureau of Investigation, testified that "if [he] had found hair on that bed," he "would have followed the rule that is standard procedure in criminal investigation, which would call for photographing of [the] bed in its original state as it was found." J.A. 1949; *see also id.* at 2138 (testimony of Rodger Morrison, head of the serology section of the Huntsville regional laboratory of the Alabama Department of Forensic Sciences, that "the general procedure" involved photographing the hair before it was collected); *id.* at 2930 (Vincent Scalise's testimony that the hair "should have been photographed before [it] was collected showing [it] in the exact location where it was noted or first observed").

---

crime scene investigation, the hairs were probably among those obtained from him shortly after his arrest. *See, e.g.*, J.A. 532-33 (1984 trial testimony of Elmore that hairs were "yanked" from his head and pubic area while he was being detained at the Greenwood Law Enforcement Center); 1984 Trial Tr. 644-45 (testimony of James T. Coursey of the Greenwood City Police Department that he combed and plucked Elmore's pubic hairs); *id.* at 646-47 (testimony of SLED's Thomas W. Henderson, Jr., that he was present when Coursey obtained the hairs from Elmore). That theory is consistent with the conspicuous omission of any reference to the hairs in Coursey's affidavit in support of the arrest warrant. According to the SLED investigators, by the time the warrant was secured, they had recovered the hairs from Mrs. Edwards's bed, determined that the hairs were of Negroid origin with an unusual reddish cast, and reported their findings to the local police. Moreover, the record indicates that the local police were aware prior to Elmore's arrest that he had red hair. Even so, the hairs appear nowhere in Coursey's affidavit outlining the evidence against Elmore; rather, the affidavit relies solely on the existence of Elmore's thumbprint on the exterior frame of the back door into the Edwards home.

Those expert witnesses also emphatically agreed that, to conform with standard procedures, the SLED agents should have collected the bedcovers and sheets. *See, e.g.,* J.A. 1949 (Starling's testimony that "I would have recovered the bed-sheets, the bed covers upon which the hairs were found, in the original state and delivered it to the lab, where it could have been appropriately examined"); *id.* at 2137 (Morrison's testimony that "[y]ou always collect the bed linens"); *id.* at 2925 (Scalise's testimony that "you most definitely would have collected and safeguarded the sheets and any other coverlets that were on the bed"). As Morrison explained, "[i]f you thought the hairs which you found . . . were of importance, then you would also want to collect the bed linens as well and look for additional hairs, look for additional fibers, semen stains, bloodstains, all these kinds of things, things which aren't obvious on the crime scene itself." *Id.* at 2137-38; *see also id.* at 1950 (Starling's testimony that "the hairs would have drawn my attention to the fact that there might be some other type of evidence on the sheets, such as seminal stains or other body fluids"); *id.* at 2925 (Scalise's testimony that "[a]nything on the bed should have been collected . . . and brought back for analysis," including testing for "traces of blood" and "possible sperm, saliva or any evidence, physical evidence, of that nature").

Additionally, Elmore's experts related that — if, as the State alleged, Elmore first inflicted bloody injuries on Mrs. Edwards in the kitchen before raping her on the bed — they would "have expected to find some blood evidence on that bed." J.A. 2014 (testimony of Starling); *see also id.* at 2136-37 (Morrison's testimony that "[a]ssuming that . . . the assault . . . originated in the kitchen and the victim is bleeding at that point, which all evidence indicates that, if an assault took place on the bed, you would expect to find bloodstains there as well"); *id.* at 2927 (Scalise's testimony that, "[i]f the assault had occurred on the bed," he "of course" would have expected to find blood there).[17] Starling also identified another

---

[17]Dr. Jonathan Arden provided further testimony undermining the State's theory that Elmore had raped Mrs. Edwards on the bed. According

incongruity between the evidence and the State's theory of the case. Asked "[i]f the victim had reached out and grabbed fifty hairs of the assailant, yanked those hairs out physically by force, would you expect to find some evidence of those hairs under the fingernails or on the hands of the victim," Starling responded that "[y]es, I would." *Id.* at 2019. According to the SLED investigation report, however, "the only hairs that were found on the hands of the victim was head hair from the victim herself." *Id.* at 2020.

Like Elmore's expert witnesses, the SLED agent who allegedly discovered the pubic hairs — Ira Byrd Parnell, Jr. — deemed the large number of hairs found on the bed (a total of forty-nine) to be "a highly unusual circumstance" and "a vastly greater number of hairs than is usually present at most crime scenes." J.A. 2745 (testimony of Parnell); *see also id.* at 2014-15 (Starling's testimony that "[y]ou don't find fifty hairs on a bed, or at least I have never found fifty. I have never heard of anyone who's found fifty, and I consider it most unlikely that you would find fifty hairs, even if you're combining the hairs of a victim and a perpetrator"); *id.* at

---

to Dr. Arden, the autopsy evidence indicated "that no sexual assault was perpetrated upon [Mrs. Edwards's] live body." J.A. 2220-21. As Dr. Arden explained, the only evidence of sexual assault were two abrasions found in Mrs. Edwards's vagina; there was no indication, for example, of any semen in the body. *See id.* 2218-19. Dr. Arden reviewed a photograph of the larger abrasion and found it to be not only "a postmortem injury," but also "very consistent with the bottle tongs." *Id.* at 2219 (explaining that, although he could not "say with certainty that the bottle tongs caused [the abrasion]," it was "entirely consistent with and suggestive of bottle tongs, especially given the other injuries on the body which are also consistent with that instrument"). There was no clear photograph of the smaller abrasion, but other relevant autopsy findings were consistent with Dr. Arden's opinion that there was no sexual assault on Mrs. Edwards while she was still alive. *See id.* at 2220-21. In her testimony, by contrast, Dr. Sandra Conradi reiterated her conclusion that the abrasions were antemortem injuries that "[c]ould have been caused by an erect penis," though she acknowledged that "the tongs may have been used." *Id.* at 2672.

2926 (Scalise's testimony that "I have investigated many, many homicides, but I have never heard of 45 to 50 hairs being recovered particularly in one location, no, absolutely not"); *id.* at 2088 (testimony of Skip Palenik, a self-employed analytical microscopist with a laboratory in Illinois, "that the finding of this many hairs was quite unusual, in my experience. In fact, I [have] never encountered a situation like that, with that many pulled hairs").

Parnell nevertheless insisted that the hairs were in fact recovered from Mrs. Edwards's bed. He could not recall precisely when in the crime scene investigation that he first spotted the hairs, but surmised that it was "[p]robably later on during the investigation." J.A. 1469. Parnell elaborated that "[i]t's also possible too that the sheet being in the crumpled condition, they had that particular view of the surface of the bed somewhat obscured. I mean, I could see the bed, I could see the sheet, but without getting in the proper position, it's possible that I didn't see the hairs interspersed among the covers on the top without closer examination." *Id.* Parnell could not recall whether further photographs were taken in the bedroom after he found the hairs, but he acknowledged that it was "very possible" that "most of the photographs had [already] been taken," given that, "probably, this examination of the surface of the bed would have been later in the investigation," with analysis of "the area around Ms. Edwards's body" taking precedence. *Id.* at 1470.

With regard to his failure to take a single photograph of the hairs on the bed, Parnell explained on direct examination by the State that "it was an oversight on my part." J.A. 2740. The nonexistent photograph was, unsurprisingly, the subject of cross-examination by Elmore's counsel:

> Q: Now, when you saw this indentation and the hair, did it occur that maybe something had happened on that bed related to the crime scene?

A: Yes, sir, that was my thinking at the time.

Q: And that would be a fairly significant thing, would it not?

A: Yes, sir.

Q: And can you think of any reason why you wouldn't have photographed that indentation?

A: I've thought about it many times, and the only thin[g] I can think is, as I said, I shot picture[s] of everywhere coming in and to the side and everywhere else. I simply just did not get one of the top of the bed.

Q: Wouldn't it be fair to say that every other piece of evidence that was collected from that crime scene was photographed?

A: That's correct.

Q: It was the only thing that wasn't photographed?

A: Yes, sir.

Q: And there were even photographs taken in other rooms where there was no evidence of a struggle at all?

A: That's correct.

Q: Photographs of the bed in the other room?

A: Yes, sir.

Q: There was no struggle in there?

A:  whatsoever that I could tell.

*Id.* at 2747-48.

According to Parnell, he pointed out the hairs to his SLED colleague, Frank Dan DeFreese; Parnell could not recall whether he shared his discovery with any of the other police officers on the scene, and no other officer is on record as having seen the hairs. *See* J.A. 2740 (testimony of Parnell); *see also id.* at 2766 (DeFreese's testimony that "I saw [Parnell] recover at least some of [the hairs]. I may not have been in the bedroom the entire time he was removing the hairs, but I saw the hairs present there"). Asked on direct examination "[w]hy did you not [seize the bedcovers and sheets], if you know," Parnell responded:

> After recovering all the hairs that were on the top sheet or visible on the top sheet, we further inspected the bedding. There were no more hairs present on the top cover at all. At that point we visually examined the sheet and bedding. There were no obvious blood or other stains present, so at that time we apparently made the decision not to recover these since there was apparently nothing of evidentiary value to them.

*Id.* at 2744. That testimony prompted the following line of questioning from Elmore's counsel:

Q:  Is it conceivable that a microscopic or chemical examination might have revealed something on the sheets that you didn't see?

A:  I saw nothing else that could have been examined.

Q:  And you felt comfortable making that decision on your own at the crime scene?

A:  Sure did.

Q:  And was it your practice at the time, when you saw something like this, to just leave it at the crime scene and not take it in?

A:  If I saw nothing of evidential value on it to collect, then I would leave it.

Q:  Even if you thought that there had been a sexual assault that occurred on top of these sheets and even if you thought that there was this hair that had some value, you still wouldn't collect the sheets?

A:  I saw the hair. I got the hair. I got all the hairs that were on it.

Q:  I'm asking you about the sheets?

A:  I understand. We examined the sheets visually. . . . It's very possible we might have examined it under the ultraviolet light at the crime scene. At any rate, we determined at that time, Lieutenant DeFreese and myself, there was nothing further of evidential value to be gained from these covers, so we left them there.

*Id.* at 2757-58; *see also id.* at 2766 (testimony of DeFreese, when asked "[w]ould you have recommended, based on what you saw at that crime scene, that that sheet be carried back to SLED [headquarters] for further analysis," that "[i]n 1982 I may not have recommended it").

Once the hairs were removed from the bed, according to Parnell's account, they were placed in a plastic zip-lock bag and delivered to Earl Wells at SLED headquarters for analysis. *See* J.A. 2748-49. On cross-examination of Parnell,

Elmore's counsel pointed out that the hairs were packaged differently than other evidence — that is, Parnell wrote directly on the plastic bag containing the hair, while other items of evidence were consistently affixed with distinctive SLED labels initialed by the agents. *See id.* at 2753 (noting, after drawing Parnell's attention to various items, that "they all have a SLED label on them initialed by either you or Mr. DeFreese, or more often than not it's initialed by both of you"). Parnell testified in that regard as follows:

> Q:  But you can't recall why it was that this one particular exhibit, the zip-lock bag of hair, didn't have one of those labels on it?
>
> A:  Are you talking about the physical label itself?
>
> Q:  Yes. It didn't have a label like the other exhibits. It just had some handwriting on the outside of a plastic bag?
>
> A:  It was something I could write on, as opposed to writing on something else that would possibly mess up a fingerprint or whatever might have been on it.
>
> Q:  Well, all these exhibits were in plastic bags, so they all could have been written on, but the others see[m] to be labeled. . . . .
>
> * * *
>
> So is there any particular reason why this exhibit wasn't treated the same way, that you can recall?
>
> A:  None that I recall. I recovered it and wrote everything else on it and initialed it myself.

*Id.* at 2754-55.[18]

In his PCR testimony, SLED hair analyst Wells recalled that the hair "was presented to me in a clear bag, a plastic baggie container." J.A. 2799-2800. When asked whether the bag "had any of this writing [Parnell's initials] on it when it came to you," Wells responded that, "[w]hen it was first submitted to me, it would not have had any writing on it. It would have been in a clear bag, to my knowledge." *Id.* at 2800. Wells also acknowledged that, although he had testified at the 1984 trial that forty-five of the hairs allegedly recovered from Mrs. Edwards's bed were Negroid pubic hairs consistent with Elmore, he had actually mounted only "a representative sample" of those hairs on slides for microscopic comparison with Elmore's known hairs. *Id.* at 2789. Wells could not remember how many of the forty-five hairs were mounted on slides or how many slides were used; he estimated that "[t]here could have been two, three, four, five [slides]," each mounted with "multiple hairs [or] single hairs." *Id.* at 2801. Wells insisted that those "slides existed at one time," and that he had turned them over to the court for Elmore's 1982 trial, but neither the slides nor any written record of them could be located during the PCR proceedings. *See id.* at 2789, 2801.

### d.

With respect to the blood evidence, Elmore presented not only expert witnesses, but also his former girlfriend, Mary Alice Dunlap (now Harris). *See* J.A. 1896. During the state PCR proceedings, Dunlap was asked — for the first time on the record — whether she had noticed blood on Elmore's

---

[18]Elmore's appellate brief mentions a second item of evidence, in addition to the hairs allegedly found on Mrs. Edwards's bed, packaged differently than other evidence: "a piece of bloody carpet." Br. of Appellant 9 (citing J.A. 2755). Notably, however, while the cited portion of Parnell's testimony includes discussion of "bloody carpet," it does not include any reference to the carpet being uniquely packaged. *See* J.A. 2755.

button-front shirt when he came to her apartment after allegedly murdering Mrs. Edwards on the night of Saturday, January 16, 1982. As Dunlap described the scene, she and Elmore were inside her apartment, with the lights on, and "[h]e was like maybe three feet[ ] away from me. I saw him real good." *Id.* at 1897. Elmore "was wearing a white shirt that night," and Dunlap "didn't notice anything on his shirt." *Id.* at 1898. When asked if she was confident that she would have noticed blood on the shirt, Dunlap responded, "Yes," in that Elmore "was only three feet away from me at all times," and she certainly would have seen "red blood" on "a white shirt." *Id.* Dunlap also recalled, consistent with her 1984 trial testimony, that Elmore had "started unbuttoning his shirt and then he just ripped it off," after which Dunlap "threw [the shirt] away." *Id.* at 1903. Dunlap explained why she did so (something she had not been asked during the trial): "I didn't want his clothes in my apartment." *Id.*[19]

Elmore's forensic experts agreed that the lack of visible blood on the shirt was significant, especially given other evidence that Mrs. Edwards's murderer carried her body to the closet. Serology specialist Rodger Morrison described crime scene photographs taken in an area of the bedroom near the closet showing a "large puddle or pool of blood" on the floor and bloodstains on the adjacent wall, as well as photographs of Mrs. Edwards's body reflecting that her clothing and hair were "saturated with blood." J.A. 2133-34. According to Morrison, it was "obvious from these photographs" that Mrs. Edwards had "void[ed a] volume of blood" while positioned against the wall on the bedroom floor, yet there was "no trail" between the pool of blood and the closet, indicating that she was subsequently "picked up and placed in the closet." *Id.* at 2134; *see also id.* at 1958-59 (similar testimony of Hayward Starling).

---

[19]Dunlap was not asked during the state PCR proceedings whether she saw blood on Elmore's other clothing, including his undershirt, coat, pants, or shoes. She did not otherwise testify to noticing blood anywhere on Elmore.

Explaining the significance of the blood evidence, Morrison testified that — because Mrs. Edwards (at approximately 130 pounds) and Elmore (about 145 pounds) were "nearly equal in size in terms of weight" — Elmore would have been required to cradle Mrs. Edwards's "thoroughly blood soaked and slippery" body against his own in order to carry it to the closet. J.A. 2135. "[I]n so doing," Morrison explained, Elmore would have gotten "blood all over [him]" from Mrs. Edwards's body, "if [he had not] already gotten blood all over [him] from [causing her] injuries." *Id.*; *see also id.* at 1961 (testimony of Starling acknowledging that it was possible, but improbable, that Elmore could have carried the bloody body to the closet without getting any blood on his white shirt and without picking up more blood than that found on his pants). In its cross-examinations of Starling and Morrison, the State suggested a reason for the lack of more blood on Elmore's clothing: that the pants were pulled down or off at the time Elmore brutalized Mrs. Edwards and carried her to the closet, and that he was not wearing the white shirt at the crime scene. *See, e.g., id.* at 2000 (seeking for Starling to agree that, "assum[ing] based on the facts of this case that pubic hair was pulled[, c]an we not also assume that the individual from whom the hair [was] pulled possibly did not have his pants on"); *id.* at 2154-55 (eliciting from Morrison that, if Elmore was the murderer, the lack of blood on his shirt may have indicated that "he didn't have the shirt on at the time of the bloody assault").

In any event, Elmore's experts identified other aspects of the blood evidence casting doubt on the State's theory of the case. For example, Morrison testified that — if it were assumed that the Type A blood found on Elmore's pants and left shoe belonged to Mrs. Edwards and had been transferred to Elmore during the crimes — it should also be assumed that the Type B blood on Elmore's coat and pants was his own blood and had "been placed there at the same time." J.A. 2139. Indeed, Morrison observed that it was "a very common occurrence" for the perpetrator of a violent assault to bleed at

the crime scene, "particularly in situations [like Mrs. Edwards's murder] where you have multiple stab wounds." *Id.* Notably, however, no Type B blood was found in the Edwards home. *See id.* at 2140.

Additionally, there were no traces of blood of any type in the car that Elmore was driving on the night the crimes allegedly occurred. Vincent Scalise testified that, if Elmore was the perpetrator and thus had left the bloody footprints found at the scene, Scalise "would have definitely expected to find some traces of blood" in Elmore's car. J.A. 2922-23.[20] For his part, Morrison noted that the small amount of blood on Elmore's clothing was likely insufficient to result in a clothing-to-car transfer of blood. *See id.* at 2158. Of course, Morrison was also of the opinion that, if Elmore had perpetrated the crimes against Mrs. Edwards, he would have been covered in blood. In those circumstances, Morrison explained, "there would be quite a bit of blood on [Elmore] that could be transferred to the automobile." *Id.*

Written records reflect that blood evidence recovered from the crime scene was delivered to the SLED laboratory on January 19, 1982, the day after Mrs. Edwards's body was found. *See* J.A. 1780. Elmore's shoes — which he had been wearing at the time of his arrest on January 20, 1982, and which had been the subject of questioning that morning by SLED's Thomas W. Henderson, Jr. — were among additional evidence received in the laboratory later that day. *See id.* at 1781. Also on January 20, 1982, the laboratory separately received Elmore's coat and pants from Gary Vanlerberghe of the Greenwood City Police Department, whose officers had

---

[20]With regard to the bloody footprints, Scalise further testified that neither of those prints was identifiable. *See* J.A. 2915 (footprint in carport); *id.* at 2921 (footprint in carpeted dining room); *cf. supra* note 10 (relaying defense lawyer John F. Beasley's suggestion in closing argument that footprints were identifiable and, thus, lack of match to Elmore was significant).

seized those items during that day's search of the home of Elmore's mother. *See id.* at 1785, 2615. Finally, on January 22, 1982, Henderson submitted the vacuum bag samples collected from Elmore's car. *See id.* at 1787.

The SLED laboratory record of Elmore's coat and pants indicates that the blood analysis of those items was completed on February 19, 1982, by serologist John C. Barron. *See J.A.* 1785-86. That record also contains an ambiguous notation that, on February 3, 1982, there had been a "return[ ]" of the coat and pants between Henderson and another SLED agent, Patsy Habben, who worked in the laboratory. *Id.* at 1786. Elmore's PCR counsel interpreted the notation to mean that Henderson had removed the coat and pants from the laboratory sometime prior to February 3, 1982, exposing those items to tampering; Henderson then returned the coat and pants to the laboratory on February 3, two weeks prior to Barron's blood analysis. *See id.* at 2629. Barron testified, however, that he "would interpret [the notation] as saying Agent Patsy Habben . . . returned [the coat and pants] to Tom Henderson on that date." *Id.* Additionally, Barron explained that, before the coat and pants were handed over to Henderson, "[t]he stains would have been removed" from them for the later blood analysis. *Id.* at 2631. Barron qualified his testimony as follows: "I can interpret what I believe [the notation] means, but either Mr. Henderson or Ms. Habben would have to say exactly what it means." *Id.* at 2633. It does not appear from the record, however, that Henderson or Habben gave chain-of-custody evidence about the coat and pants.

e.

Elmore's expert witnesses also criticized numerous aspects of the handling of fingerprint evidence by the SLED team, such as the investigators' failure to compare prints found in the Edwards home with the known prints of anyone other than Mrs. Edwards and Elmore. In seeking relief from his convictions, Elmore has principally relied on the existence of the

identifiable print lifted from the blood-smeared toilet in Mrs. Edwards's en suite bathroom — a print that has been matched to neither Mrs. Edwards nor Elmore. The print, consisting of two fingertips, was found on the underside of the toilet seat and designated "E-5" on the written report of SLED fingerprint analyst Frank Dan DeFreese.

According to his report, DeFreese lifted eight prints from the Edwards home. *See* J.A. 1772; *see also supra* note 8 (relaying DeFreese's 1982 trial testimony that few fingerprints were found because "'Mrs. Edwards, or whoever kept her house, was a very meticulous housekeeper'" (quoting J.A. 83)). DeFreese's report indicates that only three of the eight prints were identifiable, i.e., Elmore's thumbprint on the exterior frame of the back door, Mrs. Edwards's thumbprint on the swinging door between the kitchen and dining room, and Mrs. Edwards's palm print on top of the toilet tank in her en suite bathroom. *See* J.A. 1772 (reflecting that five prints, including E-5, "were found to contain insufficient ridge detail for comparison"). DeFreese required a minimum of ten points of comparison to identify a print. *See id.* at 2773.

During Elmore's PCR proceedings, however, Hayward Starling testified that one of the two E-5 fingertips was identifiable, with an estimated fifteen points of comparison. *See* J.A. 1977 (explaining that there were "probably fifteen" points of comparison, but "I did not count"). Starling excluded Elmore as the source of the E-5 print, but was not able to compare it to Mrs. Edwards because he did not have access to prints of her fingertips. *See id.* at 1980 (observing that Mrs. Edwards's postmortem "prints were taken obviously under difficult circumstances and did not include the tips of the fingers, which the [E-5] print represented"). Vincent Scalise indicated that both of the E-5 fingertips were identifiable, but he was not asked to duplicate Starling's work comparing the E-5 print to Elmore and obviously could not compare the print to Mrs. Edwards. *See id.* at 2904, 2966.

When shown the E-5 print during the state PCR court's evidentiary hearing and asked by Elmore's counsel whether he saw "ten points of possible comparison," SLED's DeFreese responded:

> Only by using the greatest amount of imagination. I don't see in either one of these [fingertips] ten really good points. If you wanted to imagine some things being there, I suppose you could get ten.

J.A. 2777. Immediately thereafter, the following exchange ensued between DeFreese and the lawyer for Elmore:

Q:  Now, with respect to . . . the prints taken at the toilet that we just looked at, did you perform any comparison of those prints with the prints of Mr. Elmore?

A:  Yes, sir.

Q:  How do you know that?

A:  Because a set of known fingerprint[s] are submitted for comparison. That set of known fingerprints is compared with all of the evidence specimens . . . submitted in a particular case.

Q:  Well, if you had compared these prints with Mr. Elmore's prints and found that they matched, would you have recorded that in your report?

A:  I would have.

Q:  Well, then if you compared these prints and found that they didn't match, why wasn't that recorded in your report?

A:  Either it was improperly recorded by me or someone else, or . . . I could not absolutely

eliminate the possibility that Mr. Elmore con-
tributed to it.

Q:   I would ask the same question with respect to
     the victim. Would you have examined these
     prints to determine whether or not they matched
     the known prints of the victim?

A:   I would have.

Q:   And if you had found they matched the known
     prints of the victim, would you have recorded
     that in your report?

A:   I would have.

Q:   And again, the same question. If you didn't find
     that they matched the known prints of the vic-
     tim, was that something that you would have
     considered significant?

A:   Yes, sir, it would be significant.

Q:   And following proper procedure, then, that
     should have been recorded in your report as
     well?

A:   Yes, sir, it should have been. If that were the
     case, it should have been.

*Id.* at 2777-79. On redirect examination, the State elicited the
following testimony from DeFreese:

Q:   Mr. DeFreese, you didn't find that these prints
     matched?

A:   I'm sorry, sir?

Q:   You didn't find that the prints matched the vic-
     tim or the defendant that you have been discuss-
     ing, is that correct?

A:   I'm not sure I follow your question. I didn't
     find —

Q:   These particular exhibits that you have not
     identified previously as being favorably com-
     pared to the defendant or the victim?

A:   Right, I did not find that they matched the
     defendant or the victim, no sir.

Q:   Okay. And would you state that finding
     matches with a defendant — are you conserva-
     tive in making those determinations?

A:   I am, sir.

Q:   All right, sir. And that there are sometimes
     matches that other folks can make to a particu-
     lar suspect in a criminal case that you may not
     be willing to make, is that correct?

A:   That's true.

*Id.* at 2779-80. Elmore's lawyer then resumed his cross-
examination of DeFreese:

Q:   I'm not sure I understood your last answer. Is
     there any doubt in your mind at all that these
     are not Mr. Elmore's prints?

A:   If I had found Mr. Elmore's prints there, I
     would have said so.

*Id.* at 2780-81. Counsel for Elmore interpreted DeFreese's
testimony to be that, despite his claim that the E-5 print was

unidentifiable, he compared E-5 to Mrs. Edwards and Elmore, excluded both of them as the print's source, and improperly failed to report those findings (though he most certainly would have reported any match, particularly to Elmore).

In addition to seeking relief premised on the E-5 print, Elmore also developed evidence concerning three prints lifted from the exterior frame of the back door into the Edwards home: the thumbprint matched to Elmore ("E-2"), plus two prints that appeared to have been made by palms ("E-1" and "E-3"). Although DeFreese had reported the E-1 and E-3 palm prints to be unidentifiable in 1982, he agreed with the assessments of Starling and Scalise during the PCR proceedings that at least one of those prints contained more than ten points of comparison. *See* J.A. 1974 (Starling's testimony that both prints were identifiable and that neither matched Elmore); *id.* at 2895-96 (Scalise's testimony that E-1 and E-3 contained "[m]ore than sufficient" ridge detail and were "very clear prints"); *id.* at 2774-75 (DeFreese's testimony that one of the prints was identifiable). DeFreese acknowledged that "evidently I was incorrect" in previously reporting that both E-1 and E-3 were unidentifiable. *Id.* at 2775.

As for the E-2 thumbprint, Starling and Scalise confirmed that the print was made by Elmore. Nonetheless, Scalise rejected the notion — advanced by DeFreese and four Greenwood city police officers during Elmore's 1984 trial — that the "freshness" of the print could be ascertained. *See* J.A. 2880 (Scalise's testimony that "it is well documented there is absolutely no way to determine the age of the latent fingerprint and when it was placed on the given subject"). Moreover, addressing the 1984 testimony of the four city officers that the print was visible to the naked eye, Scalise observed that the print's visibility indicated "that it was a permanent print" and, thus, "could have been there for an indefinite period of time." *Id.* at 2889.

Scalise also revealed information about Elmore's thumbprint not shared with the 1984 jury: The print was upside-

down and wrapped around the door frame. *See* J.A. 2885-86, 2960-62. As such, Scalise testified, the print was consistent with someone washing windows and the door. *See id.* at 2887 (explaining that a turned hand was "consistent with someone who was supporting their weight with that hand" while performing chores); *id.* at 2962 (observing that, while working around the door, Elmore's "finger would have been on that particular spot for an extended period of time, and the pressure may have brought it around" the frame). By contrast, the print's position was "not really consistent with someone walking up to the door and placing a lone solitary print there." *Id.* at 2886. Scalise elaborated that "[i]t would be sort of difficult to turn the hand around to walk through the doorway. It wouldn't be the normal way that you would enter the door." *Id.* at 2887. Similarly, with respect to the print being wrapped around the door frame, "[i]t would not be consistent with just the touching [of the door frame. I]f the area was just touched, I see no reason that the finger would wrap around." *Id.* at 2962.

2.

During the state PCR court's evidentiary hearing, James Gilliam recanted his prior testimony — given at Elmore's 1982, 1984, and 1987 trials — that Elmore had approached him in a common area of the Greenwood jail in early April 1982 and spontaneously confessed to murdering Mrs. Edwards. Gilliam made his recantation after the state PCR court advised him of the South Carolina statute criminalizing the act of perjury. *See* J.A. 1904-05. According to Gilliam's recantation, he had falsely testified to the confession in response to a proposition from jail administrator Arlie Capps — that proposition being to the effect of, "'You help me out on the Elmore thing, we'll look after you.'" *Id.* at 1910. Gilliam understood Capps to be asking for "[i]nformation," i.e., "to get [Elmore] to talk." *Id.* at 1907, 1911. On direct examination by Elmore's PCR counsel, Gilliam averred as follows:

Q: Did Mr. Elmore tell you anything?

A: No. Mr. Elmore — only thing Mr. Elmore told me was he didn't do it.

Q: Did Mr. Elmore say, "If you have sex with a woman and wash it off, can they tell"?

A: No, he didn't.

Q: Did Mr. Elmore say, "They won't find any fingerprints, because I wiped them down"?

A: No, he didn't.

Q: Did Mr. Elmore say, "I didn't mean to kill her, but she started screaming, so I had to"?

A: No, he didn't.

Q: Did you testify in 1982 and 1984 and 1987 that he did?

A: Yes, I did.

Q: But today you're telling this court that's not true?

A: I'm telling this court the whole truth.

Q: In fact, the only thing that Mr. Elmore ever told you was what?

A: That he didn't do it.

*Id.* at 1908-09. Gilliam explained that his trial testimony "started worrying [him] in 1988," so he told a pastor (a Pastor Spearman) and then a trusted local lawyer (Rauch Wise) that

he had lied about Elmore's confession. *Id.* at 1909. Gilliam also confided in his wife. *See id.* at 1920.

Gilliam's recantation was corroborated by lawyer Wise, who had represented Gilliam in 1981 on a state charge of receiving stolen goods. Wise also had advised one of Elmore's court-appointed lawyers, Billy Garrett, during the February 1987 sentencing-phase-only trial "about some trial techniques and so forth." J.A. 2178-79 (explaining that Garrett "had never tried a death penalty case, and I had tried two at that time"). Wise had unsuccessfully sought to locate Gilliam on Garrett's behalf for an interview prior to Elmore's 1987 trial. *See id.* at 2181. According to Wise, in May 1987 (rather than 1988), following Elmore's trial, Gilliam told Wise "that he had lied in the Elmore trial" and "felt it was time to come clean." *Id.* at 2173, 2174. Wise shared that information with Elmore's state appeals lawyer, David Bruck, and also was involved in taking a June 1987 videotaped statement from Gilliam again admitting "that he had lied about what Elmore had said to him and he did it to get himself out of some trouble." *Id.* at 2176.[21]

On cross-examination by the State during the PCR proceedings, Gilliam testified that he had lied "to try to benefit [him]self." J.A. 1911. Gilliam elaborated that, at the time of each of Elmore's three trials, he was either incarcerated or residing in Greenwood, and "you're dealing with pretty powerful people in Greenwood County. They can help you out with things." *Id.*; *see also id.* at 1920 (explaining on redirect examination that he did not come forward after the first trial because he "was still living in Greenwood County," and "that's a reason to be afraid"). Four other men who had been incarcerated with Elmore in April 1982 testified that they also had been approached by law enforcement officials and asked

---

[21]As best as Bruck could later recall, Gilliam's recantation was not raised on direct appeal from the 1987 death sentence because it was an issue better suited to a PCR application. *See* J.A. 3072I.

for information on Elmore. Capps, however, firmly denied that he ever communicated with Gilliam or any other jail inmate "concerning developing information about" Elmore. *Id.* at 2382.

3.

Dr. Jonathan Venn, a clinical psychologist employed by the South Carolina Department of Juvenile Justice, testified at the state PCR court's evidentiary hearing with regard to his evaluation of Elmore for the purpose of "arriv[ing] at an opinion . . . about his mental abilities for his defense." J.A. 2357. Dr. Venn opined, inter alia, that Elmore is "an individual who operates at a very low level of intelligence. He has a lot of difficulty solving problems, remembering, and figuring things out." *Id.* at 2362.[22] Dr. Venn also acknowledged that he had been requested by Elmore's PCR counsel to focus on the trial testimony of SLED's Thomas W. Henderson, Jr., recounting Elmore's statement on the day of his arrest to the effect of "'If I killed her, I don't remember it.'" *Id.* at 2363-64. According to Dr. Venn, because Elmore was "probably accustomed to making excuses about his memory," and because "he's not good at using words to express himself," that statement "does not imply anything about his guilt or innocence." *Id.* at 2364-65.

Dr. Venn further opined that Elmore's initial statements to the police that he did not know Mrs. Edwards were "typical of a person of Mr. Elmore's memory problems." J.A. 2377. Pressed by the State to address Elmore's subsequent acknowledgment that he did know Mrs. Edwards, Dr. Venn testified:

---

[22]Notably, Dr. Venn disclaimed the notion that Elmore is mentally retarded, but had not been requested to evaluate Elmore for mental retardation. *See* J.A. 2362 (testimony of Dr. Venn that "Mr. Elmore is not mentally retarded, but he's just a notch above being mentally retarded"). Of course, the state PCR court has since recognized that Elmore is mentally retarded and, thus, ineligible for execution.

I believe the way the [trial] testimony reads is that once it was explained to [Elmore] who [Mrs. Edwards] was, that he did identify her. She was one of perhaps a hundred clients of his, someone he had not been working for very long, only in November and December, and he has a lot of memory problems. He's not good at remembering names.

*Id.* The State established, however, that Dr. Venn had never before encountered such a circumstance in his regular work with juveniles, which did not involve memory deficit evaluations. *Id.* at 2368, 2377.

4.

Finally, the state PCR court received testimony from various lawyers who had represented Elmore in his trials and direct appeals — most significantly, Geddes D. Anderson, the part-time Greenwood County Public Defender who had led the defense in the 1982 and 1984 trials (and also represented Elmore in the sentencing-phase-only trial in 1987). In describing his preparation of the case, Anderson testified:

Unlike so many other defendants, the hundreds that I have represented, Edward Lee Elmore — it's just so peculiar. He is so courteous and polite and [at] the same time reticent. He never — Edward Lee Elmore never really gave to me a lot to work with. I just can't keep but telling you that. He's not a stereotyp[ical] kind of defendant that you normally — that is yelling and screaming, "I didn't do it, I didn't do it, I didn't do it, here's what happened," and going through all of the histrionics that so many defendants will go through. This man was not like that, and it was very difficult to represent him. He was not the kind of person who would step forward and state his position. . . . [T]hat's one reason I never believed, to be perfectly honest, never believed James Gilliam

[that Elmore had approached Gilliam in the Green-
wood jail and spontaneously confessed to murdering
Mrs. Edwards]. [Elmore] wouldn't say it to anybody,
even the lawyers, in terms of articulating what spe-
cifically happened that night . . . .

J.A. 2415. Anderson acknowledged that, rather than convinc-
ing him of Elmore's innocence, Elmore's quiet demeanor "led
[Anderson] to believe . . . that perhaps [Elmore] might have
been present [in the Edwards home at the time of Mrs.
Edwards's murder]." *Id.* at 2415-16.

Anderson further intimated that he believed Elmore to be
guilty when questioned about whether Elmore's race might
have been a factor in the prosecution:

> A:   . . . I never did perceive it, that they had singled
>       out Mr. Elmore. I think legitimately they
>       focused in on a suspect and had, in my judg-
>       ment, ample evidence at the time. I perceived
>       that.
>
>                            * * *
>
> Q:   And at the penalty phase were you concerned
>       that again race might be a factor in the case
>       against Mr. Elmore?
>
> A:   I would probably answer that question simi-
>       larly, as I did in the guilt phase. . . . [H]ad the
>       evidence been against — in the guilt phase —
>       been against a white gentleman, same age and
>       same characteristics as Mr. Elmore, whatever, I
>       don't think the jury would have held back
>       because he was white in the penalty phase. I
>       can't conceive of that. This case, to me, my
>       own personal opinion, never had the character-
>       istics of racial rancor. It was just a situation in

my mind, that some person, some perpetrator
saw an opportunity to break in and commit
homicide.

J.A. 2480-81.

Consistent with his acceptance of the "ample evidence"
against Elmore of a plain "break in and . . . homicide," it did
not occur to Anderson that the perpetrator actually may have
been Mrs. Edwards's neighbor, Greenwood County Council-
man Jimmy Holloway. On direct examination by the State,
Anderson testified:

Q: Did you know a Mr. Holloway?

A: I knew him. Being a resident of Greenwood, I
knew Jimmy Holloway. I knew that he lived
over in that area.

Q: Were you aware that Mr. Holloway was the
individual that discovered Mrs. Edwards' body?

A: Yes.

Q: And were you aware of the circumstances con-
cerning his discovery that morning?

A: You know, I had forgotten that he had gone
over there and come back. I had forgotten that,
but I knew he was the first person on the scene,
yes.

Q: All right, sir. Did you consider investigating
Mr. Holloway as a possible suspect?

A: Never had it in my mind.

Q: Why would that be?

A:    Well, it's just human nature on my part, know-
      ing the man that — that never entered my mind.

Q:    Did you have any indication that he was some-
      how involved in this?

A:    It never entered my mind. To be perfectly hon-
      est, I think it's ludicrous to think he was
      involved in any way. Just knowing him.

Q:    All right, sir. Did you speak with him other than
      through his trial testimony?

A:    Just — in fact, I never — to answer your ques-
      tion, I never interviewed him about anything
      about the case. I was confident in my own mind
      that he had certainly no involvement whatso-
      ever. I might have spoken to him in and around
      the courthouse, but no formal interview or no
      effort on my part to specifically direct an effort
      to find out any information in terms of investi-
      gating Mr. Holloway as a possible suspect. That
      never entered my mind.

J.A. 2412-13.

Anderson barely contemplated that the crimes may have occurred sometime other than the night of Saturday, January 16, 1982. *See* J.A. 2417 (Anderson's testimony that "I think basically in my approach to the case I more or less zeroed in or condescended [sic], or ever what you want to say, that perhaps [the murder] did occur during [the] time frame [alleged by the State]"). Although Anderson knew that Elmore had corroborated alibis for that Sunday and Monday, Anderson said he focused his efforts — unsuccessfully — on establish-ing an alibi for Saturday night, rather than developing evi-dence that the crimes happened later. *See id.* at 2416-17. On cross-examination, Anderson acknowledged listening to part

of Dr. Jonathan Arden's hearing testimony that Mrs. Edwards almost certainly died no earlier than Sunday afternoon. *See id.* at 2464. Anderson then admitted that, "[i]n retrospect, we should have had an expert testify that perhaps [the murder] could have occurred on Sunday afternoon" — a point that Anderson recognized was "very" important to Elmore's defense. *Id.* at 2465. Instead of doing so, Anderson recalled, his co-counsel merely "got [the State's witness, Dr. Sandra Conradi,] to admit that the time of the death could have varied greatly." *Id.* at 2421.

Although he recognized that the Elmore case involved "a who-done-it scenario," Anderson conducted no independent analyses of the State's forensic evidence. *See* J.A. 2417-18 ("Q: Did you do any . . . independent investigation of any of the forensic evidence, the fingerprints, the hair, match-up on the hair?" "A: None."). Moreover, Anderson admitted that he never thought to suspect irregularities in the chain of custody of physical evidence, but he demonstrated no willingness to second-guess that approach, as reflected in the following exchange on direct examination by the State:

> Q:   . . . [D]uring the '82 trial, you stipulated to the chain of custody of the forensic evidence that was introduced into evidence, including the fingerprints, the hair that was recovered at Mrs. Edwards' home, the photographs generally, and other matters which the SLED agents were testifying about. Why did you agree to the chain of custody or stipulate to the chain of custody at that first trial, if you recall?
>
> A:   It was not like a lot of cases where there are going to be gaps in the transfer of evidence from one police officer or one agency to another agency and various sources might put their hands on the evidence. In this case, SLED was called in immediately. I don't think but

maybe one or two officers were in the home. Maybe there were more, but as I understand it, nothing particularly was disturbed, at least from what they said. The SLED team arrived, it was sealed off, and all the evidence gathered at the scene was gathered by SLED personnel and taken directly to Columbia, so there was no transfer or exchange of evidence interagency or from officer to officer.

Q:   Did you inquire of the chain at any time, either with the solicitor or with the agents who came to the home?

A:   I'm sure I inquired, but I think I probably just stood by my opinion that I have respect for the SLED team, and they're the best we have in South Carolina, and I assumed they were not going to contaminate the evidence.

*Id.* at 2423-24. Anderson reiterated on cross-examination that, "because of [his] feeling about SLED" — "that the SLED team was the best in South Carolina and that they would not contaminate the evidence" — he "chose not to make any objection . . . about the chain of custody on any of [the] evidence." *Id.* at 2480.

Anderson also expressed confidence that the prosecution maintained an open file. *See* J.A. 2411-12. When asked on cross-examination whether he "ever [got] a look at the State's exhibits prior to . . . the first day or so of the [1982] trial," Anderson recalled "examining the evidence," likely "a day or two before the trial or something like that." *Id.* at 2466. Anderson was certain that he received a two-page chart prepared by SLED outlining all of the forensic evidence in the case, but he conceded that he had been "remiss" in ascertaining whether all of the evidence was actually available. *Id.* at 2467. Furthermore, Anderson requested to see only the evi-

dence that the State intended to introduce at the 1982 trial. *See id.* at 2468. Thereafter, during the 1984 trial, the State introduced the same evidence offered at the 1982 trial, again with the stipulation of defense counsel. *See id.* at 2479. When asked whether it would "be fair to say that you didn't do anything more in looking at that forensic evidence at the [1984] trial," Anderson responded, "Exactly." *Id.*

As an excuse for his failure to conduct any independent analyses of the forensic evidence, Anderson repeatedly emphasized the scarce state funding available for defense experts. For example, Anderson recalled at one point in his testimony that "I think we had a grand total of two thousand dollars to spend on expert witnesses, and so it goes without saying that those resources were limited." J.A. 2405. According to Anderson, any of the available funds that his defense team sought were used to pay for a mental competency evaluation of Elmore prior to the 1982 trial. *See id.* at 2456-57.

Having listened earlier in the state PCR court's evidentiary hearing to testimony of Elmore's expert witnesses, Anderson conceded that "certainly there are areas that I did not cover [at trial], some of which obviously existed back in those days." J.A. 2407. Nevertheless, Anderson asserted that "I certainly aim toward being competent to cross-examine expert witnesses. . . . I consider myself a lawyer of average intelligence, and the bottom line simply is I did the best I could [for Elmore] with the resources I had." *Id.* While defending his own performance, Anderson also denigrated the integrity of Elmore's PCR witnesses, remarking that "I'm sure they are fine experts, but those of us who are experienced in criminal law know that experts can be paid and you can get the song you want sung if you got the right quarter." *Id.* at 2441.

Elmore's mother was the only person, other than Elmore himself, who Anderson was certain he interviewed prior to the 1982 trial; he thought he also interviewed other witnesses, perhaps including Elmore's girlfriend, Mary Alice Dunlap.

*See* J.A. 2458-60. According to Anderson, in preparing for the second trial in 1984, the sole subject of any new investigation was Elmore's "adaptability to prison life." *Id.* at 2426. "[T]o be perfectly candid," Anderson admitted, "I was probably aiming toward the penalty phase," since at least one of the 1982 jurors apparently had "held out a lengthy period of time" in voting for the death penalty. *Id.* at 2429. Additionally, Anderson conceded that, based on the results of the first trial, he believed Elmore was likely to be found guilty again. *See id.* at 2478.

Anderson indicated on direct examination by the State that much of his preparation for Elmore's 1982 and 1984 trials occurred during the ten-day period prior to each of those trials. *See* J.A. 2440 ("[A]s the public defender, in the first two trials, [I was] clear of any court appearances ten days prior to the trial [under South Carolina law]. I'm thinking that I utilized that."). Even for each of those ten-day periods, however, Anderson could "not say[ ] that I spent every hour of every day preparing for [Elmore's] case. The record might reflect that I may have made a court appearance [in another matter], but I think I utilized that legal time allowance to my best ability." *Id.* at 2442. Anderson's testimony prompted the following exchange on cross-examination by counsel for Elmore:

> Q:   . . . [I]f I understand your testimony correctly, in the short interval, two months, between Mr. Elmore's arrest and the [first] trial, the predominant amount of your preparation would have been done within that ten-day period just prior to the start of the trial?
>
> A:   Probably so.
>
> Q:   And that's because you had too many other distractions you testified to during that earlier time?

A:    I would say that, and I agree with that, but I
      don't want to — I want to make it clear that I
      felt confident — now, in retrospect, maybe
      some things were not done, but I felt that
      [Elmore] got adequate representation from me.

*Id.* at 2455-56. Anderson estimated that, around the time of
his representation of Elmore, he carried a caseload of sixty to
eighty cases between his private practice and his role as the
part-time public defender. *See id.* at 2448. His public defender
duties consumed about 60% of his time but earned him only
about one-third of his total income. *See id.* at 2447. Anderson
admitted that he was a "heavy drinker" in the early 1980s, but
he insisted that he "was perfectly sober during the course of
each of [Elmore's] trials." *Id.* at 2485, 2487.

Anderson's court-appointed co-counsel for the 1982 and
1984 trials, John F. Beasley, testified during the state PCR
court's evidentiary hearing that he could not recall Anderson
"drinking or being under the influence" during preparation for
the trials or the trials themselves. J.A. 2581. Beasley acknowl-
edged that he had little memory of the trials at all, remarking
that, "[a]s a matter of fact, I didn't realize we tried it twice
until earlier this week when I found out." *Id.* at 2591. Beasley
observed that "I always tried to be prepared, and I'm sure I
was prepared as much as I could, but as to specifics of what
I might have done, I just don't recall." *Id.* at 2592. Asked
whether he had communicated with Elmore, Beasley did "re-
member talking with him, because he's one of the few that I
ever represented that did not admit doing it." *Id.* at 2593.
Beasley also recalled that, because Elmore had not confessed
to Anderson and Beasley, they did not believe Gilliam's
account of Elmore's spontaneous jailhouse confession. *See id.*
at 2582. In any event, Beasley expressed having "full confi-
dence in the law enforcement officers." *Id.* at 2581 (explain-
ing that "I knew them all. I had never had any occasion where

any law official ever tried to pull anything over on me, and I had no reason to suspect anything being wrong").[23]

Beasley was replaced on Elmore's defense team for the 1987 sentencing-phase-only trial by Billy Garrett. Despite Anderson's continued assignment to the case, Garrett wanted to argue that Elmore was entitled to a life sentence premised on the ineffective assistance of counsel in the 1982 and 1984 trials, but understood South Carolina precedent to preclude that theory. *See* J.A. 2495-98. Garrett was disturbed by Anderson's and Beasley's apparent failure to attempt to locate two witnesses who could corroborate Elmore's alibi for the night of Saturday, January 16, 1982 — specifically two store employees who could have testified that they saw Elmore on their store premises at the time he was allegedly murdering Mrs. Edwards. *See id.* at 2496-97. According to Garrett, "[i]n 1987 I took steps to try to locate these alibi witnesses, and of course by that time, unfortunately, the record was gone and we didn't find those people." *Id.* at 2497. Garrett also testified that, although his proposed ineffective assistance theory was initially "a real problem" between Anderson and him, Anderson came to understand "it was nothing personal" and they "were able to work well together on the case." *Id.* at 2498.

Garrett said that he befriended Elmore and, unlike Anderson, easily communicated with him. *See* J.A. 2498-99, 2502. Describing the development of the defense strategy for the 1987 trial, Garrett explained:

---

[23]According to Elmore's state appeals lawyer, David Bruck, during a discussion with Beasley about the hair evidence in preparation of the appeal from the 1982 or 1984 verdict, Beasley made a racist remark about Elmore. *See* J.A. 3072D-E. Bruck testified that, "[a]s best [he could] recall it," Beasley remarked, "'If that don't take the cake, a red headed nigger,' and chuckled, laughing." *Id.* at 3072E. Bruck explained that he remembered the remark because "it struck [him] as unusual that a lawyer would refer to his own client by a racial epit[het]." *Id.* Beasley has denied making the remark. *See id.* at 2596. The state PCR court rejected Elmore's claim that the alleged remark entitled him to relief from his convictions, *see* First PCR Order 120-24, and Elmore has since abandoned that claim.

> It was my general reaction to the case — it had already been tried twice. [Elmore] had been found guilty and sentenced to death twice. It was my general reaction that that crime, if the jury believed he did it, was a very horrendous and horrible crime, and they would probably sentence him to death. We had to make a strategic decision to try to either go and argue a full mitigation case where we're arguing that "ladies and gentlemen of the jury, you should really feel sorry for him, he's had a bad upbringing, a bad situation at home with his girlfriend, he just snapped, and this horrible thing happened." But we felt like if we made that type of argument, that the result would have been the same anyway. And with our client telling us that's not the case, he basically said, "I didn't do this, I didn't commit this crime," I didn't feel real comfortable going up in front of a jury even in the sentencing phase and trying to mitigate something that he told me he didn't do. And I believed him. That's what he said, and, you know, I backed him up all the way on it.

*Id.* at 2502-03. According to Garrett, Elmore's innocence defense was constrained by the 1987 trial court's ruling — which Garrett recognized to be inviolable under South Carolina law — "that any evidence that came in in the guilt phase would come in in the sentencing phase." *Id.* at 2506. Knowing that it would be admitted, Garrett studied that evidence and interviewed the investigating officers. *See id.* at 2507-08. His plan was to show the jury that the evidence "didn't necessarily mean that it was Edward that committed this crime. There were doubts, and they needed to give him the benefit of those doubts." *Id.* at 2510.

In the course of his investigation, Garrett became particularly concerned "about the hair on the bed." J.A. 2509. He explained:

> [I]t appeared that [the SLED team] had done a good
> job of taking photographs of everything else on the
> scene, including the bed [in a second bedroom] that
> had not been utilized in the [rape], if any, and they
> had pictures of the top of that bed, yet on the bed
> that the act allegedly occurred . . . they didn't have
> the first picture, and that seemed to me to be incon-
> sistent with everything else. They had pictures of
> minute pieces of dental work in the record, and it
> just concerned me that I couldn't find a picture of the
> bed.

*Id.* at 2509. The circumstances led to "speculation[ ] that there
really wasn't any hair from Edward on the bed." *Id.* at 2512.
Garrett elaborated:

> We didn't know the State would do something like
> that. Our feeling was that it wouldn't, but . . . with
> all these hairs being found on the bed, no pictures of
> the hair being found on the bed, I asked the officers
> themselves personally, off the record and on the
> record, "Did you find these hairs on the bed," and
> they said yes, they did. Short of calling them a liar
> in front of the jury or something like that, it was not
> something that we really could . . . contradict at trial.

*Id.* at 2512-13. Garrett's trial strategy boiled down to being
"very critical of [the] investigation [for] not tak[ing] a picture
of the hair on the bed" for presentation to the defense and the
jury. *Id.* at 2557. According to Garrett, the lack of a photo-
graph of the hairs on the bed "really concerned me, and it's
always concerned me, and until the day I die that will concern
me." *Id.*

Garrett also questioned James T. Coursey of the Green-
wood City Police Department, who had collected pubic hairs
from Elmore at the time of his January 20, 1982 arrest, about
why Coursey had not photographed Elmore's groin area. *See*

J.A. 1160-62 (Garrett's 1987 recross-examination of Coursey). When Garrett asked "wouldn't it have been better to take a picture of the area . . . to determine whether or not there was any injury, any type of bruising in this area before pulling pubic hairs," Coursey responded that he did not "recall seeing any bruise" nor "any injuries," and thus had no reason to take a photograph. *Id.* at 1161-62.

With respect to other forensic evidence, Garrett sought to demonstrate during the 1987 trial, inter alia, that there was an insignificant amount of blood on Elmore's clothing. *See* J.A. 2518 (recalling that the SLED agents "cut out large swatches on the coat to make it look like this thing was just gouged in blood, and on examination I got them to admit that although they cut a big spot out, the spot of blood may have been this small, so to let the jury know that . . . it looked more sensational than it was"). Garrett also underscored that Elmore's thumbprint on the exterior frame of the back door into the Edwards home was consistent with the fact that "Edward had worked there." *Id.* at 2520. Garrett did not think to challenge other aspects of the State's theory of the case, including the assumption that Mrs. Edwards had died on the night of Saturday, January 16, 1982. *See id.* at 2522.

On cross-examination by Elmore's PCR counsel, Garrett testified that he was "three years out of law school" when he represented Elmore, with "two or three General Sessions trials" under his belt, and little or no experience with forensic evidence. J.A. 2541-42. Additionally, Garrett acknowledged that, because he could not contest the admissibility of the evidence, "it would have been a waste of time" to investigate the chain of custody. *Id.* at 2543. Garrett also recognized the weaknesses of the innocence theory that he had employed on Elmore's behalf:

> Q:   . . . [I]sn't it true that in the context of this third
>      trial, where guilt had already been established at

a prior trial, you were limited in being able to develop that theory?

A:   Absolutely.

Q:   And wasn't the jury instructed, in fact, that there had been a prior finding of guilt and that it was not really within their province to overturn that finding?

A:   That's true.

Q:   So it was a very difficult theory to advance in the context of this third trial, is that a fair statement?

A:   Very difficult. And it took a lot of time to try to cope with having to try to do that method. It was a very difficult method, not only for a young practitioner. I think it would have been difficult for any practitioner to try to advance that theory.

*Id.* at 2562-63. Nevertheless, the innocence theory was consistent with what Elmore was telling Garrett: "'I'm not guilty of this crime.'" *Id.* at 2564.

## B.

After receiving the aforementioned evidence, the state PCR court issued the First PCR Order of July 3, 1997, which was an amended version of an earlier order dated November 29, 1996. *See* First PCR Order 2 (explaining that such order made "certain clerical changes" and "a few alterations and deletions" to the November 1996 order). Notably, the original order was sent to Elmore's lawyers with a cover letter dated December 2, 1996, in which the presiding PCR judge stated as follows:

> Edward Lee Elmore may well not be guilty and I appreciate the effort put forth by defense counsel and perhaps an appellate court may agree with one of your positions and grant relief.

J.A. 3135. The judge's statement is somewhat difficult to harmonize with his orders denying relief, which demonstrate no doubt in Elmore's guilt and at times openly disparage his claims. That discordance may be explained by the fact — which Elmore is quick to point out — that the orders are almost identical to the proposed order submitted by the State and adapted from its own brief. Even the amended First PCR Order occasionally refers to itself as a "Brief." *See, e.g.*, First PCR Order 24, 75 n.1.[24]

### 1.

As a threshold matter, the First PCR Order identified the Supreme Court precedents relevant to Elmore's claims that his constitutional rights were contravened by the deficient performance of his trial counsel, as well as by the State's suppression of exculpatory evidence and knowing presentation of false testimony. For purposes of Elmore's multi-faceted ineffective assistance claim, the state PCR court recognized that its analysis was controlled by the two-prong inquiry outlined in *Strickland v. Washington*, which requires the defendant to show (1) "that counsel's performance was deficient" (the "performance prong"), and (2) "that the deficient performance prejudiced the defense" (the "prejudice prong"). *See* 466 U.S. 668, 687 (1984). The court further acknowledged that, to satisfy *Strickland*'s prejudice prong, "[t]he defendant must show

---

[24]In any event, the First PCR Order "is unquestionably an 'adjudication' by the state court" entitled to the deferential review mandated by 28 U.S.C. § 2254(d). *Young v. Catoe*, 205 F.3d 750, 755 n.2 (4th Cir. 2000) (applying § 2254(d) standard even though "the PCR Court's Order of Dismissal adopted almost verbatim the state's legal memorandum in opposition to [Young's] Application for Post-Conviction Relief").

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 (adding that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome").[25]

With respect to the allegedly suppressed exculpatory evidence, the state PCR court invoked *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution"), as well as *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (recognizing that, "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'" (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985))). The court also noted the commonality between the tests for *Strickland* prejudice and *Brady* materiality. *See Strickland*, 466 U.S. at 694 (explaining that "the appropriate test for prejudice finds its roots in the test for materiality").

Finally, relevant to the State's alleged presentation of false testimony, the state PCR court mentioned *Giglio v. United States*, 405 U.S. 150 (1972), which counts among its forebears *Napue v. Illinois*, 360 U.S. 264 (1959). In *Napue*, the Supreme Court reiterated the principle "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269. The *Napue* Court also recognized that "[t]he same result obtains when the State, although

---

[25]Additionally, as discussed *infra* Part VIII.C.2.b.i, the state PCR court erroneously perceived that *Lockhart v. Fretwell*, 506 U.S. 364 (1993), rendered *Strickland*'s prejudice-prong test more demanding by requiring a showing that the result of the trial was fundamentally unfair or unreliable.

not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* Under *Giglio* and *Napue*, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271) (second alteration in original); *see Bagley*, 473 U.S. at 680 (describing such rule "as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt").

2.

a.

Turning to the First PCR Order's analysis of the merits of Elmore's claims, the state PCR court entertained two contentions involving Mrs. Edwards's neighbor, Jimmy Holloway: that the State committed a *Brady* violation by failing to disclose Holloway as a suspect in the Edwards murder, *see* First PCR Order 104, and that the defense team rendered constitutionally ineffective assistance under *Strickland* in failing to "more fully investigate[ ] the role of Mr. Holloway concerning the victim's death," *id.* at 43. In rejecting Elmore's *Brady* claim, the court observed:

> [Elmore] asserts that the behavior of the neighbor was "bizarre under any standard." Clearly, rather than bizarre, it revealed a legitimately concerned neighbor who feared that something had happened to his close neighbor by some obvious circumstances. His actions to assure that he may need a witness if the body was found was both legitimate and reasonable under society's questioning standards revealed by [Elmore's] own claim herein.

> As revealed by the Deposition of Thomas Henderson, the only assertion of law enforcement to suggest that Holloway was a suspect was the obvious fact

that he found the body. This was known and revealed.

* * *

The only information apparently not disclosed was SLED Agent Henderson's mental impression that the person who finds a murder victim may be a suspect. The circumstances suggesting that Holloway acted unusual were known at the time of the 1984 and 1987 trials, having been disclosed in the first trial. Further, [expert Vincent] Scalise, who speculated about the nature of Mr. Holloway's activities, conceded on cross-examination that [Holloway] was acting as a "concerned neighbor" would act at all times in his activities on Monday, except[, inter alia,] when he failed to call [Mrs. Edwards's] home on Sunday . . . and stopped looking in the house when he got to the bedroom to contact hospitals and have someone join him in the search. Mr. Scalise recognized that it was not usual [sic] for a person who comes upon a crime scene to seek assistance. But most importantly, Mr. Scalise recognized what all involved in criminal justice recognize: [that the first suspect in many murder cases is the person who finds the body]. He recognized, however, that he did not have any indication that Mrs. Edwards' murder was committed by Mr. Holloway, just that he thought the actions deserved inquiry. Mr. Scalise ignored the existence of the Negroid hair identified with [Elmore] on the scene and questioned the existence of the motive, although he did acknowledge that Mr. Elmore was known by Mrs. Edwards.

There is nothing shown that the prosecution had in its possession that was not disclosed related to Mr. Holloway's actions. In a shocking assertion underlying the allegation, [Elmore] asserts directly to "Mr.

Holloway's possible culpability for this horrendous crime." A review of the speculative assertions as to why the crime was not likely done by Mr. Elmore does not point to Mr. Holloway or anyone else. His speculative assertions are whether the "scene" suggests a random break-in or burglary. The problem is that it was *not* a random murder. Elmore knew and had done work for the victim. His speculation is not more than that.

*Id.* at 105-08 (citations omitted). The court determined that the State was not obliged to identify "known witness" Holloway as a "suspect." *See id.* at 105-06, 108. Furthermore, the court concluded that the State's failure to disclose Holloway as a suspect did "not undermine confidence in the outcome of the case," in that Elmore's "unfounded characterization of [Holloway] as the 'more likely suspect' [was] gross speculation." *Id.* at 108; *see also id.* at 109 (describing Elmore as "boldly point[ing] the speculative finger towards the victim's concerned neighbor, James Holloway").

The state PCR court invoked similar grounds to reject Elmore's assertion of ineffective assistance of counsel. On that issue, the court observed:

In his testimony before this Court [in the PCR proceedings], counsel Anderson testified that he personally knew Mr. Holloway and was aware that he had been the first person on the scene and discovered the victim's body. Counsel Anderson stated that making Mr. Holloway a suspect never had entered his mind and that "I think it's ludicrous to think he was involved in any way, just knowing him." Further, while Anderson did not interview him concerning the facts of the case, in 1984, he was obviously aware of the entirety of Mr. Holloway's role as well as the forensic evidence of Negroid hairs on the victim's bed based upon the earlier trial.

First PCR Order 43-44 (citations omitted). The court also stated that — although, according to general investigator Henderson, "Mr. Holloway was an initial suspect because he had found the body and reported it to the police" — there was "'no evidence'" against Holloway and the police thus had "ruled him out." *Id.* at 44 (citation omitted). In those circumstances, the court concluded, there was "no showing of either deficient performance or prejudice." *Id.*

b.

The state PCR court also considered Elmore's *Strickland* claim with respect to Dr. Sandra Conradi's time-of-death opinion, i.e., that the defense team was constitutionally deficient "in failing to hire an independent pathologist . . . to challenge Dr. Conradi's conclusions about the time of death." First PCR Order 11. After outlining Dr. Conradi's trial testimony, as well as the PCR evidence of both Dr. Conradi and Dr. Jonathan Arden, the court concluded — on the performance prong of *Strickland* — that Elmore had "not shown deficient performance in failing to hire a pathologist to review Dr. Conradi's findings." *Id.* at 22. The court explained that Dr. Conradi "gave a broad range of death from 12 to 65 [sic] hours from the time of autopsy," and that, although Dr. Arden's "opinion was different, he conceded that there was a possibility that the time of death could have been on the Saturday night." *Id.* Additionally, the court observed that "the historical evidence reveals that Mrs. Edwards' activities support death on Saturday night" — that "historical evidence" being Mrs. Edwards's unexecuted "plan to leave for North Carolina on Sunday morning," the "Sunday and Monday papers in the driveway," "the TV set [being] left on . . . with the TV Guide open to Saturday," "the automatic coffee pot being on and the alarm still ringing from a 6:30 A.M., automatic wake-up," and "the fact that [Jimmy] Holloway testified that he last spoke with Mrs. Edwards at 3:00 o'clock Saturday, and on Sunday her car was parked at the house." *Id.*

On *Strickland*'s prejudice prong, the state PCR court ruled that Elmore had "failed to show a reasonable probability that had a pathologist be [sic] retained in 1984, the result of the proceeding would have been not guilty." First PCR Order 23. The court observed that, even without a defense pathologist, "counsel Beasley was able to clarify that the 'time of death' opinion in the 1984 trial was inexact and the range of death was broad, from 12 hours to 3 days." *Id.* at 22. Moreover, "Dr. Arden's newly developed range [was] within Dr. Conradi's range," and Dr. Conradi was able in the PCR proceedings to "credibly support[ ] her analysis and [provide] reasonable clarification over matters Dr. Arden assumed she missed." *Id.* at 22-23.

c.

Concerning Elmore's assertion that the pubic hairs allegedly recovered from Mrs. Edwards's bed were never actually there, the state PCR court assessed claims under *Giglio*/*Napue* and *Strickland*. On the *Giglio*/*Napue* claim, the court described Elmore's assertion as being "that forty-nine hairs were not recovered from the victim's bed in January, 1982." First PCR Order 93. According to the court, Elmore "question[ed] the receipt of [the hair] evidence because neither the bed nor its coverings had blood on them, no photographs were taken of the bed or of the hair on the bed, and the sheets were not taken as evidence." *Id.* There was no mention by the court of other evidence relied on by Elmore, e.g., that the hairs were packaged differently than other crime scene evidence; that the number of hairs found was unusually large; that Elmore exhibited no apparent groin injury or bruising; and that no matching hairs were found on Mrs. Edwards's body, including her hands and fingernails, nor anywhere else in her house.

The state PCR court found "that, based upon the credible testimony of [SLED's Ira Byrd Parnell, Jr., and Frank Dan DeFreese], [Elmore] failed in his burden of proof." First PCR Order 93. Additionally, the court concluded that Elmore had

not demonstrated a due process violation premised on "he [sic] lack of photographs and the failure to collect the bed-covers." *Id.* at 95-96 (recognizing "that the failure of the state to preserve potentially exculpatory evidence does not consti-tute a denial of due process unless the defendant can show bad faith on the part of the police" (citing *Arizona v. Young-blood*, 488 U.S. 51 (1988)). On that issue, the court explained that "[t]here has been no assertion of 'bad faith' on the part of Agents Parnell or DeFreese concerning their crime scene investigation, just a complaint that they should have done more." *Id.* at 96.

On the *Strickland* claim, with respect to Elmore's general contention that his "defense counsel performed incompetently in stipulating to the chain of custody," the state PCR court observed that "there was no objection to the exhibits or more specifically as to the chain of custody of any exhibits pre-sented in the guilt phase of the 1984 trial." First PCR Order 27. The court further recited:

> Counsel Anderson testified [in the PCR proceedings] that [the prosecutor] had an "open file" and made all reports available to him. Counsel had also partici-pated in the earlier trial. Counsel Anderson testified that in 1982 he had stipulated to the chain of custody of the forensic evidence that was introduced. . . . He testified that he was sure that he inquired about the chain of custody, "but I think I probably stood by my opinion that I have respect for the SLED team, . . . they're the best we have in South Carolina, and I assumed they were not going to contaminate the evi-dence."

*Id.* at 27-28 (citations omitted) (final alteration in original). Specific to the chain of custody of the hairs allegedly found on Mrs. Edwards's bed, the state PCR court determined that Elmore "failed to show where there was a break in the chain

that counsel failed to show." *Id.* at 31. The court premised such determination on its findings that

> Agent Parnell discovered and seized the hair from the victim's bed, secured the items in a zip-lock bag and along with Agent DeFreese delivered the item to Earl Wells at SLED. Lt. Wells then maintained custody of the hair that was introduced at trial in 1982 until the time of trial.

*Id.* (citations omitted). Elmore's "bare assertions to the contrary," according to the court, were "without merit." *Id.*

Additionally, the state PCR court ruled that trial counsel was not constitutionally ineffective for failing to present evidence that the SLED agents neglected to secure the bedcovers and sheets from Mrs. Edwards's bed or to photograph the hairs allegedly found there. The court explained that, "[s]ince Agent Parnell, who was clearly seeking evidentiary matter saw no value in the [bedding] not seized — no stains or other matters to be gained from the covers or sheets [—] it cannot be said there was deficient performance or prejudice under *Strickland* shown." First PCR Order 27 (also observing that "the speculative presentation of the other witnesses that they normally seize such items does not create a Sixth Amendment violation").

With respect to the absence of photographic proof of the hairs on the bed, the state PCR court characterized Elmore's claim as being "that counsel failed to put up experts concerning a failure to photograph the bed where the pubic hairs were located." First PCR Order 27. Such failure did not constitute ineffective assistance, the court explained, because "a reveiw [sic] of the photographs of the scene that were admitted in 1984 show that there were no photographs of the hairs on the bed. The defense did not need to hire an expert to point that out." *Id.* Moreover, according to the court, "[a]s in this PCR proceeding, Agents Parnell and DeFreese credibly testified

[during the 1984 trial] about the existence and discovery of the hair." *Id.*[26]

### d.

Regarding the blood evidence, the state PCR court rejected Elmore's contention that the defense team was constitutionally ineffective by stipulating to the chain of custody for Elmore's coat and pants. *See* First PCR Order 28-30. In so ruling, the court discounted Elmore's interpretation of the SLED laboratory record as showing that general investigator Thomas W. Henderson, Jr., had removed the coat and pants from the laboratory — exposing those items to tampering — before returning them on February 3, 1982, two weeks prior to serologist John C. Barron's blood analysis. The court did not confront the alleged incongruity between the vast amount of blood at the crime scene and the comparatively small amount of blood on Elmore's clothing. Moreover, the court did not address Henderson's alleged motive for planting blood on Elmore, arising from the fact that Henderson's mother was (and Henderson himself had been) a longtime neighbor of Mrs. Edwards. Instead, the court simply accepted Barron's interpretation of the laboratory record, i.e., that the coat and pants had been handed over to Henderson that February 3, with the stains already removed. Accordingly, the court found

---

[26]Elsewhere in its decision, in the course of analyzing whether Elmore's trial lawyers were deficient for failing to challenge Dr. Sandra Conradi's finding of a sexual assault, the state PCR court rejected additional evidence offered by Elmore to undermine the State's theory that Mrs. Edwards pulled the pubic hairs from Elmore while he was raping her on the bed: that is, Dr. Jonathan Arden's opinion that there was no sexual assault on Mrs. Edwards while she was still alive. *See supra* note 17. According to the court, "Dr. Conradi's testimony in 1984 as corroborated in [the] PCR hearing reveals support that Mrs. Edwards was alive when there was penetration of her vagina." First PCR Order 23. Although the court acknowledged that it was unclear whether Mrs. Edwards was violated with an erect penis or an object like the bottle tongs, the court deemed there to be "strong circumstantial evidence" that it was a penis — that evidence being the "pulled pubic hairs on the victim's bed." *Id.* at 24.

that "John Barron received the evidence and cut out the speci-
mens prior to the return of the coat and jeans to Tom Hender-
son." *Id.* at 30. And, the court concluded that neither deficient
performance nor prejudice had been shown. *See id.*[27]

e.

The state PCR court considered the evidence of the "E-5"
print lifted from the blood-smeared toilet in Mrs. Edwards's
en suite bathroom in the course of analyzing claims under
*Brady*, *Giglio/Napue*, and *Strickland*. With respect to the
*Brady* and *Giglio/Napue* claims, the court observed that
Elmore contended he was deprived of due process in that the
State "falsified evidence, testified falsely, and withheld mate-
rial, exculpatory evidence" — that evidence being the "latent
print found on Mrs. Edwards' toilet identified as E-5 which
[Elmore's] experts suggest are fingertips." First PCR Order
61-62. In so contending, Elmore interpreted the PCR testi-
mony of SLED fingerprint analyst Frank Dan DeFreese as
being that, despite his written report deeming the E-5 print to
be unidentifiable, DeFreese had actually compared E-5 to
Mrs. Edwards and Elmore, excluded both of them as the
print's source, and improperly failed to report those findings.

The state PCR court criticized Elmore for "strain[ing] his
own credibility by the assertions present," and concluded that
there was "no *Brady* violation or due process violation which
mandated a new trial." First PCR Order 75. The court
explained that DeFreese "did not revise his earlier opinion

---

[27]The state PCR court also concluded that Elmore's trial lawyers were
not deficient in failing to adduce evidence that there was no blood on
Elmore's shirt when he arrived at the apartment of his former girlfriend,
Mary Alice Dunlap, after allegedly murdering Mrs. Edwards. According
to the court, defense counsel's assertion during closing argument — "that
the *lack* of any evidence of a bloody shirt created a reasonable doubt," *see
supra* note 9 — accomplished "exactly" the same result that would have
been achieved by questioning Dunlap under oath as to whether Elmore's
shirt was bloody. *See* First PCR Order 48.

that E-5 found on the toilet lacked sufficient ridge detail" to be identifiable, and that Elmore's "own experts disagreed in their opinion whether both of the alleged 'tip' prints found on E-5 on the toilet have sufficient detail for comparison." *Id.* at 76 (noting that "[Hayward] Starling opined only one; [Vincent] Scalise opined that both were sufficient"). According to the court, "since Agent DeFreese was of the opinion that the ridge detail was insufficient for comparison, it is a natural flow that no comparison (or elimination) could be accurately made, although he testified that he could not find that they matched either the defendant or the victim." *Id.*

The state PCR court concluded that, even "[a]ssuming that the new defense experts would have testified as they did in the state PCR proceeding, . . . there was no constitutional violation because the original verdicts [were] worthy of confidence." First PCR Order 76 (internal quotation marks omitted). The court elaborated:

> Now, and before, the jury would be told the same thing — the defendant's print was located outside the home and there are no prints of the defendant located inside the home. Further, the alleged latent print on the toilet, if identifiable, is of little value. As each defense witness conceded, they could not eliminate Mrs. Edwards from being the maker because her finger tip prints were not available for identification. Further, her palm print was already located near the same area.
>
> The situation with E-5 would be much different if it was a bloody print suggesting a post-crime placement. However, it was an unidentified latent print or an unidentifiable latent print. Even the possibility that it did not belong to [Elmore] or the victim would not mandate a new trial. The evidence is not exonerating. The mere fact that an unidentified print is found at the scene does not mean the owner of that

print was Mrs. Edwards' assailant or [that the print was] impressed contemporaneous with the crime. Here, the jury was told (or could have been told based upon the SLED report) that the latent print on the toilet was not identified with Edward Elmore. Nothing has changed since the trial that would have affected what the jury heard. If it was error in the expert opinion of Agent DeFreese with respect to E-5 on the toilet, it was not constitutional error. [Elmore's] claims to the contrary are without support.

*Id.* at 76-77 (internal quotation marks omitted); *see also id.* at 109 ("[T]he fingerprint evidence claim does not 'support' Mr. Elmore's innocence, it merely reveals a print left by an unidentified person at some time in the past. It is not the existence of other prints in the home, it is the fact that Elmore's print was found that is significant."). Finally, the court remarked that "[t]he problem with [Elmore's] argument is that it fails to recognize that expert opinion in the forensic area can often not be consistent" — that is, "experts may disagree as to results." *Id.* at 78.

Assessing the fingerprint evidence as part of Elmore's ineffective assistance claim, the state PCR court did not squarely address the performance prong of *Strickland*. *See* First PCR Order 24-25. Elsewhere in its decision, however, the court observed that Elmore could not obtain a new trial premised on the fingerprint being "after-discovered evidence," because "the evidence of the print was as available in 1982 through 1987 as it is today and could have been analyzed [by the defense] with 'due diligence.'" *Id.* at 78 n.2. In any event, the court rejected the fingerprint evidence aspect of Elmore's ineffective assistance claim under *Strickland*'s prejudice prong, for the same reason it deemed the print to be immaterial under *Brady*: the existence of an additional identifiable print in the Edwards home, and the exclusion of Elmore as the

print's source, "did not undermine confidence in the outcome of this case." *Id.* at 25.

The state PCR court further concluded that Elmore failed to substantiate a *Brady*, *Giglio/Napue*, or *Strickland* claim premised on the "E-1" and "E-3" prints that were lifted, along with Elmore's "E-2" thumbprint, from the exterior frame of the back door into the Edwards home. *See* First PCR Order 25, 77-78. Although DeFreese had reported in 1982 that neither E-1 nor E-3 was identifiable, he conceded during the PCR proceedings that he had been incorrect with respect to one of those prints; meanwhile, Elmore's experts Starling and Scalise opined that both E-1 and E-3 were identifiable, and Starling excluded Elmore as their source. In considering the import of that evidence, the court highlighted three points:

> First, it was conceded that Mr. Elmore's [E-2 thumbprint was] located in the same area of the door frame [as the E-1 and E-3 prints]. Second, the mere fact of an unidentified print *outside* the house does not connect it necessarily with Mrs. Edwards' death, absent other circumstantial evidence, such as Mr. Elmore's hair being consistent with the numerous hairs found on the victim's bed. Third, the jury was told of the other prints[28] and knew they had not been identified with Elmore.

*Id.* at 77-78. The court concluded that the new information about the E-1 and E-3 prints did "not mandate a new trial," because it did "not undermine confidence in the [1984 verdict]." *Id.*; *see also id.* at 25 (explaining same).

As for Elmore's E-2 thumbprint, the state PCR court did not mention Scalise's evidence challenging the 1984 testi-

---

[28]The "other prints" referred to by the state PCR court are apparently the two identifiable prints found inside the Edwards home and matched to Mrs. Edwards.

mony of DeFreese and four Greenwood city police officers that the print appeared to be "fresh." Notably, however, the court has not referred to the thumbprint as being fresh when summarizing the evidence against Elmore. Additionally, the First PCR Order contains no discussion of Scalise's revelations that the E-2 print was upside-down and wrapped around the door frame, nor Scalise's opinion that such placement was consistent with someone performing chores, but inconsistent with someone knocking on the door and waiting for Mrs. Edwards to answer.

f.

With respect to James Gilliam's recantation of his 1982, 1984, and 1987 trial accounts of Elmore's spontaneous jailhouse confession, the state PCR court assessed, inter alia, claims under *Giglio/Napue* and *Strickland*. The court recognized that the premise of the *Giglio/Napue* claim was that Gilliam's "recantation of his earlier trial testimony was true," and that "the state should have known the earlier testimony was false" and "revealed the falsity of the confession previously." First PCR Order 49. The court rejected the proposition, however, that Gilliam's PCR testimony was reliable and his trial testimony unreliable. In so doing, the court observed:

> Why Gilliam chose to recant his [trial] testimony is not evident, but that does not mean that his new version has credibility and I hold that it does not. [Elmore's claim] must be dismissed for the lack of credibility in the recantation.

*Id.* at 60; *see also id.* at 109 ("[T]his Court finds that James Gilliam did not testify falsely at the three trials — the post conviction relief recantations are the matters not worthy of belief."). The court also ruled that Elmore's trial counsel — having moved in 1984 to exclude Gilliam's testimony and then having "vigorously cross-examine[d]" him in an "attempt[ ] to suggest that [he] was getting favorable treatment"

for his account of Elmore's confession — was not constitutionally ineffective in dealing with Gilliam as a witness. *Id.* at 10-11. Simply put, according to the court, "[t]here was nothing more counsel could have done which would have probably changed the result." *Id.* at 11.

g.

The state PCR court considered the testimony of Dr. Jonathan Venn in the context of assessing Elmore's *Strickland* contention that his trial lawyers were deficient in failing to present expert psychological evidence that his statement to investigators — that if he killed Mrs. Edwards, he did not remember doing so — was not inculpatory. The court concluded, inter alia, that because Elmore had testified during the 1982 trial that he had not made any such statement, counsel could not "be deemed deficient for failing to present speculative testimony [during the 1984 trial] that the comment was the product of a memory deficit or low intelligence." First PCR Order 47. Additionally, the court observed that such testimony, "if presented, would not have undermined confidence in the outcome where it was in support of the fact that [the statement] was made and could be truthful!" *Id.*

h.

As a general matter, the state PCR court underscored that Elmore had "been convicted two times of the murder of Dorothy Edwards in Greenwood and sentenced to death three times." First PCR Order 4. The court also referred to Elmore's "attempts to undermine confidence in those sound verdicts" — though the 1982 convictions and death sentence were overturned by the Supreme Court of South Carolina because of reversible error by the trial judge, and the 1984 death sentence was vacated by the Supreme Court of the United States for improper exclusion of mitigation evidence. *See id.* In any event, the state PCR court determined that — during the guilt phase of the 1984 trial, as well as the 1987 sentencing-phase-

only trial — "counsel for [Elmore], the investigating law enforcement officers, and the prosecution performed within the mandates required by the United States Constitution." *Id.* at 4-5.

Specific to Elmore's multi-faceted claim that his 1984 defense team rendered constitutionally deficient assistance, the state PCR court recognized that Elmore's prior testimony, "etched into the record in 1982, had an effect on how counsel would prepare and present the case in the retrial in 1984." First PCR Order 9. The court cited Elmore's 1982 testimony concerning

> his location on Saturday and Sunday, his denial of any involvement in the death of Mrs. Edwards, his admission of knowing Mrs. Edwards and having been both inside and outside her house, his denial that he made any comments to [the police] concerning if he killed him [sic] he did not remember, his denial of any communication about the crime at all with James Gilliam, his concession that he wore the jeans, coat, and shoes on the same night Mrs. Edwards was killed, and his removal and loss of the white shirt he was wearing.

*Id.* at 8-9. Without explaining why that testimony (with one exception) interfered with trial counsel's ability to engage in the tactics that Elmore asserted were necessary for a fair trial — particularly a pretrial investigation of the State's forensic evidence — the court concluded that "[c]ounsel was neither 'deficient' or [sic] has Sixth Amendment prejudice been shown with respect to the second trial." *Id.* at 9.[29]

---

[29]The one exception to the state PCR court's failure to explain why Elmore's 1982 testimony interfered with a proposed tactic for the 1984 trial was this: As discussed above, the court ruled that the defense team was not deficient in 1984 by failing to present expert testimony on Elmore's memory deficits to explain his "if he killed Mrs. Edwards, he did not remember doing so" statement to the police, because, at the 1982 trial, Elmore had denied making any such statement. *See* First PCR Order 47.

Finally, the state PCR court declared that there was "overwhelming evidence . . . that solely pointed to the guilt of Edward Elmore." First PCR Order 119. According to the court, "[v]iewed from the juror's perspective in the 1984 trial, the only choice based upon the evidence was to convict." *Id.* at 120.[30]

## V.

### A.

Elmore pursued an appeal from the First PCR Order in the Supreme Court of South Carolina. In late October 1998, while that appeal was pending, the State revealed that it had located a box containing physical evidence — previously claimed to be missing — that Elmore had persistently sought in the PCR proceedings. The most significant piece of once-missing evidence was "Item T," which included the unmatched Caucasian hair recovered from Mrs. Edwards's bloody abdomen during her autopsy. Item T was found, along with other Edwards murder evidence, in hair analyst Earl Wells's private office at SLED headquarters in Columbia, where it apparently had been stored away for nearly seventeen years.

#### 1.

As early as the proceedings culminating in the First PCR Order of July 3, 1997, Elmore had underscored discrepancies between the written reports of Dr. Sandra Conradi and Earl Wells concerning the contents of Item T. According to Dr. Conradi's autopsy report, "[e]xamination of [Mrs. Edwards's]

---

[30]The state PCR court's observations about the "overwhelming evidence" against Elmore were made in the course of assessing his Sixth Amendment claim that the 1984 trial was not conducted before an impartial jury. *See supra* note 1. That claim is premised on PCR evidence that a 1984 juror, after being selected for the jury and while preparing to be sequestered for the duration of the proceedings, had improper and prejudicial contact with a juror from the 1982 trial.

chest and abdomen reveal[ed] occasional dark colored tightly curled apparent pubic hair." J.A. 3617. Dr. Conradi signed a subsequent log of "Evidence Transferred" to the police, reflecting the transfer of "fibers, hairs from chest & abdomen." *Id.* at 3628. After receiving and analyzing that evidence (by then designated as Item T), Wells reported that it consisted of "[b]lue fibers." *Id.* at 3630. An additional record indicates that, at the time of Elmore's first trial in 1982, Wells transferred custody of Item T to the Greenwood City Police Department. *See id.* at 1777.

Item T was neither referenced nor introduced during any of Elmore's three trials, and the conflicting reports of Dr. Conradi and Wells went unnoticed and unquestioned by Elmore's defense team. Contrastingly, Elmore's PCR counsel discerned the discrepancies and repeatedly sought access to Item T to resolve them, but was foreclosed in those efforts by the State's claim that Item T was missing. *See, e.g.*, J.A. 2301-02 (representation to state PCR court by Assistant Deputy Attorney General Donald J. Zelenka in 1995 that "[w]e've been doing diligent searches" for the missing evidence, "but I have it pretty much upon firm information that those matters are no longer in existence"); *id.* at 1616-19 (1995 PCR deposition testimony of Wells that Item T was among evidence turned over to city police in 1982 and, to his knowledge, had never been returned to him or anyone else at SLED).

Dr. Conradi testified during the state PCR court's 1995 evidentiary hearing that, although she reported both fibers and hairs in Item T, it was "just a quick designation of what" the Item T materials might be. J.A. 2704. Furthermore, Dr. Conradi cautioned that it was "not unusual" to mistake hairs for fibers or fibers for hairs. *Id.* at 2684. She explained: "What we attempt to do is collect the evidence . . . and transfer it to somebody who can see what it is. We have called hairs fibers and fibers hairs before." *Id.* at 2704.

For his part, Wells testified at the hearing on direct examination by the State that his "microscopic examination

revealed that the only thing present in [Item T] was blue fibers; no hair." J.A. 2792. On cross-examination, Elmore's PCR counsel asked Wells whether he had "independent knowledge" that Item T contained blue fibers only, or whether he was "simply making an assumption" based on his written report. *Id.* at 2820. Wells insisted that it was "not an assumption" that the Item T materials were limited to blue fibers. *Id.* He proclaimed: "I have examined the items that were contained in that exhibit. Those items proved to be blue fibers. No hairs. Just blue fibers." *Id.* According to Wells, "it was wrong for [Dr. Conradi] to identify fibers and hair." *Id.*

Relying on that 1995 testimony, the state PCR court rejected Elmore's Sixth Amendment *Strickland* contention that his trial lawyers rendered ineffective assistance by failing to investigate the discrepancies between Dr. Conradi's and Wells's descriptions of Item T. *See* First PCR Order 32. In so ruling, the court found that Item T consisted solely of blue fibers, and explained that "[d]efense counsel cannot be deemed ineffective for failing to develop that blue fibers were found on the victim's body rather than hair." *Id.* Indeed, according to the court, Elmore "failed to show either deficient performance or prejudice." *Id.* Elmore thereafter filed his appeal from the First PCR Order in the state supreme court.

2.

On October 29, 1998, Assistant Deputy Attorney General Zelenka advised Elmore's PCR counsel that Edwards murder evidence had been discovered in Wells's private office at SLED headquarters, where the parties met on November 19, 1998, to discern what had been found. As it turned out, the evidence included four microscopic slides mounted with the Item T materials — four human hairs, three animal hair fragments, and a single blue fiber. Consequently, on December 4, 1998, the parties filed a joint motion in the state supreme court to dismiss without prejudice Elmore's pending appeal from the First PCR Order, and to remand to the state PCR

court for further proceedings, including a reopening of the evidentiary record. The state supreme court granted the parties' motion by its order of January 8, 1999.[31]

In a subsequent deposition, Zelenka testified concerning the discovery of the Item T slides and other evidence in Wells's office. Zelenka explained that, in mid-October 1998, following an inquiry from the state supreme court about missing exhibits from the state PCR court's 1995 evidentiary hearing, he contacted Wells "to see if somehow he may have had [those exhibits] in his possession for some reason." J.A. 3510. Wells responded to the inquiry on October 28 or 29, saying that he did not possess the sought-after exhibits, but that he had "located a box of [other] Elmore materials" during a move from one private office to another within SLED headquarters. *Id.* Wells also said "he had been meaning to call [Zelenka] about that"; Wells did not specify (and Zelenka did not inquire) when the evidence had been discovered. *Id.* at 3510-11. Zelenka was not sure where in Wells's office the Item T slides had been located, but recalled it might have been in a filing cabinet. *See id.* at 3517.

The State offered to have Wells testify during the state PCR court's initial remand hearing of April 9, 1999, but Elmore's PCR counsel objected on the ground that such testimony should await further analysis of Item T. *See* J.A. 3363-64. The court sustained Elmore's objection, marked for identification the four Item T slides and other evidence that had been discovered in Wells's possession, and released that evidence to Elmore's lawyers for testing. *See id.* at 3364-71.

That June, Elmore's hair expert, analytical microscopist Skip Palenik, determined that the first Item T slide contained a Caucasian pubic hair inconsistent with Mrs. Edwards. *See* J.A. 3564-65. Additionally, Palenik reported that the second

---

[31]The state supreme court's January 8, 1999 remand order is found at J.A. 3354.

slide included a Caucasian hair fragment unsuitable for micro-
scopic comparison, three animal hair fragments, plus the sin-
gle blue fiber; that the third slide contained a Caucasian head
hair that might be suitable for comparison if properly
mounted; and that the fourth slide contained a Caucasian head
hair that was consistent with Mrs. Edwards. *See id.* at 3565-
66.

At a status conference of July 1, 1999, Elmore requested
the state PCR court to grant immediate relief — a new trial
— on the basis of Palenik's finding of the unmatched Cauca-
sian pubic hair. *See* J.A. 3403-04. The State opposed
Elmore's new trial request as "a little premature," and sought
to have the Item T slides analyzed by an independent expert
of its choosing, plus re-examined by Wells. *See id.* at 3407-
09. Counsel for Elmore indicated opposition to Wells's fur-
ther hair analysis, explaining that it would be

> absolutely of no value to this Court to have Mr.
> Wells look at the hair again. . . . Mr. Wells has had
> the hair in his possession for 17 years[, and] is the
> person who received this hair evidence from Sandra
> Conradi[,] who mounted it on slides, who examined
> it under a microscope and then wrote down the result
> of his analysis as blue fiber. Mr. Wells at this point
> has maybe more interest in the outcome of this anal-
> ysis of that hair evidence than Mr. Elmore does.

*Id.* at 3410-11. The court deferred ruling on Elmore's new
trial request, authorized independent testing by the State, and
denied permission for re-examination by Wells or any other
SLED agent. *Id.* at 3412.

Thereafter, the State submitted the four Item T slides to
Myron T. Scholberg, a retired FBI forensic scientist, for
microscopic examination. According to Scholberg's affidavit,
"the presence of hair was immediately apparent and clearly
visible, that is to say that hair was visible on these slides to

the naked eye." J.A. 3638. Scholberg averred that "I do not know or see how Mr. Wells could have looked at the four microscopic slides and honestly reported that the four Item T slides only contained blue fiber." *Id.* Scholberg disagreed, however, with Palenik's conclusion that the Caucasian pubic hair on the first slide was inconsistent with Mrs. Edwards. Rather, Scholberg found that the hair on the first slide was consistent with Mrs. Edwards, as were the hairs on the third and fourth slides. *See id.* at 3566-67. Like Palenik, Scholberg found that the second slide contained a Caucasian hair fragment unsuitable for microscopic comparison, three animal hair fragments, and the lone fiber. *See id.*

In the face of the diverging opinions of Palenik and Scholberg, the parties agreed to subject the Item T materials to mitochondrial DNA testing, which had then only recently been deemed admissible by the state supreme court. The final results of the DNA testing, performed by LabCorp in North Carolina, were reported on November 26, 2000. *See* J.A. 3635-37. In line with Scholberg's analysis, the DNA testing indicated that the hairs on the first, third, and fourth slides belonged to Mrs. Edwards or her maternal relative. *See id.* at 3637. Significantly, however, the DNA testing also revealed that the second slide's previously uncompared Caucasian hair fragment "could not have originated from Dorothy Edwards." *Id.*[32]

3.

Relying on the DNA test results excluding Mrs. Edwards as the source of one of the Item T Caucasian hairs, Elmore filed a motion for summary judgment, by which he again requested immediate relief in the form of a new trial. In his

---

[32]It is not clear from the record whether the unmatched Caucasian hair contained on the second Item T slide is a head hair or a pubic hair, or whether any effort was made to determine the source of the second slide's three animal hair fragments and single blue fiber.

supporting memorandum, Elmore explained that, although he had "raised many grounds for relief," he sought summary judgment on "a straightforward claim of state misconduct, including concealment of material exculpatory evidence and perjured testimony by law enforcement officers." J.A. 3540. As part of its opposition to Elmore's motion, the State proffered an affidavit executed by Wells, who stated that, as of his 1995 PCR testimony, he was "of the belief that [he] did not possess any evidentiary material" concerning the Edwards murder. *Id.* at 3573. Wells also averred, arguably contrary to his 1995 testimony, that he had fully "relied upon [his 1982 written] report in responding to questions concerning the testing." *Id.* ("During my testimony at the state post-conviction relief hearing in March 1995 I testified concerning my analysis of item 'T' and relied solely upon my April 2, 1982 report and my standard practice upon review of my case documentation."). According to Wells, he found Item T and the other once-missing evidence in his office "[d]uring late October 1998," and he did not inspect that evidence until November 19, 1998, when counsel for the parties met with him at SLED headquarters. *Id.* at 3574. At that time, Wells made "a visual inspection of some of the material and determined it included hair in addition to fibers through the use of a stereo microscope." *Id.*

During a hearing conducted on December 21, 2000, the state PCR court, without objection, converted Elmore's summary judgment motion to a motion to alter or amend the First PCR Order. *See* J.A. 3585 ("Right or wrong, I treat it as a motion to alter or amend, you get the same result if I alter it or amend it so as to grant the relief, you get the same results if I deny it."). Elmore's PCR lawyers focused their arguments on the Fourteenth Amendment *Brady* claim and alleged perjury concerning Item T, and also reminded the court of previously raised issues, including irregularities in the blood, fingerprint, and other hair evidence, the recantation of James Gilliam, and Elmore's low level of intelligence and memory problems. One of those lawyers summarized:

> Item-T is, in and of itself, is enough to grant a new trial. The results are exculpatory, they are clearly exculpatory. Caucasian hair . . . found on the dead abdomen of the victim, [not belonging] to the victim or to Mr. Elmore. That, you know, in and of itself is a reason you should alter or amend the judgment in this case and grant a new trial to Mr. Elmore. But Item-T does not stand alone[,] as powerful as it is, as exculpatory as the results are, it doesn't stand alone. And the suspicious nature of how it was found [—] I guess sometimes the cover up is always worse than the lie, but the continuing to have lies about what it was, who had it when, again casts essentially a pale of suspicion over everything in this case.

*Id.* at 3594. Focusing on the forty-five pubic hairs allegedly recovered from Mrs. Edwards's bed, the lawyer asserted that "the hair evidence was always suspicious to begin with, [and] I think now in light of [the Item T] evidence and what this Court has seen[,] it's much beyond merely suspicious." *Id.* In the lawyer's words, "the whole thing really stinks." *Id.* at 3594-95.

In response, the State conceded that Item T had been misreported as encompassing solely blue fibers, but maintained that the unmatched Caucasian hair discovered therein was not material under *Brady* (nor prejudicial under *Strickland*) because Mrs. Edwards "could easily have picked up stray hairs" during the violent assault in her home that were "completely unrelated to this crime." J.A. 3602. Moreover, according to the State, other evidence — such as Elmore's thumbprint outside the house, the Type A blood on his clothing, the microscopically consistent pubic hairs on Mrs. Edwards's bed, and Gilliam's account of Elmore's jailhouse confession — "point[ed] to Mr. Elmore as being . . . the appropriate Defendant in this case." *Id.*

At the close of the hearing, the state PCR court orally ruled that, although it would amend the First PCR Order to address

the subsequent developments with respect to Item T, it would not award Elmore a new trial. *See* J.A. 3614. In so ruling, the court accepted the State's position, explaining: "Obviously [Item T] should have been disclosed to counsel at the time, but as far as impacting on the [1984 verdict], I don't think that it would have." *Id.* The court also indicated that the First PCR Order's disposition of all other grounds for relief would stand. *Id.* In closing, the court remarked, "Good luck to everybody, I'm out of here." *Id.*

On January 4, 2001, prior to the state PCR court's issuance of a written order memorializing its December 21, 2000 oral ruling, Elmore filed a motion for reconsideration and additional fact development. Elmore maintained therein that his lawyers "were caught off guard by the 'conversion' of" his summary judgment motion to a motion to alter or amend, and had expected "there would be opportunities for further fact development" if the motion were denied. J.A. 3641 ("[C]ounsel for Mr. Elmore did not make sufficiently clear at the hearing that if the court believed the present record was not sufficient to grant post-conviction relief, [Elmore] was entitled to take advantage of the opportunity provided by the South Carolina Rules of Civil Procedure to seek the court's assistance in additional fact development."). Elmore asserted that he should yet be entitled to pursue motions for authorization to do the following:

> *Exhume the body of Mr. James Holloway in order to obtain a DNA sample (to determine if the [unmatched Item T] hair belongs to him) and to see if it is possible to still obtain finger prints (to check against the unidentified prints found on the toilet seat in the victim's private bathroom);

> *Obtain a court order for the release of any other fingerprint cards, etc., which may exist for Mr. Holloway;

*Review the personnel records of SLED Agent Earl Wells and other officers involved in this case;

*Review SLED records to determine when Mr. Wells, in fact, moved offices; . . .

*Conduct DNA testing of the shoe and blue jean pants introduced at trial, but without waiving [Elmore's] objection to the tainted chain of custody of the shoes and pants and noting that [Elmore] fully believes that the few small areas of Type A blood . . . identified on the shoe and pants were either placed their [sic] when the items were inexplicably removed from SLED by former neighbor to James Holloway[,] SLED agent Tom Henderson, . . . prior to the items being tested — or that testing of the items would further exonerate [Elmore]; and

*Conduct DNA testing of the scrapings taken from under the victim's fingernails.

*Id.*

   The State opposed Elmore's motion for reconsideration and additional fact development, contending that his lawyers had demonstrated consent to the conversion of the summary judgment motion and had never before indicated a need for further discovery despite ample opportunities to do so. *See* J.A. 3644-47. The State also asserted that "further discovery is simply not supported by reason," and that the specific request "to exhume the body of Mr. James Holloway is made without any legal or factual showing." *Id.* at 3647-48. In reply, Elmore maintained that his summary judgment motion served the interests of judicial economy and efficient use of financial resources. *See id.* at 3651. Elmore further contended that "[j]ustice requires that [the requested additional] testing occur before the state executes [him], and the appropriate time and place to do this crucial testing is now and in the state court's

jurisdiction." *Id.* Nonetheless, Elmore indicated that he was amenable to "less intrusive methods of obtaining" Holloway's DNA than the exhumation of his body. *Id.* at 3652.

4.

By its Second PCR Order of February 26, 2001, the state PCR court memorialized its December 21, 2000 oral ruling, and denied Elmore's motion for reconsideration and additional fact development. At the outset of its decision, the court observed that it was disallowing Elmore a new trial premised on the unmatched Item T hair; nevertheless, the court recognized that such "hair evidence is new evidence not available at the earlier hearings which" required amendment of the First PCR Order's discussion of Elmore's previously raised Item T *Strickland* contention. *See* Second PCR Order 3-4.

In addressing the merits of Elmore's more recent Item T *Brady* claim, the state PCR court recognized: "That the hair evidence taken from the victim's body should have been disclosed during discovery cannot be denied." Second PCR Order 4. The court noted, however, that Elmore's "position that Agent Wells knowingly withheld this evidence is refuted by both his Affidavit and the fact that it was he, not another source, who discovered the missing evidence and reported the discovery in October of 1998 to Mr. Zelenka." *Id.* It is not clear whether the court ruled that the State improperly suppressed Item T despite Wells's mere negligence, or that Wells's mere negligence excused the suppression. Meanwhile, the court plainly dismissed the notion that Wells had committed perjury in his 1995 PCR testimony. *See id.* (accepting Wells's "sworn statement that his previous testimony was incorrect but was based upon his then recollection"). And, the court did not confront the issue of why Wells's 1982 written report reflected that Item T consisted solely of "[b]lue fibers." J.A. 3630.

Relevant to the issue of *Brady* materiality, the state PCR court underscored that only one unmatched Caucasian hair

was found among the Item T materials, and indicated that the Item T evidence would be more compelling if "numerous hairs removed from the body were Caucasian and inconsistent with the victim's hair as established by the latest DNA testing." Second PCR Order 4. The court concluded:

> One hair from the victim's body from the bedroom floor that could have come from various sources does not mandate a new trial[,] especially where even if the state of the art DNA testing existed in [the 1980s], the test results would be the same, i.e. one Caucasian hair from the body not consistent with the victim's hair.

*Id.* at 5. The court also alluded to the forty-five pubic hairs that were microscopically consistent with Elmore and allegedly found on Mrs. Edwards's bed, noting Elmore's failure to request DNA testing of those hairs. *See id.*

Revisiting Elmore's previously raised Item T *Strickland* contention, the state PCR court "decline[d] to find [Elmore's] counsel ineffective for not further pursuing the fiber evidence." Second PCR Order 4. The court seemed to rely on the prejudice prong of *Strickland*, rather than the performance prong. That is, in the course of its discussion relevant to *Brady* materiality, the court remarked that Elmore "failed to prove a Sixth Amendment violation due to attorney deficiency" — thereby indicating that Elmore's *Strickland* contention failed for absence of prejudice, just as his *Brady* claim fell short for lack of materiality. *Id.* at 5.

Finally, on its denial of Elmore's request for additional fact development, the state PCR court observed that "[t]he argument that counsel was misled by the [conversion of the summary judgment motion] is not compelling," and the court criticized Elmore's lawyers for "apparently assum[ing] I would order a new trial based on argument not proof." Second PCR Order 6. The court also noted that "[t]his case has been

on remand since 1999, the final hearing held and extensive
investigation performed. I will not now authorize further test-
ing. The case was remanded by consent to examine the miss-
ing hair evidence, not to reopen the evidentiary hearing." *Id.*
As to specific items sought by Elmore, the court denied his
"request to inspect SLED Agent Wells' file," because Elmore
had disregarded prior opportunities to obtain that evidence. *Id.*
The court also withheld permission to exhume the body of
Jimmy Holloway, explaining: "Holloway himself testified he
was in the victim's home when the body was found. Even if
DNA testing showed the single [unmatched Item T] hair to be
Holloway's, the prior jury verdicts would not have been
undermined." *Id.* at 5.[33]

---

[33]At a subsequent hearing of May 7, 2001, the state PCR court advised
the parties that it would correct an erroneous reference in the Second PCR
Order to the unmatched Item T hair as being "non-Caucasian" (rather than
"Caucasian"), which the court did by order of May 18, 2001. Also during
the May hearing, Elmore's lawyers returned evidence that had been
entrusted to them for review and testing, including that reported in Octo-
ber 1998 as having been found in Wells's private office at SLED head-
quarters. The items being resubmitted to the court also included two boxes
of evidence — some not previously disclosed to Elmore — that had been
discovered in the possession of the Greenwood City Police Department
and transferred to the custody of Elmore's lawyers in late April 1999, fol-
lowing the January 1999 remand by the Supreme Court of South Carolina.
Those boxes contained physical evidence (such as Mrs. Edwards's bloody
robe, scrapings from beneath her fingernails, and an unknown material
removed from behind her left ear), plus police reports and diagrams, notes
of witness interviews, and three strips of negatives of photographs taken
at the crime scene. One of those photographs showed the bed in Mrs.
Edwards's bedroom where forty-five of Elmore's pubic hairs were alleg-
edly discovered. According to Elmore, the photograph specifically showed
"crime scene equipment — cameras, cases, and other processing materials
— all over the top of the bed on which the hair was allegedly found. No
hair was visible in the photograph." Br. of Appellant 7-8. In returning the
photograph and other evidence to the state PCR court, Elmore's lawyers
indicated that they were doing so as a result of the court's ruling that there
would be no testing or consideration of evidence that was not the subject
of the remand order — including the evidence discovered post-remand in
the hands of the city police. *See* J.A. 3689-90.

## B.

Following the state PCR court's issuance of the Second PCR Order, Elmore revived his appeal in the Supreme Court of South Carolina, now challenging both the First PCR Order and the Second PCR Order. On June 10, 2003, the state supreme court granted a writ of certiorari on every question presented, including the Sixth and Fourteenth Amendment claims at issue herein. After briefing and oral argument, however, the court dismissed the writ as improvidently granted by order of July 12, 2004. Elmore filed a petition for rehearing from the denial of certiorari, in which he notified the court that the State had agreed to conduct additional DNA testing that could prove exonerating. On September 20, 2004, Elmore's rehearing petition was denied.

## VI.

## A.

On September 22, 2004, having exhausted his Sixth and Fourteenth Amendment claims in the South Carolina courts and facing an imminent October 15, 2004 execution date, Elmore initiated these federal habeas corpus proceedings in the District of South Carolina. On October 5, 2004, the district court granted a stay of Elmore's execution, and, during a status conference of December 7, 2004, the parties requested court supervision over the further DNA testing that they had agreed to conduct by consent. Thereafter, the court directed delivery of evidence to SLED Agents Ira Jeffcoat and Kenneth L. Bogan, whom the parties agreed would conduct the DNA tests (unless more complicated mitochondrial DNA testing proved necessary). The evidence designated for testing included the hairs allegedly recovered from Mrs. Edwards's bed, scrapings from beneath her fingernails, and blood found on Elmore's pants and shoes.

On July 5, 2005, Elmore filed his 28 U.S.C. § 2254 petition, in which he asserted not only exhausted claims, but also

the unexhausted claim that, because he is mentally retarded, his execution would contravene the Eighth Amendment under *Atkins v. Virginia*, 536 U.S. 304 (2002). The Supreme Court of the United States had decided *Atkins* on June 20, 2002, while Elmore's petition for certiorari was pending in the Supreme Court of South Carolina as part of the state PCR proceedings; the state supreme court subsequently granted Elmore the writ of certiorari on June 10, 2003, ten days shy of the one-year anniversary of the *Atkins* decision. Notably, *Atkins* abrogated South Carolina precedent deeming the execution of mentally retarded prisoners to be constitutional. *See State v. Jones*, 378 S.E.2d 594, 597 (S.C. 1989). Moreover, a South Carolina statute imposes a one-year limitations period for filing a PCR claim premised on a newly recognized constitutional standard or right. *See* S.C. Code Ann. § 17-27-45(B).

The respondents in these federal habeas proceedings — Jon Ozmint, Director of the South Carolina Department of Corrections, and Henry McMaster, the State's Attorney General (collectively, the "Respondents") — answered Elmore's § 2254 petition and moved for summary judgment on September 6, 2005. The Respondents contended, inter alia, that the *Atkins* claim (unlike Elmore's other claims) was barred for failure to exhaust state remedies. *See* 28 U.S.C. § 2254(b)(1) (providing that a state prisoner's petition for a writ of habeas corpus "shall not be granted unless it appears that" the petitioner "has exhausted the remedies available in the courts of the State"). In his response of September 26, 2005, Elmore requested the district court, pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), to stay his petition and hold the federal proceedings in abeyance while he returned to state court to exhaust his *Atkins* claim. The following day, September 27, 2005, Elmore indeed initiated parallel *Atkins* litigation in the state PCR court with the filing of his second PCR application.[34]

---

[34]The respondents in the parallel state *Atkins* litigation were the State of South Carolina and Ozmint, collectively referred to as the "State" in our discussion of those PCR proceedings.

In subsequent memoranda requested by the district court on the stay issue, the parties outlined their competing positions on the applicability of *Rhines*, which instructs that a stay is appropriate "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." 544 U.S. at 278. Naturally, Elmore claimed eligibility for the *Rhines* stay and abeyance procedure. By contrast, the Respondents contended both that Elmore lacked good cause for his failure to exhaust and that his *Atkins* claim was not potentially meritorious, because Elmore had failed to comply with South Carolina's statute of limitations by asserting the claim in state court within one year of *Atkins* being decided, and, alternatively, because Elmore is not in fact mentally retarded. With their *Rhines* memorandum, the Respondents filed copies of the State's pleadings in the parallel state *Atkins* litigation, making the same timeliness and merits contentions.[35]

The district court denied Elmore's stay request by its order and opinion of April 25, 2006, and refused to alter or amend that ruling by order and opinion of August 11, 2006.[36] In the latter decision, the court explained that Elmore could not justify his failure to initiate the state *Atkins* litigation within South Carolina's one-year limitations period and, thus, failed to satisfy *Rhines*'s requirement of good cause for the failure to exhaust.

In the meantime, on October 27, 2005, the magistrate judge had issued his report and recommendation, stating that the

---

[35]In asserting that Elmore is not mentally retarded, the Respondents maintained that — under principles of res judicata, issue preclusion, and collateral estoppel — Elmore was stuck with the 1995 PCR testimony of his expert, Dr. Jonathan Venn. *See supra* note 22 (relaying Dr. Venn's opinion that "'Mr. Elmore is not mentally retarded, but he's just a notch above being mentally retarded'" (quoting J.A. 2362)).

[36]The district court's April 25, 2006 order and opinion is found at J.A. 4671-77, and its August 11, 2006 order and opinion at J.A. 4689-91.

district court should grant the Respondents' summary judgment motion and deny Elmore relief on all of his pending § 2254 claims — a disposition that the district court implemented by its order and opinion of May 17, 2007, denying Elmore a writ of habeas corpus, and its order and opinion of August 3, 2007, refusing to alter or amend the judgment.[37] The claims pursued by Elmore in his § 2254 petition, in addition to the *Atkins* claim, included the following: the *Strickland* and *Brady* claims premised on the suppression of the unmatched "Item T" Caucasian hair removed from Mrs. Edwards's bloody abdomen during her autopsy; the *Strickland* and *Giglio/Napue* claims involving the forty-five pubic hairs allegedly found on Mrs. Edwards's bed; the *Strickland* claim concerning the medical examiner's time-of-death opinion; the *Strickland*, *Brady*, and *Giglio/Napue* claims related to the fingerprint evidence; and the *Giglio/Napue* claim based on James Gilliam's since-recanted account of Elmore's spontaneous jailhouse confession. Those claims comprise the Sixth Amendment ineffective assistance claim and the Fourteenth Amendment due process claim now before us.[38]

The magistrate judge demonstrated no hesitation in concluding that the state PCR court's adjudication of Elmore's claims passed muster under § 2254, and the district court largely did the same in its initial order denying the writ, but for one exception: The district court recognized that the state PCR court's finding that Earl Wells did not knowingly sup-

---

[37]The magistrate judge's October 27, 2005 report and recommendation is found at J.A. 4397-4537, the district court's May 17, 2007 order and opinion at J.A. 4692-4762, and its August 3, 2007 order and opinion at J.A. 4964A-Q.

[38]Elmore also pursued in the district court, as he does in this appeal, the Sixth Amendment claim that his 1984 trial was not conducted before an impartial jury. *See supra* note 1. Elmore elected to abandon other claims exhausted and rejected in the South Carolina courts, i.e., the *Strickland* and *Brady* claims concerning the possible culpability of Mrs. Edwards's neighbor, Jimmy Holloway, plus the *Strickland* claims premised on the blood evidence and the testimony of Gilliam and Dr. Venn.

press Item T was irrelevant under *Brady*. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*." (emphasis added)). Nevertheless, the district court agreed with the state PCR court's conclusion that the suppression of Item T was immaterial to the 1984 verdict.

In seeking to alter or amend the judgment, Elmore pointed out that the parties were awaiting the results of the DNA testing being overseen by the district court, and he provided notice of a June 13, 2007 decision of the state PCR court denying without prejudice the State's motion to dismiss his parallel state *Atkins* litigation as time-barred. The district court was not swayed to disturb its judgment, however, explaining that Elmore could present any exonerating DNA test results in a second § 2254 petition, and that the state PCR court might yet enforce a statute of limitations bar on his *Atkins* claim. Thereafter, on October 9, 2007, the district court granted Elmore the certificate of appealability necessary for this appeal on issues involving all of his live § 2254 claims. *See* 28 U.S.C. § 2253(c)(1) (providing that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from" "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court").[39]

## B.

As earlier explained, the first oral argument in this appeal, conducted on March 21, 2008, primarily focused on the stay issue, i.e., whether the district court should have stayed its proceedings and, alternatively, whether we should stay this appeal pending the exhaustion of Elmore's *Atkins* claim in the

---

[39]The district court's October 9, 2007 order granting the certificate of appealability is found at J.A. 4970.

South Carolina courts. During the argument, the parties informed us that the parallel state *Atkins* litigation was ongoing in the state PCR court, and that a recent examination of Elmore by the South Carolina Department of Disabilities and Special Needs — performed at the request of the State — had confirmed that he is mentally retarded as defined by South Carolina law. Nonetheless, the Respondents continued to suggest that the Eighth Amendment could not save Elmore from execution, and that there was no justification for staying these federal proceedings, because Elmore's lawyers had inexcusably raised his *Atkins* claim too late.

By our order of March 24, 2008, we recognized that, subsequent to the district court's judgment against Elmore, additional significant factual development had occurred in the state PCR court concerning his *Atkins* claim. We also observed that the state PCR court had taken steps toward an expeditious disposition of the *Atkins* claim, which disposition would likely involve the resolution of novel state law questions and impact this appeal. In light of the circumstances, and in the interests of federalism and comity, we stayed the appeal pending final disposition of the state *Atkins* litigation.

Thereafter, by its order of February 1, 2010 (the "*Atkins* Order"), the state PCR court ruled that Elmore fits South Carolina's definition of being mentally retarded and, thus, is categorically excluded by the Eighth Amendment from execution under *Atkins* and *Franklin v. Maynard*, 588 S.E.2d 604 (S.C. 2003) (post-*Atkins* decision of Supreme Court of South Carolina defining mental retardation and establishing procedures for making mental retardation determinations). Among the state PCR court's findings were that Elmore "has significantly subaverage intellectual functioning." *Atkins* Order 12. Indeed, as the court recognized, "all intellectual and academic testing over the course of [Elmore's] life" resulted in scores that consistently placed him "within the mental retardation range." *Id.*

The state PCR court observed that "[i]t took [Elmore] five years to move beyond the first two grade levels," and he "fi-

nally gave up and quit school in the fifth grade at the age of thirteen, though he did give eighth grade a two week try before he floundered and dropped out for good at the age of fifteen." *Atkins* Order 14 (emphasis omitted). Elmore's jobs were always "in the capacity as an unskilled laborer," and he "had difficulty with practical tasks such as balancing a checkbook," "do[ing] simple conversions such as inches to feet," and "us[ing] a phone book." *Id.* at 14-15, 19. Elmore "never lived independently" or "paid bills," though he "would give money [for household expenses] to his mother and his girlfriend," with whom he alternately resided. *Id.* at 17 (internal quotation marks omitted). Elmore's "on again, off again relationship" with his girlfriend (Mary Alice Dunlap) "was more like a mother-child relationship, in the day-to-day aspects of it." *Id.* at 19. Moreover, Elmore deferred to his employers to set his pay, and failed to safeguard his own health and safety by, for example, wearing protective gear and taking medication for hypertension. *See id.* at 17-18 (relating Elmore's account of being told by one employer, after falling from an unstable ladder, that "at least Mr. Elmore was at the right building" (internal quotation marks omitted)). Elmore "is unable to entertain abstract concepts, no matter how elementary," and he is no "more skilled at self-care than . . . a seven year old child who [is] able to dress and clean himself without help." *Id.* at 16, 20 (internal quotation marks omitted).

According to the state PCR court, Elmore "is universally described as a pleasant person with a compliant manner," but "his social skills are widely reported to be simple and superficial." *Atkins* Order 19. Although Elmore's "verbal skills are, [relatively] speaking, [his] strong suit," his "ability to communicate is not all that it appears to be." *Id.* at 15-16. Rather, Elmore's verbal skills are "the product of [a lifelong] experience coping with his difficulties and learning how to 'pass'" — that is, "go[ing] to great lengths to 'pass' as normal" in order to avoid "the stigma of being adjudged mentally retarded." *Id.* at 16 & n.6 (internal quotation marks omitted).

In ruling that Elmore is mentally retarded and favorably disposing of his *Atkins* claim, the state PCR court did not re-examine Elmore's other constitutional claims (including the *Strickland*, *Brady*, and *Giglio/Napue* claims), nor mention its earlier denial without prejudice of the State's motion to dismiss the *Atkins* claim as time-barred. On March 10, 2010, the Respondents notified us of the state PCR court's *Atkins* Order and advised that it would not be further contested. *See Elmore v. Ozmint*, No. 07-14 (4th Cir. Mar. 10, 2010) (Respondents' status report enclosing copy of *Atkins* Order). The Respondents explained that, "[a]lthough an appeal may have been appropriate to address [the state PCR court's] earlier deferred conclusions about the applicability of the statute of limitations . . . , the state has chosen to forego [that issue] at this time in this case, in light of the court's [unassailable] mental retardation findings." *Id.* at 2.

Accordingly, we lifted our stay of this appeal by order of March 11, 2010. The parties' subsequent briefs and our September 22, 2010 oral argument focused on the issues remaining before us, including those involving Elmore's Sixth Amendment ineffective assistance claim (relying on *Strickland*) and his Fourteenth Amendment due process claim (invoking *Brady* and *Giglio/Napue*).

## VII.

At last turning to our assessment of this appeal, we begin by outlining the applicable standard of review. First of all, we review de novo the district court's denial of habeas corpus relief to Elmore on the basis of the state court record. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). In so doing, however, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") mandates that we accord deference to the state court decisions adjudicating Elmore's claims on the merits, i.e., the First PCR Order and the Second PCR Order. *See* 28 U.S.C. § 2254(d); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (observing that

§ 2254(d) contains a "highly deferential standard for evaluating state-court rulings" that "demands that state-court decisions be given the benefit of the doubt" (internal quotation marks omitted)). Under AEDPA, we may deem Elmore to be entitled to relief only if the state PCR court's adjudication of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

By its plain terms, § 2254(d)(2) limits our review to the evidence placed before the state PCR court. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 n.7 (2011). Section 2254(d)(2) is one of two AEDPA provisions governing review of state court factual findings. The other such provision is § 2254(e)(1), which provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The Supreme Court has not decided whether § 2254(e)(1) — an "arguably more deferential standard" than § 2254(d)(2) — "applies in every case" involving § 2254(d)(2) review. *Wood v. Allen*, 130 S. Ct. 841, 849 (2010) (explaining that, although the Court had "granted certiorari to resolve the question of how §§ 2254(d)(2) and (e)(1) fit together," it was not necessary to reach that issue because the challenged state court finding was reasonable under § 2254(d)(2)). As our Court has interpreted the two provisions, the § 2254(e)(1) standard has a place in § 2254(d)(2) review: We consider whether the state PCR court based its decisions "on an objectively unreasonable factual determination in view of the evidence before it, bearing in mind that factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Baum v. Rushton*, 572 F.3d 198, 210 (4th Cir. 2009) (internal quota-

tion marks omitted). We must be "especially" deferential to the state PCR court's findings on witness credibility, *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010), and we will not overturn the court's credibility judgments unless its error is "stark and clear," *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008).

Like our § 2254(d)(2) review, and in accordance with recent Supreme Court instructions, our § 2254(d)(1) review is generally confined to the record that was before the state PCR court. *See Cullen*, 131 S. Ct. at 1398 (concluding that, because the "backward-looking language [of § 2254(d)(1)] requires an examination of the state-court decision at the time it was made[,] the record under review is limited to the record in existence at that same time"). Moreover, "clearly established Federal law" under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state PCR court rendered the relevant decisions. *See Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Under the "contrary to" clause of § 2254(d)(1), Elmore may be entitled to habeas corpus relief if the state PCR court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state PCR court decided the case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 413 (2000). By contrast, under the "unreasonable application" clause, Elmore may merit relief if the state PCR court identified the correct governing legal principles from the Supreme Court's decisions but unreasonably applied those principles to the facts of Elmore's case. *See id.*[40]

---

[40]Even if we conclude under § 2254(d) that the state PCR court erred, habeas corpus relief can be granted to Elmore only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). Significantly, however, it is unnecessary to conduct a *Brecht* harmlessness analysis on a *Strickland* or *Brady* claim that already has withstood the more onerous test for prejudice (*Strickland*) or materiality (*Brady*). *See Kyles v. Whitley*, 514 U.S. 419, 436 & n.9 (1995).

## VIII.

Despite the highly deferential AEDPA standard, we conclude that Elmore is entitled to habeas corpus relief under 28 U.S.C. § 2254 on his Sixth Amendment *Strickland* claim. Simply put, the gross failure of Elmore's 1984 trial lawyers to investigate the State's forensic evidence — including the medical examiner's time-of-death opinion, the pubic hairs allegedly recovered from Mrs. Edwards's bed, the nature of the "Item T" materials removed from Mrs. Edwards's bloody abdomen, and the fingerprint lifted from the blood-smeared toilet in Mrs. Edwards's en suite bathroom — had a palpably adverse effect on the defense.[41]

---

[41]Although we do not resolve Elmore's Fourteenth Amendment due process claim, *see supra* note 1, we recognize that such claim encompasses at least one strong contention: that Item T was suppressed by the State in contravention of *Brady*. The Respondents have conceded that Item T was suppressed, in that SLED's Earl Wells "mistakenly reported" its contents as being solely blue fibers and then held the Item T slides in his office for nearly seventeen years. Additionally, the Respondents have acknowledged that Item T is favorable to Elmore. The Respondents maintain, however, that the state PCR court reasonably concluded that Item T — particularly the unmatched Caucasian hair contained therein — was not material to Elmore's 1984 convictions.

We are not convinced, however, that the state PCR court's materiality analysis can withstand even deferential AEDPA review. The court tersely dismissed Item T's unmatched Caucasian hair as "[o]ne hair from the victim's body from the bedroom floor that could have come from various sources." Second PCR Order 5. In so doing, the court did not, for example, confront evidence undermining the theory that Mrs. Edwards could have easily picked up a random hair from her bedroom floor, *see, e.g.*, J.A. 83 (1982 trial testimony of SLED's Frank Dan DeFreese that Mrs. Edwards, who resided alone, "was a very meticulous housekeeper"), nor did the court consider how the misidentification of Item T's contents might have cast doubt on the competence and honesty of Wells and his fellow SLED agents.

Elmore's other Fourteenth Amendment contentions, though hardly frivolous, run headlong into the state PCR court's credibility findings. That is, invoking *Giglio* and *Napue*, Elmore asserts that the State knowingly

## A.

In ruling in Elmore's favor on his *Strickland* claim, we assume that *Cullen v. Pinholster* precludes our consideration of evidence developed subsequent to the First PCR Order and the Second PCR Order, including later-developed evidence that the parties have urged us to take into account. *See* 131 S. Ct. 1388, 1398, 1400 n.7 (2011) (recognizing that 28 U.S.C. § 2254(d)(1) and (2) review is limited to the existing state court record). *But see, e.g., Hale v. Davis*, No. 07-12397, 2011 WL 3163375, at *8 (E.D. Mich. July 27, 2011) (observing that "the full implications of *Cullen* are unclear").[42]

For his part, Elmore contends that we should view his *Strickland* and other pending claims through the lens of the state PCR court's mental retardation finding, even though the court considered Elmore's mental retardation solely in the context of his later-asserted Eighth Amendment *Atkins* claim. For example, Elmore maintains that, "[e]ven if counsel could ground their inaction on communications from the client in the ordinary case, . . . such a justification evaporates when the defendant is mentally retarded." Br. of Appellant 56. "Thus," according to Elmore, "not only can [his] communications not be invoked to excuse counsel's anemic advocacy, the fact that counsel relied at all on the communications of a retarded client actually provides yet another affirmative reason there can be no confidence in the reliability of [his] conviction[s]." *Id.* at 57-58.

---

presented false testimony concerning the pubic hairs, the toilet print, and his purported jailhouse confession to fellow inmate James Gilliam. The State's witnesses flatly denied any wrongdoing, however, and it would be difficult to say that the state PCR court acted unreasonably or committed stark and clear error in finding those denials credible.

[42]Because *Cullen* was decided after the last round of briefing and oral argument herein, the parties have not addressed its import.

Meanwhile, the Respondents have emphasized the results of the additional DNA testing that had been agreed to during the state PCR proceedings and overseen by the district court — results that neither the South Carolina courts nor the district court awaited. According to the Respondents, the DNA test results indicate that "a significant number of hairs" allegedly found on Mrs. Edwards's bed fully or partially match Elmore, and "blood stained cuttings from" Elmore's pants and shoe fully or partially match Mrs. Edwards. Br. of Appellees 1 (citing J.A. 4958-59).[43] The Respondents assert that, although the DNA testing "was neither done nor available at the 1982, 1984 or 1987 trials nor the initial PCR proceedings[,] it conclusively confirms and corroborates the state's prosecution theory and evidence of Mr. Elmore's guilt and involvement in Dorothy Edwards' brutal death." *Id.*

Elmore, who had previously conceded that the hairs are his, points out that the DNA test results are entirely consistent with his long-standing position that the SLED agents lied about finding the hairs on Mrs. Edwards's bed and planted the blood on his pants and shoe. *See* Br. of Appellant 32 n.7 ("As it is Elmore's contention that his pubic hairs were taken from him and immediately placed in evidence as if they had been recovered from the [crime] scene, it should come as no surprise that DNA testing confirms that the hairs in the bag the State claims was recovered from the crime scene are, in fact, Elmore's."); *id.* at 23 ("Not surprisingly, given the inconsistencies of the spots [of blood] with the nature of the crime scene, the highly suspicious chain of custody on [the pants and shoe], and the highly irregular manner in which the other evidence in this case was collected, the blood on the clothing was found to contain the victim's DNA."). Elmore also highlights that "[t]he validity of the DNA testing has never been subjected to the adversarial process." Reply Br. of Appellant 1. "In sum," according to Elmore, "the DNA evidence

---

[43]The DNA testing of scrapings from beneath Mrs. Edwards's fingernails apparently resulted in a match to Mrs. Edwards. *See* J.A. 4959.

Respondents attempt to now interject into this case does nothing to offset the unreliability of the forensic evidence" used to obtain Elmore's 1984 convictions. *Id.* at 3.

Even if *Cullen* left us free to consider the mental retardation finding and the DNA test results, none of that evidence would alter our view of Elmore's *Strickland* claim. The 1984 defense team's failure to investigate the State's forensic evidence has not been (and cannot be) blamed on Elmore himself, *see infra* note 48, and those lawyers' constitutionally deficient performance is patent even without taking Elmore's mental retardation into account. Moreover, the recent DNA test results, heralded by the State as definitive proof of Elmore's guilt despite the lack of any court determination of their reliability, are consistent with Elmore's position that the SLED agents falsely testified about finding his pubic hairs on Mrs. Edwards's bed and planted Mrs. Edwards's blood on his clothing. Thus, we are content to look to the record solely as it existed at the time of the First PCR Order and the Second PCR Order.

## B.

The record before us reflects that Elmore's 1984 trial was essentially a replay of his 1982 trial. In the words of the state PCR court, the State presented "overwhelming evidence . . . that solely pointed to the guilt of Edward Elmore," leaving the jury no choice but "to convict." First PCR Order 119-20. The State's evidence primarily consisted of the following: Elmore knew Mrs. Edwards, having been hired by her on several occasions, the latest being December 30, 1981, to wash the windows and clean the gutters of her home; the crime scene suggested that Mrs. Edwards was murdered on the night of Saturday, January 16, 1982, a time of death that was deemed feasible by the medical examiner; Elmore lacked a corroborated alibi for more than two hours that Saturday night; Elmore's thumbprint was found on the exterior frame of the back door into Mrs. Edwards's house, apparently where the

murderer entered the premises; forty-five pubic hairs consistent with Elmore were recovered from Mrs. Edwards's bed; Type A blood (the type Mrs. Edwards shared with about 40-45% of the population) was found on Elmore's pants and shoe; Elmore evinced a lack of credibility and a guilty conscience by, inter alia, initially denying at the time of his arrest that he knew Mrs. Edwards and thereafter telling the police that, if he killed Mrs. Edwards, he did not remember doing so; and Elmore spontaneously confessed to fellow Greenwood jail inmate James Gilliam that he had raped and murdered Mrs. Edwards and eradicated physical evidence of his crimes.

Elmore proclaimed his innocence to his lawyers for the 1982 and 1984 trials, Geddes D. Anderson and John F. Beasley, who therefore did not believe Gilliam's account of Elmore's jailhouse confession and endeavored to discredit Gilliam. Nevertheless, Anderson and Beasley did not otherwise mistrust the State's case against Elmore. *See, e.g.*, J.A. 2481 (PCR testimony of lead counsel Anderson allowing that the State had "ample evidence" against Elmore). The bulk of Anderson's trial preparation occurred during the ten-day periods prior to Elmore's 1982 and 1984 trials, when Anderson was also working on other cases. Anderson interviewed Elmore, Elmore's mother, and perhaps Elmore's former girlfriend and other witnesses, but definitely did not interview the person who reportedly found the body of Mrs. Edwards, her neighbor Jimmy Holloway.

The defense team conducted no independent analyses of the State's forensic evidence. Anderson waited until the eve of the 1982 trial to look at any of the physical evidence, and then — inexplicably — asked to see only the exhibits that the State intended to introduce. He did not suspect any irregularities in the evidence's chain of custody and thus stipulated thereto. Both Anderson and Beasley admitted to being lulled into inaction by the belief that the police were above reproach. *See* J.A. 2424 (Anderson's PCR testimony that "I think I probably just stood by my opinion that I have respect for the SLED

team, and they're the best we have in South Carolina, and I assumed they were not going to contaminate the evidence"); *id.* at 2581 (Beasley's PCR testimony that "I had full confidence in the law enforcement officers. I knew them all. I had never had any occasion where any law official ever tried to pull anything over on me, and I had no reason to suspect anything being wrong"). At most, the defense team gave fleeting thought to hiring experts to examine the evidence. Anderson blamed scarce state resources, but his testimony indicated that he and Beasley never isolated evidence deserving further examination, identified appropriate experts and ascertained their fees, or inquired about state and other possible sources of funding.

Once Elmore's 1982 convictions were reversed by the state supreme court, Anderson and Beasley had a rare second chance to contest the State's case — along with near-perfect knowledge of what that case would be. Yet, as Anderson conceded, he looked no further at the physical evidence in preparation for the 1984 trial and again blindly stipulated to its admissibility. Anderson also acknowledged that he saw the guilt phase as a lost cause. Focusing instead on the expected sentencing phase, Anderson conducted just one new investigation, into the subject of Elmore's adaptability to prison life.

During the guilt phase of the 1984 trial, the defense team's cross-examination of the State's witnesses was largely perfunctory. After medical examiner Dr. Sandra Conradi identified a sixty-hour window in which Mrs. Edwards could have died (based on the autopsy), but pinpointed a likely Saturday night death (premised on non-scientific circumstantial evidence), the defense merely elicited from Dr. Conradi that the scientific indicators of time of death "are very variable." J.A. 653. The defense got SLED's Frank Dan DeFreese to agree that Elmore's thumbprint, though "fresh"-appearing, "could have been [on the exterior door frame] a month." *Id.* at 579. The cross-examination of SLED's Earl Wells clarified only that the "high degree of probability" of a match between

Elmore and the forty-five pubic hairs allegedly found on Mrs. Edwards's bed was something short of "100 percent." *Id.* at 624. And, the defense led SLED's John C. Barron to concede that it was impossible to determine the age of the blood on Elmore's clothing. There was no cross-examination of Holloway, who testified to finding Mrs. Edwards's body and discerning much of the circumstantial evidence of a Saturday night death, or of SLED's Ira Byrd Parnell, Jr., who claimed that he recovered the incriminating hairs from Mrs. Edwards's bed.

In their closing arguments on Elmore's behalf, his lawyers underscored that there was a possibility, however slim, that the forensic evidence was incorrectly implicating Elmore. *See, e.g.*, J.A. 949 (Anderson's argument that "[t]here was never any expert testimony from individuals from SLED that pinpointed Edward Lee Elmore as the wrongdoer in this case. . . . The most I heard was high probability, a high degree of probability"). The lawyers also pointed out a few gaps in the State's case, including the lack of inculpatory evidence in Elmore's car; the existence of evidence contradicting the theory of his guilty conscience (e.g., his entirely voluntary encounter with the police just prior to his arrest); and the inconsistency between Elmore's alleged eradication of evidence inside the Edwards home, but failure to destroy evidence outside the home (i.e., his thumbprint on the exterior door frame and the unwashed clothing left at his own residence).

Ultimately, however, Anderson conceded that he was ill-equipped to challenge the police investigators. *See* J.A. 955 (Anderson's admission to the jury that, "[m]an, they're trained. They're ready for me. They've been here every day. They're ready for me. Loaded for bear. I stayed away from them. I can't cross-examine them. Nobody can"). Beasley effectively abandoned his client and actually vouched for those investigators, advising the jury: "I think at SLED they are recognized as being one of the best departments or proba-

bly as good as the F.B.I. They have a very fine department, and they have very good personnel, and they are experts at everything they do." *Id.* at 913. Not surprisingly, it merely took the jury about two hours to agree on the guilty verdict. After all, as the state PCR court recognized, conviction was the jury's only rational option in view of the State's evidence and Elmore's ineffectual defense.

Of course, it is now clear from the PCR proceedings that an investigation into the State's evidence would have exposed a multitude of questions about its legitimacy and reliability. For example, Elmore presented behavioral profiling evidence tending both to exculpate him and to cast suspicion on Holloway (and, by extension, the circumstantial evidence of a Saturday night death). The medical examiner testimony of Dr. Conradi and Elmore's expert Dr. Jonathan Arden revealed that, within the scientific time-of-death range identified by Dr. Conradi at trial, a Sunday afternoon death was much more likely than a Saturday night one. Those medical examiners disagreed only on the degree of probability of a Saturday night death. Dr. Arden deemed it "extraordinarily unlikely and improbable really in the extreme," while Dr. Conradi suggested a higher probability but conceded that Saturday night was close to the "outside limit" of the possible range. *See* J.A. 2252, 2721.

Elmore also presented PCR evidence calling into question the SLED agents' previously unchallenged account of recovering Elmore's forty-five pubic hairs from Mrs. Edwards's bed. That is, the agents failed to take a single photograph of the hairs on the bed, to collect the bedcovers and sheets for further forensic analysis, or to package the hairs like other physical evidence taken from the crime scene; despite the State's theory that an already-bloodied Mrs. Edwards pulled the hairs from Elmore as he raped her on the bed, there was no blood or semen on the bedcovers or sheets; the number of Elmore's pubic hairs was exceptionally large; Elmore sustained no apparent groin injury or bruising; and none of

Elmore's pubic hairs were found on Mrs. Edwards's body or elsewhere in the house. Meanwhile, Elmore demonstrated that the Item T Caucasian hairs removed from Mrs. Edwards's bloody abdomen during her autopsy — including one hair that DNA testing has confirmed was not hers — were falsely reported by SLED as being blue fibers and then concealed in a SLED office for nearly seventeen years. Similarly, Elmore established that the SLED team misreported at least one fingerprint as being unidentifiable, and may have so misreported a print lifted from the blood-smeared toilet in Mrs. Edwards's en suite bathroom. Additionally, Elmore proffered evidence that the scant amount of blood on his clothing was inconsistent with the gruesome crime scene, and he produced a SLED laboratory record suggesting that his clothing was exposed to pre-analysis tampering.

In the face of the foregoing record, the state PCR court rejected Elmore's multi-faceted Sixth Amendment ineffective assistance of counsel claim, which was premised on the lack of investigation into the State's forensic evidence, along with other errors by his trial lawyers. Elmore has since more narrowly formulated his ineffective assistance claim to focus solely on the lawyers' failure to investigate the forensic evidence, particularly Dr. Conradi's time-of-death opinion, the forty-five pubic hairs allegedly found on Mrs. Edwards's bed, the contents of Item T, and the fingerprints lifted from the crime scene.

## C.

The "clearly established Federal law" governing the state PCR court's assessment of Elmore's Sixth Amendment ineffective assistance claim was *Strickland v. Washington*, 466 U.S. 668 (1984). Importantly, the state PCR court recognized the controlling force of *Strickland* on Elmore's ineffective assistance claim, explaining that "the [*Strickland*] court established as a constitutional standard a two-prong test to determine ineffectiveness; was counsel's performance deficient;

and second, if so, whether there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different." First PCR Order 5.

Our review of the First PCR Order and the Second PCR Order, however, leads to the ineluctable conclusion that the state PCR court both unreasonably applied and acted contrary to *Strickland* in resolving Elmore's ineffective assistance claim. That is, although the state PCR court correctly identified certain *Strickland* principles, the court unreasonably applied those tenets to the facts before it. *See Williams v. Taylor*, 529 U.S. 362, 413 (2000) (recognizing that, under § 2254(d)(1)'s "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case"). The state PCR court defied other *Strickland* principles — both acknowledged and unacknowledged by the court — freeing itself to test Elmore's ineffective assistance claim under a legal framework in many ways contrary to that mandated by *Strickland*. *See Williams*, 529 U.S. at 413 (observing that, under the "contrary to" clause of § 2254(d)(1), "a federal habeas court may grant the writ if," inter alia, "the state court arrives at a conclusion opposite to that reached by this Court on a question of law"). At bottom, the state PCR court's adjudication of Elmore's ineffective assistance claim "was so lacking in justification that there was . . . error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).[44]

---

[44]To illustrate the proper application of *Strickland* principles, we cite herein to decisions of the Supreme Court and our Court rendered in *Strickland*'s wake, including some issued after the First PCR Order and the Second PCR Order. *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (recognizing that a federal habeas court may rely on decisions, unseen by the state court under review, "appl[ying] the same 'clearly established' precedent of *Strickland*"). Nonetheless, we recognize that "'the *Strickland* test of necessity requires a case-by-case examination of the evidence'" and look to other precedents only "for guidance." *Cullen*, 131 S. Ct. at 1407 n.17 (quoting *Williams*, 529 U.S. at 391).

### 1.

In *Strickland*, the Supreme Court instructed that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The Court also announced its two-prong test to analyze ineffective assistance claims, encompassing performance and prejudice. *See id.* at 687.

To satisfy the performance prong of *Strickland*, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. In so doing, the defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. For its part, the court deciding the "ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* That is, the court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* "In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* Nevertheless, the court also "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Significantly, the *Strickland* Court recognized that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "[S]trategic

choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," but "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91.

Under *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691. With particular respect to the duty to investigate,

> what investigation decisions are reasonable depends critically on [information supplied by the defendant]. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* Thus, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Id.*

Turning to *Strickland*'s prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. As defined by the Court, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent [counsel's]

errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Making this determination requires the court deciding the ineffectiveness claim to

> consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Id.* at 695-96. In sum, "[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696.

### 2.

### a.

### i.

Specific to *Strickland*'s performance prong, the state PCR court recognized the *Strickland* principle that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691; *see* First PCR Order 149 ("'[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options.'" (quoting *Strickland*, 466

U.S. at 680 (discussing Eleventh Circuit's *Strickland* decision then before it))). Furthermore, the state PCR court emphasized its *Strickland* obligation to "'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed *as of the time of counsel's conduct*.'" First PCR Order 147 (emphasis in original) (quoting *Strickland*, 466 U.S. at 690). In that regard, the state PCR court cautioned:

> When the court considers [*Strickland*'s performance] prong, it must do so without falling into the trap of considering the actions only in hindsight. Whether counsel made an error is a question which can be answered only viewing his actions or decisions in the light of all surrounding circumstances at the time the decision was made, not in the artificial light of hindsight.

*Id.*; *accord Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (explaining that *Strickland* "adopted the rule of contemporary assessment of counsel's conduct").

Nevertheless, with little discussion of facts relevant to the proper contemporary assessment of the conduct of Elmore's trial lawyers, the state PCR court found that their failure to investigate the State's forensic evidence constituted objectively reasonable attorney performance. Most pertinently, the court recited lawyer Anderson's testimony that "'I think I probably stood by my opinion that I have respect for the SLED team, . . . they're the best we have in South Carolina, and I assumed they were not going to contaminate the evidence.'" First PCR Order 28 (alteration in original) (citation omitted). In so doing, the court advanced the notion that no investigation of the forensic evidence was necessary, because the defense lawyers reasonably trusted in not only the integrity, but the infallibility, of the police.

As a matter of logical consistency, such notion conflicts with the state PCR court's own observation (made in the

course of chastising Elmore for asserting his fingerprint-related claims) that "experts may disagree as to results." First PCR Order 78. Much more significantly, such notion is abhorrent to *Strickland*, which was designed to protect the Sixth Amendment right to "a reliable adversarial testing process." *See* 466 U.S. at 688; *see also Evitts v. Lucey*, 469 U.S. 387, 395 (1985) ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits."); *Nix v. Williams*, 467 U.S. 431, 453 (1984) (Stevens, J., concurring in the judgment) ("The Sixth Amendment guarantees that the conviction of the accused will be the product of an adversarial process, rather than the *ex parte* investigation and determination by the prosecutor."); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."). A healthy skepticism of authority, while generally advisable, is an absolute necessity for a lawyer representing a client charged with capital murder. After all, the custodians of authority in our democracy are ordinary people with imperfect skills and human motivations. The duty of the defense lawyer "is to make the adversarial testing process work in the particular case," *Strickland*, 466 U.S. at 690 — an obligation that cannot be shirked because of the lawyer's unquestioning confidence in the prosecution.

To be sure, it was thus an unreasonable application of *Strickland* to rule that the failure of Elmore's lawyers to investigate the State's forensic evidence was justified by their faith in the integrity and infallibility of the police. Indeed — even engaging in a post-AEDPA "doubly deferential" review of attorney conduct under *Strickland*'s performance prong, *see Cullen*, 131 S. Ct. at 1403 (recognizing that federal habeas courts must "take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)" (internal quotation marks omitted)) — the Supreme Court has found

deficient performance premised on a failure to investigate in circumstances that were no more egregious than those present here. *See Rompilla v. Beard*, 545 U.S. 374, 383-90 (2005); *Wiggins v. Smith*, 539 U.S. 510, 519-34 (2003).[45]

Of particular relevance, in *Rompilla*, the Court concluded that the state habeas courts reached "an objectively unreasonable conclusion" in ruling "that defense counsel's efforts to find mitigating evidence by other means excused them from looking at the prior conviction file." 545 U.S. at 388-89. The record reflected that — although Rompilla's lawyers made "a number of efforts" to find mitigating evidence, "including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts" — the lawyers did not examine Rompilla's readily available prior conviction file despite knowing the prosecution would use it in aggravation. *Id.* at 381, 383. In expounding on why the lawyers' deficiency was "clear" and "obvious," *id.* at 383, the Court observed:

> It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking. No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony. Nor would a reasonable lawyer compare possible searches for school reports, juvenile records, and evidence of drinking habits to the opportunity to take a look at a file disclosing what the prosecutor knows and even plans to read from in his case. Questioning a few more family members and searching for old records can promise less than

---

[45]AEDPA deference was applied in the *Rompilla* and *Wiggins* performance-prong assessments, but not in their prejudice-prong analyses.

> looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce.

*Id.* at 389 (citation omitted). The Court summarized that "[i]t is owing to these circumstances that the state courts were objectively unreasonable in concluding that counsel could reasonably decline to make any effort to review the file." *Id.* at 390.[46]

Similarly (albeit prior to AEDPA), in *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the Supreme Court deemed trial counsel's lack of investigation to be deficient under *Strickland*'s performance prong. The *Kimmelman* defendant (Morri-

---

[46]The *Rompilla* Court recognized that "[t]he notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense." 545 U.S. at 387. Rather, the Court explained,

> the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:
>
> > "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."

*Id.* (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). The Court recognized that those Standards, which existed at the time of Elmore's trials, may be used "as guides to determining what is reasonable." *Id.* (internal quotation marks omitted).

son) was charged with rape, and his lawyer had neglected to file a timely motion to suppress an incriminating bedsheet seized without a search warrant. *See* 477 U.S. at 368-69. The trial record revealed

> that Morrison's attorney failed to file a timely suppression motion, not due to strategic considerations, but because, until the first day of trial, he was unaware of the search and of the State's intention to introduce the bedsheet into evidence. Counsel was unapprised of the search and seizure because he had conducted no pretrial discovery. Counsel's failure to request discovery, again, was not based on "strategy," but on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense and that the victim's preferences would determine whether the State proceeded to trial after an indictment had been returned.

*Id.* at 385. Despite "applying a heavy measure of deference to his judgment," the Court found "counsel's decision unreasonable, that is, contrary to prevailing professional norms." *Id.* (internal quotation marks omitted); *see also id.* at 394 (Powell, J., concurring in the judgment) ("Petitioners contend that trial counsel's errors were not egregious enough to satisfy *Strickland*'s performance prong. . . . The Court correctly finds that [Petitioners' argument is] mistaken.").

The *Kimmelman* Court was convinced of deficient performance in that Morrison's "lawyer neither investigated, nor made a reasonable decision not to investigate, the State's case through discovery." 477 U.S. at 385. According to the Court, "[s]uch a complete lack of pretrial preparation puts at risk both the defendant's right to an 'ample opportunity to meet the case of the prosecution' and the reliability of the adversarial testing process." *Id.* (quoting *Strickland*, 466 U.S. at 685). Therefore, not even "defense counsel's vigorous cross-

examination, attempts to discredit witnesses, and effort to establish a different version of the facts" during trial could "lift counsel's performance back into the realm of professional responsibility." *Id.* at 385-86. As the Court explained,

> [i]n this case, . . . we deal with a total failure to conduct pre-trial discovery, and one as to which counsel offered only implausible explanations. Counsel's performance at trial, while generally creditable enough, suggests no better explanation for this apparent and pervasive failure to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

*Id.* at 386 (quoting *Strickland*, 466 U.S. at 691).

Lamentably akin to defense counsel in *Kimmelman* and *Rompilla*, Elmore's lawyers disregarded their professional obligation to investigate critical prosecution evidence, thereby engendering "a breakdown in the adversarial process that our system counts on to produce just results." *See Strickland*, 466 U.S. at 696. As in *Kimmelman* and *Rompilla*, the failure to investigate cannot be excused by the lawyers' other efforts (which, in any event, were meager and superficial). Indeed, the need for scrutiny of the forensic evidence was indisputable: The case was a real "who-done-it" in which Elmore was asserting his innocence, the State's case against him largely hinged on the forensic evidence, and, at least as far as Elmore's lawyers knew, the prosecutor was maintaining an open file. Yet Elmore's lawyers conducted no more examination of the forensic evidence than to ask a day or two before the 1982 trial to see the exhibits that the State intended to introduce. The lawyers did not look behind the State's proposed exhibits, did not investigate the other (possibly exculpatory) evidence that the State was bypassing, and did not conduct an independent analysis of a single item of forensic evidence in the State's arsenal.

As obvious as the need for investigation was prior to the 1982 trial, it was more so ahead of the 1984 retrial. Rather than capitalize on their comprehensive knowledge of the State's case, however, Elmore's lawyers opted for capitulation. So, for example, in the face of Elmore's corroborated alibis for Sunday and Monday, his lawyers "condescended [sic]" to the State's theory — and the medical examiner's opinion — that Mrs. Edwards was murdered on Saturday night. *See* J.A. 2416-17 (PCR testimony of lawyer Anderson admitting same). Despite knowing that the pubic hairs allegedly found on Mrs. Edwards's bed were by far the State's most damning physical evidence, Elmore's lawyers did nothing to probe the circumstances of the hairs' discovery. The lawyers did not even inspect readily accessible SLED records that would have suggested the possible benefit of further inquiry into, inter alia, the Item T materials that were removed from Mrs. Edwards's bloody abdomen (were they hairs or fibers?), and the fingerprint lifted from the blood-smeared toilet in Mrs. Edwards's en suite bathroom (was it really unidentifiable?). To paraphrase *Rompilla*, "[i]t flouts prudence to deny that a defense lawyer should try to look at [forensic evidence] he knows the prosecution will cull for [inculpatory] evidence, let alone when the [forensic evidence] is sitting in the [prosecutor's office], open for the asking." *See* 545 U.S. at 389.[47]

---

[47]Because Elmore has focused his ineffective assistance claim on the time-of-death opinion, the pubic hairs, Item T, and the toilet print, we do the same herein. Nevertheless, the record raises additional concerns with the State's forensic evidence that a proper adversarial investigation could have uncovered. Such concerns relate to, inter alia, Dr. Jonathan Arden's opinion that Mrs. Edwards's vaginal injuries were caused postmortem by the bottle tongs, the opinions of other experts that the scant amount of blood found on Elmore's clothing was inconsistent with the gruesome crime scene, the SLED record suggesting that Elmore's clothing was exposed to pre-blood analysis tampering, and the expert opinion that the placement of Elmore's thumbprint on the exterior frame of the back door into the Edwards home (upside-down and wrapped around the frame) was consistent with performing chores and inconsistent with knocking at the door and waiting for an answer.

Notably, the facts of this case distinguish it from *Harrington v. Richter*, in which the Supreme Court recently rebuffed the theory that, "because Richter's attorney had not consulted forensic blood experts or introduced expert evidence, the [state habeas court] could not reasonably have concluded counsel provided adequate representation." 131 S. Ct. at 788. There, at the trial of Richter and his codefendant for the attempted murder of one man (Johnson) and the murder of another (Klein), Richter's lawyer introduced the theory that the codefendant had fired on Johnson in self-defense and that Klein had been killed in the crossfire. *See id.* at 781-82. Although "[b]lood evidence [did] not appear to have been part of the prosecution's planned case prior to trial," the introduction of the self-defense theory prompted the prosecution to put on two unnoticed blood experts to refute Richter's account. *Id.* at 782. Richter's lawyer's cross-examination of those two expert witnesses "probed weaknesses in the[ir] testimony," and the lawyer called seven fact witnesses for the defense, including Richter and others who "provided some corroboration for Richter's story." *Id.* In the subsequent habeas proceedings, Richter asserted that his trial counsel was deficient in failing to present blood experts in support of the self-defense theory. *See id.* at 783.

The *Richter* Court concluded that "[i]t was at least arguable that a reasonable attorney could decide to forgo inquiry into the blood evidence in the circumstances here." 131 S. Ct. at 788. The Court observed that "it was far from a necessary conclusion that [the importance of the blood evidence] was evident at the time of the trial," and that, "[e]ven if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it." *Id.* at 789. For, the Court explained,

> making a central issue out of blood evidence would
> have increased the likelihood of the prosecution's
> producing its own evidence on the blood pool's ori-

gins and composition; and once matters proceeded on this course, there was a serious risk that expert evidence could destroy Richter's case. Even apart from this danger, there was the possibility that expert testimony could shift attention to esoteric matters of forensic science, distract the jury from whether Johnson was telling the truth, or transform the case into a battle of the experts.

True, it appears that defense counsel's opening statement itself inspired the prosecution to introduce expert forensic evidence. But the prosecution's evidence may well have been weakened by the fact that it was assembled late in the process; and in any event the prosecution's response shows merely that the defense strategy did not work out as well as counsel had hoped, not that counsel was incompetent.

*Id.* at 790 (citation omitted). Highlighting the proposition that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy," the Court also recognized that "Richter's attorney represented him with vigor and conducted a skillful cross-examination. [D]efense counsel elicited concessions from the State's experts and was able to draw attention to weaknesses in their conclusions." *Id.* at 791.

Here, in stark contrast to *Richter*, forensic evidence was always and obviously vital to the State's case, which otherwise relied on James Gilliam's account of Elmore's spontaneous jailhouse confession and Elmore's guilty demeanor and lack of a corroborated alibi for Saturday night. As such, the defense did not risk "making a central issue out of [the forensic] evidence," because the State was already certain to do so. *Cf. Richter*, 131 S. Ct. at 790. Rather, the circumstances necessitated that the defense work to engender doubt about the forensic evidence. Elmore's lawyers attempted as much in their cross-examinations of the State's witnesses, but, because

the lawyers had twice squandered opportunities to investigate the forensic evidence (prior to the 1982 and 1984 trials), they were unarmed for the battle.

The dearth of investigation also distinguishes this case from others where counsel, having conducted some investigation, made an informed decision to pursue another strategy. *See Cullen*, 131 S. Ct. at 1407 ("There comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'" (alteration in original) (quoting *Strickland*, 466 U.S. at 691)). In *Cullen*, for example, the Supreme Court withheld relief because the defendant (Pinholster) failed to show "that the [state habeas court's] decision that he could not demonstrate deficient performance by his trial counsel necessarily involved an unreasonable application of federal law." *Id.* at 1403-04. Pinholster complained of his counsel's failure to pursue and present additional penalty-phase mitigation evidence concerning his troubled background. *See id.* at 1404. The Court observed, however, that counsel had investigated mitigating evidence (including Pinholster's background) prior to the trial's penalty phase, and reasonably concluded that an alternative "family sympathy defense" was a better strategy. *See id.* at 1404-05; *see also, e.g.*, *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (concluding, even pre-AEDPA, "that counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment"); *Darden v. Wainwright*, 477 U.S. 168, 185-86 (1986) (deeming counsel's performance adequate where "a great deal of time and effort went into the defense of [the] case," including "a significant portion . . . devoted to preparation for sentencing," leading to a reasonable choice "to rely on a simple plea for mercy from petitioner himself").

Because Elmore's lawyers' investigation into the State's forensic evidence never started, there could be no reasonable strategic decision either to stop the investigation or to forgo

use of the evidence that the investigation would have uncovered. In nonetheless approving the performance of Elmore's lawyers, the state PCR court unreasonably applied *Strickland* to the facts of this case. That is, "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [*Strickland*]." *See Richter*, 131 S. Ct. at 786.[48]

ii.

In otherwise evaluating Elmore's ineffective assistance claim under the performance prong of *Strickland*, the state PCR court repeatedly relied on later-developed facts — unknown to Elmore's trial lawyers when they decided against investigating the State's forensic evidence prior to the 1982 and 1984 trials — to retroactively justify that decision. Of course, the court's reliance on such facts was in plain contravention of *Strickland*'s contemporary assessment rule — a rule that the state PCR court itself acknowledged. *See* First PCR Order 147-48. To illustrate, the court found that the defense team was not deficient in failing to hire an independent pathologist to challenge medical examiner Dr. Sandra Conradi's time-of-death opinion, because, more than a decade

---

[48]Our conclusion that the state PCR court unreasonably applied *Strickland* in its performance-prong analysis is not altered by the court's discussion that "the [*Strickland*] court recognized that much of counsel's strategic investigations was [sic] necessarily based upon the communications that counsel has with his client." First PCR Order 8. Generally addressing Elmore's multi-faceted ineffective assistance claim, the state PCR court observed that Elmore's 1982 trial testimony "had an effect on how counsel would prepare and present the case in the retrial in 1984." *Id.* at 9. But the court did not — and undoubtedly could not — draw any cause-and-effect connection between Elmore's 1982 testimony (concerning such issues as his whereabouts at the alleged time of Mrs. Edwards's murder) and his lawyers' failure to investigate the State's forensic evidence prior to either the 1982 or the 1984 trial. *See id.* at 8-9; *cf. Strickland*, 466 U.S. at 691 (explaining that limited investigation may be reasonable if "need for further investigation" was "diminished or eliminated" by defendant's statements to counsel, or if such statements alerted counsel that additional investigation "would be fruitless or even harmful").

later, Elmore's PCR expert Dr. Jonathan Arden "conceded that there was a possibility that the time of death could have been on Saturday night." *Id.* at 22. With respect to the defense team's failure to investigate the forty-five pubic hairs allegedly found on Mrs. Edwards's bed, the court concluded there was no deficiency because SLED's Ira Byrd Parnell, Jr., and Frank Dan DeFreese "credibly testified" in the PCR proceedings, as they had at trial, about their discovery of the hairs. *See id.* at 27. The court also invoked Parnell's PCR testimony that he did not collect the bedcovers and sheets because he saw nothing of evidentiary value on them. *See id.*[49]

Moreover — despite recognizing that the use of hindsight is prohibited for *Strickland*'s performance-prong analysis but necessary to the prejudice-prong inquiry, *see* First PCR Order 148 — the state PCR court deemed facts relevant to the prejudice issue to also be pertinent to the performance question. The court thereby suggested that Elmore's trial lawyers were not deficient in failing to investigate the State's forensic evidence because the jury would have credited the State's evidence over any contrary evidence that Elmore could have proffered. For example, the court cited "the historical evidence" pointing to a Saturday night death (such as the burning coffeepot and ringing alarm clock) in ruling that there was no deficiency in answering Dr. Conradi's time-of-death opinion. *See id.* at 22. The court relied on its own findings of no break in the chain of custody to reject Elmore's assertion that his trial lawyers erred with respect to the pubic hairs allegedly found on Mrs. Edwards's bed. *See id.* at 31 (finding that Parnell discovered and seized the hairs, that he and DeFreese

---

[49]On the absence of a photograph of the hairs on the bed, the court noted that "[t]he defense did not need to hire an expert to point that out," without confronting the lawyers' failure to otherwise bring the nonexistent photograph to the 1984 jury's attention or even discern that no photograph existed. *See* First PCR Order 27. Indeed, the court did not address much of Elmore's evidence of irregularities in the pubic hair evidence, and declared that Elmore relied on "bare assertions" of police misconduct. *See id.* at 31.

delivered the hairs to SLED colleague Earl Wells, and that Wells maintained custody of the hairs until the 1982 trial). As for Item T, which was still missing at the time, the court found in the First PCR Order that Item T's contents were limited to blue fibers and thus that "[d]efense counsel cannot be deemed ineffective for failing to develop that blue fibers were found on the victim's body rather than hair." *Id.* at 32.[50]

In relying on those facts, the state PCR court disregarded the contemporary assessment rule of *Strickland*, from which the Supreme Court has never strayed. The state PCR court instead should have heeded the Supreme Court's 1986 decision in *Kimmelman*, which (a full decade before the First PCR Order) instructed against the "use of hindsight to evaluate the relative importance of various components of the State's case." *Kimmelman*, 477 U.S. at 386-87 (quoting *Strickland*, 466 U.S. at 689, for the proposition that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"). The *Kimmelman* petitioners had sought "to minimize the seriousness of counsel's errors [in failing to conduct the pretrial discovery necessary for a timely motion to suppress the unlawfully seized bedsheet] by asserting that the State's case turned far more on the credibility of witnesses than on the

---

[50]Once it was revealed that Item T actually consisted of four human hairs, three animal hair fragments, and a single blue fiber, the state PCR court revisited its Item T *Strickland* analysis in the Second PCR Order, which apparently relied solely on the prejudice prong to deny relief. *See* Second PCR Order 4-5; *see also Strickland*, 466 U.S. at 697 (advising that courts may address performance and prejudice prongs in any order, and need not take up both prongs if defendant has made insufficient showing on one). The court similarly seemed to limit its First PCR Order evaluation of Elmore's fingerprint-related *Strickland* contention to the prejudice prong, though the court elsewhere observed that the fingerprint evidence was available to the defense as early as 1982 "and could have been analyzed with 'due diligence.'" *See* First PCR Order 24-25, 78 n.2.

bedsheet and related testimony." *Id.* at 385. The Court observed, however, that the petitioners' theory was doomed by its dependence on hindsight. *See id.* at 386. The Court explained:

> At the time Morrison's lawyer decided not to request any discovery, he did not — and, because he did not ask, could not — know what the State's case would be. While the relative importance of witness credibility vis-a-vis the bedsheet and related expert testimony is pertinent to the determination whether [Morrison] was prejudiced by his attorney's incompetence, it sheds no light on the reasonableness of counsel's decision not to request any discovery.

*Id.* at 387; *accord Washington v. Murray*, 4 F.3d 1285, 1289 (4th Cir. 1993) ("[Counsel's] conduct should have been evaluated from his perspective at the time of trial, and the district court should not have constructed a tactical decision counsel might have made, but obviously did not." (citing *Strickland*, 466 U.S. at 689)).

There is no question that the state PCR court unreasonably applied and acted contrary to *Strickland* in its performance-prong analysis by relying on non-contemporaneous facts to excuse the lawyers' failure to conduct a pretrial investigation into the State's forensic evidence. In so doing, the state PCR court defied the *Strickland* principle that a court deciding an "ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *See* 466 U.S. at 690.

### iii.

In sum, the state PCR court's performance-prong analysis of Elmore's ineffective assistance claim was both an unreasonable application of, and contrary to, the controlling *Strick-*

*land* principles. Simply put, this is one of those instances of deficient performance in which counsel, despite a professional obligation to conduct an investigation, "has failed to investigate [the] defense at all or has performed an investigation so minimal that no strategic reason could be given for the failure to investigate further." *See United States v. Roane*, 378 F.3d 382, 411 (4th Cir. 2004) (emphasis omitted) (citing cases); *see also Washington*, 4 F.3d at 1288 ("Prior to trial, counsel was completely in the dark about the import of the evidence, and therefore, could not have made a strategic choice against using it."). Hence, no amount of deference could compel any fair conclusion other than that Elmore has satisfied his burden under *Strickland*'s performance prong.

b.

i.

Next, on the prejudice prong of *Strickland*, the state PCR court correctly recognized that the applicable test is "whether there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different," with a "reasonable probability" being "a probability sufficient to undermine confidence in the outcome." First PCR Order 5; *see also id.* at 148 (reiterating same). The court erroneously misperceived, however, that the Supreme Court's 1993 decision in *Lockhart* enlarged the previously understood requirements of *Strickland*'s prejudice-prong test. As the state PCR court saw it, *Lockhart* "dealt . . . a telling blow" to defendants' typical argument "that if the outcome of the proceeding would likely have been different, they have shown prejudice." First PCR Order 148. The state PCR court relied on its reading of *Lockhart* that "a reviewing court must not consider 'mere outcome determination,' but must look only at whether the error alleged resulted in a proceeding which was 'fundamentally unfair or unreliable.'" *Id.* (alteration omitted) (quoting *Lockhart*, 506 U.S. at 369). According to the court, "[t]o do otherwise applies *Strickland* incorrectly"

and "may grant [the defendant] a windfall to which the law does not entitle him." *Id.* at 148-49.

Importantly, the Supreme Court has not only rejected the state PCR court's interpretation of *Lockhart*, but deemed that interpretation to be an unreasonable application of and contrary to the clearly established principles of *Strickland. See Williams*, 529 U.S. at 391 ("The [state habeas court] erred in holding that our decision in *Lockhart* . . . modified or in some way supplanted the rule set down in *Strickland*."). *Williams* explained that *Lockhart* involved the unusual circumstance of an attorney error — the failure to make an objection that would have been sustained at the time, but overruled under current law — that "had not deprived [the defendant] of any substantive or procedural right to which the law entitled him." *Id.* at 392. Thus, "in *Lockhart*, [the Court] concluded that, given the overriding interest in fundamental fairness, the likelihood of a different outcome attributable to an incorrect interpretation of the law should be regarded as a potential 'windfall' to the defendant rather than the legitimate 'prejudice' contemplated by . . . *Strickland*." *Williams*, 529 U.S. at 392. *Williams* underscored, however, that *Lockhart* did "not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him" — including, relevant to Elmore, the "constitutionally protected right . . . to provide the jury with . . . evidence that his trial counsel either failed to discover or failed to offer." *Id.* at 393. As Justice O'Connor had already explained in her *Lockhart* concurrence:

> I write separately only to point out that today's decision will, in the vast majority of cases, have no effect on the prejudice inquiry under *Strickland* . . . . The determinative question — whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" — remains unchanged.

*Lockhart*, 506 U.S. at 373 (O'Connor, J., concurring) (quoting *Strickland*, 466 U.S. at 694)).

In *Williams*, the state habeas court unreasonably applied and acted contrary to *Strickland* as a result of doing exactly what the state PCR court did here: "read[ing] *Lockhart* to require a separate inquiry into fundamental fairness" even if the defendant is able to show a reasonable probability of a different result. *See Williams*, 529 U.S. at 393, 397. To be fair, however, it is unclear whether the state PCR court actually performed a distinct "fundamental fairness" analysis, as the state habeas court had done in *Williams*. *See id.* at 397 (observing both that state habeas court "mischaracterized" appropriate rule and that its "decision turned on its erroneous view"). Here, the state PCR court alternately spoke in terms of no reasonable probability of a different result (suggesting that the fundamental fairness question was not reached), and simply of a lack of prejudice (indicating that fundamental fairness may have been considered). *See, e.g.*, First PCR Order 23, 27.

In any event, we need not decide whether the state PCR court's misapprehension of *Lockhart* alone is lethal to its prejudice-prong analysis, because additional error rendered that analysis fatally unreasonable. That is, the court neither acknowledged nor obeyed the *Strickland* requirement to "consider the totality of the evidence before the . . . jury" in determining whether there was a reasonable probability that, but for counsel's errors, a different verdict would have been returned. *See Strickland*, 466 U.S. at 695; *see also Williams*, 529 U.S. at 397-98 (concluding that state habeas court's prejudice analysis was unreasonable not only for relying on misinterpretation of *Lockhart*, but also for failing to consider totality of evidence). In the context of assessing the prejudicial effect of a failure to investigate mitigation evidence for sentencing, a court acts unreasonably if it does not "evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas pro-

ceeding — in reweighing it against the evidence in aggrava-
tion." *Williams*, 529 U.S. at 397-98; *see also Porter v.
McCollum*, 130 S. Ct. 447, 454 (2009) (per curiam) ("The
[state habeas court's] decision that Porter was not prejudiced
by his counsel's failure to conduct a thorough — or even cur-
sory — investigation is unreasonable [under *Strickland*]. The
[court] either did not consider or unreasonably discounted the
mitigation evidence adduced in the postconviction hearing.");
*Rompilla*, 545 U.S. at 390-93 (finding prejudice under same
totality-of-evidence standard on de novo review); *Wiggins*,
539 U.S. at 534-38 (same).

Here, the totality-of-the-evidence standard required the
state PCR court to consider *all* of the trial and PCR evidence
favoring Elmore's acquittal and then to reweigh that evidence
against the State's evidence of guilt. Under that standard, the
court should have evaluated the collective trial evidence
together with the collective evidence that a reasonable investi-
gation of the State's forensic evidence would have uncovered.
*See Porter*, 130 S. Ct. at 454 (taking into account all mitigat-
ing evidence that would have been before the judge and jury
"[h]ad Porter's counsel been effective"); *Rompilla*, 545 U.S.
at 390-91 (considering all mitigating evidence that Rompilla's
lawyers would have found by looking at his prior conviction
file); *Wiggins*, 539 U.S. at 534-35 (including all "mitigating
evidence counsel failed to discover" in totality-of-evidence
review); *Williams*, 529 U.S. at 398 (same).

Clearly, however, the state PCR court engaged in a differ-
ent analysis — an analysis that unreasonably broke from
*Strickland* by considering less than the totality of the evi-
dence, and one that unreasonably discounted evidence favor-
able to Elmore by unduly minimizing its import and
evaluating it piecemeal. Ruling that Elmore was not preju-
diced with respect to his lawyers' failure to investigate Dr.
Sandra Conradi's time-of-death opinion, the court explained
that, even without a defense pathologist, "counsel Beasley
was able to clarify that the 'time of death' opinion in the 1984

trial was inexact and the range of death was broad, from 12 hours to 3 days." First PCR Order 22. The court also pointed out that "Dr. [Jonathan] Arden's newly developed range [was] within Dr. Conradi's range," and that Dr. Conradi was able in the PCR proceedings to "credibly support[ ] her analysis and [provide] reasonable clarification over matters Dr. Arden assumed she missed." *Id.* at 22-23. The court relied on its finding of the SLED agents' credibility in concluding that Elmore was not prejudiced by his lawyers' lack of investigation into the pubic hairs purportedly found on Mrs. Edwards's bed. *See id.* at 27, 31. And, the court decided that no prejudice resulted from the failure to investigate the fingerprint evidence — particularly the identifiable but unidentified print lifted from the blood-smeared toilet in Mrs. Edwards's en suite bathroom — because that print may have come from Mrs. Edwards and, in any event, was "of little value" and was "not exonerating." *See id.* at 24-25, 76-77 (internal quotation marks omitted).

Finally, in the First PCR Order, the state PCR court determined that the lack of investigation into Item T was nonprejudicial, because the defense team simply would have discovered that Item T contained blue fibers. *See* First PCR Order 32. Having thereafter learned that Item T actually included, among other Caucasian hairs, a Caucasian hair not belonging to Mrs. Edwards, the court yet discerned no prejudice. As the court explained in the Second PCR Order, "[o]ne hair from the victim's body from the bedroom floor that could have come from various sources does not mandate a new trial." *See* Second PCR Order 5. Contrary to the totality-of-the-evidence standard, the court embraced the theory that the only evidence that mattered was the evidence incriminating Elmore; thus, according to the Second PCR Order, "[e]ven if DNA testing showed the single [unmatched Item T] hair to be [Jimmy] Holloway's, the prior jury verdicts would not have been undermined." *Id.*; *see also* First PCR Order 109 ("[T]he fingerprint evidence claim does not 'support' Mr. Elmore's innocence, it merely reveals a print left by an unidentified

person at some time in the past. It is not the existence of other prints in the home, it is the fact that Elmore's print was found that is significant."). The court's failure to consider the totality of the evidence was particularly obvious in the Second PCR Order's discussion of Item T, which alluded to Elmore's pubic hairs on the bed as counterbalancing inculpatory evidence without taking questions about the reliability of the pubic hair evidence into account. *See* Second PCR Order 5.[51]

ii.

Properly applied, the totality-of-the-evidence standard results in only one reasonable conclusion: there is a reasonable probability — that is, a substantial likelihood — that, but for his lawyers' failure to investigate the State's forensic evidence, Elmore would have been acquitted in the 1984 trial. *See Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt."); *see*

---

[51]Two matters concerning the state PCR court's treatment of the pubic hair evidence deserve some attention. First, the court used the pubic hairs as powerful inculpatory evidence forgiving a number of alleged flaws in the State's case and Elmore's lawyers' performance, including the failure of the police and defense counsel to investigate Holloway, the failure of defense counsel to challenge Dr. Conradi's finding of a sexual assault, and the failure of the police and defense counsel to reveal that at least one fingerprint on the exterior frame of the back door into the Edwards home (near the thumbprint matched to Elmore) was identifiable and not Elmore's. In so doing, the court never acknowledged Elmore's evidence that the SLED agents lied about finding the pubic hairs on Mrs. Edwards's bed. Moreover, by relying on its own finding of the agents' credibility to rule that Elmore suffered no prejudice from his lawyers' failure to investigate the pubic hairs, the court seemed to erroneously equate *Strickland*'s reasonable probability standard with a requirement for proof by at least a preponderance of the evidence. Because the First PCR Order is ambiguous on that point, however, we refrain from noticing additional error and instead accord the court the benefit of the doubt. *See Holland v. Jackson*, 542 U.S. 649, 654-55 (2004) (per curiam).

*also Richter*, 131 S. Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable." (citing *Strickland*, 466 U.S. at 693)). With investigation, the jury undeniably would have seen a drastically different — and significantly weaker — prosecution case.

As it was, the 1984 jury heard only that the scientific indicators of time of death "are very variable," *see* J.A. 653 (trial testimony of Dr. Conradi on cross-examination), leaving the false impression that a Saturday night death was just as likely as death at any other time during Dr. Conradi's sixty-hour window. Had Elmore's lawyers looked into the time-of-death opinion, the jury would have learned that death on Sunday afternoon, when Elmore had a corroborated alibi, was much more probable than death on Saturday night. An expert like Dr. Arden would have advised that a Saturday night death, though not "physically impossible," was "incredibly unlikely." *See id.* at 2252 (Dr. Arden's PCR testimony that "I strongly hold the opinion that Mrs. Edwards was not killed Saturday night as claimed"). And Dr. Conradi would have been compelled to concede that "the usual case" meant death on Sunday afternoon, and that Saturday night was "close" to the "outside limit" of the possible range. *See id.* at 2720-21 (Dr. Conradi's PCR testimony). The additional evidence would not only call into question whether Elmore could have perpetrated Mrs. Edwards's murder, but also raise the issue of whether the circumstantial evidence of a Saturday night death was staged, thus suggesting other suspects such as Jimmy Holloway.

Whereas the 1984 jury heard the unquestioned testimony of SLED's Frank Dan DeFreese and Ira Byrd Parnell, Jr., that they found forty-five pubic hairs consistent with Elmore on Mrs. Edwards's bed, investigation into the pubic hair evidence would have equipped the defense team for impeachment of the SLED agents' account. Even without an expert witness, Elmore's lawyers could have exposed the agents' failures to photograph the hairs on the bed, to collect the bed-

covers and sheets for further testing, and to package the hairs like other physical evidence removed from the crime scene. The lawyers also could have alerted the jury that no blood or semen was present on the bedding, no other hairs consistent with Elmore were found, and no groin injury was sustained by Elmore. With an expert, the defense could have underscored not only the SLED agents' gross violations of standard procedures for the handling of forensic evidence, but also the extraordinariness of finding so many incriminating hairs. Parnell himself admitted that the hairs were exceptional in number and should have been photographed on the bed, and he was unable to explain the hairs' unique packaging.

Though perhaps the jury would have yet believed the SLED agents, there is a reasonable probability that the jury would have doubted the agents' account — a conclusion that is bolstered by additional clear evidence that the SLED team was at least mistake-prone, as well as by other persuasive evidence that the agents were outright dishonest. Inquiry into Item T would have revealed that SLED's Earl Wells either negligently or knowingly misreported Item T's contents as being solely blue fibers, when "the presence of hair was immediately apparent and clearly visible, that is to say that hair was visible . . . to the naked eye." *See* J.A. 3638 (affidavit of State's own PCR expert Myron T. Scholberg). Thus, even before the advent of the DNA testing that excluded Mrs. Edwards as the source of one of those Caucasian hairs, Item T constituted important evidence in Elmore's favor. Similarly, examination of the fingerprint evidence would have revealed that DeFreese arguably misreported the toilet print as unidentifiable, just as he admittedly misreported as unidentifiable a print lifted from a spot near Elmore's thumbprint on the exterior door frame of the back door into the Edwards home. The value of the toilet print to Elmore is somewhat circumscribed by the inability to compare it to Mrs. Edwards, but the toilet print, together with the additional door frame print, is nonetheless further evidence of police ineptitude and deceit.

Taking into account, as we must, all of the foregoing PCR evidence that Elmore's lawyers failed to expose, it can no longer be said that there is an "overwhelming" case against Elmore and Elmore alone. *Cf.* First PCR Order 119. To be sure, the case against Elmore is more appropriately characterized as "underwhelming." The PCR evidence adds salience to the trial evidence in Elmore's favor, including the lack of inculpatory evidence in his car and his voluntary pre-arrest encounter with the police. Indeed, the PCR evidence dramatically "alter[s] the entire evidentiary picture." *See Strickland*, 466 U.S. at 695-96 (recognizing that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture"). Here, the collective trial and PCR evidence tends to cast doubt on Elmore's guilt, points to the likelihood of another perpetrator, and eliminates any portrayal of the police as infallible and truthful experts impervious to cross-examination. That is not to say that, if the jury had heard the PCR evidence, Elmore's acquittal would have been certain. But, there is a reasonable probability that such evidence would have been credited, leaving the State's case to rest on Elmore's thumbprint on the back door frame, bloodspots of the type Mrs. Edwards shared with 40-45% of the population on Elmore's pants and shoe, the disputed evidence of Elmore's guilty conscience, and fellow inmate James Gilliam's account of Elmore's spontaneous jailhouse confession. That evidence of guilt, flimsy of its own right, is diminished further if the PCR evidence leads one to distrust the competence or motivations of the police investigators.

Accordingly, it must be concluded under the totality-of-the-evidence standard that there is a reasonable probability of a different verdict. In the words of *Rompilla* (slightly modified to fit the present circumstances):

> [A]lthough we suppose it is possible that a jury could have heard it all and still have decided on the [guilty verdict], that is not the test. It goes without

saying that the undiscovered . . . evidence, taken as a whole, might well have influenced the jury's appraisal of [Elmore's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at [trial].

*See* 545 U.S. at 393 (internal quotation marks omitted).

### iii.

At bottom, the state PCR court both unreasonably applied and acted contrary to *Strickland* in its prejudice-prong assessment, just as it did in its performance-prong analysis. Because the only fair conclusion is that Elmore has shown deficient performance and resulting prejudice, he is entitled to relief on his Sixth Amendment ineffective assistance of counsel claim.

### IX.

Finally, we briefly address our dissenting colleague's uncharacteristically strident — and flat-out wrong — portrayal of this decision as some sort of flippant incursion into state territory where we federal judges do not belong. As our esteemed friend would have it, our job is solely to rubber-stamp the state PCR court — never mind that court's flouting of clear Supreme Court precedent and disregard of inconvenient evidence. Conversely, we see a meaningful role for the federal courts in safeguarding the constitutional rights of state prisoners like Elmore. And we enjoy illustrious company — the Supreme Court itself — in that view. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Of course, AEDPA appreciably constrains the scope of our review. But we have carefully and faithfully adhered to the

deferential AEDPA standard, guided at every step by a bevy of pertinent Supreme Court decisions, beginning with the seminal *Strickland v. Washington*, 466 U.S. 668 (1984), and extending through the Court's AEDPA-era ineffective assistance cases. While it is enough for our dissenting colleague that the state PCR court uttered the word "*Strickland*," our AEDPA analysis — in line with that of the Supreme Court — is more demanding. For example, we rule today that the state PCR court unreasonably applied and acted contrary to *Strickland* in its prejudice-prong analysis by misapprehending the import of *Lockhart v. Fretwell*, 506 U.S. 364 (1993), and by failing to heed *Strickland*'s totality-of-the-evidence standard. In so ruling, we trod no new path. Rather, we aptly rely on the Supreme Court authority of *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000).[52]

Oddly, the dissent ascribes Elmore's ineffective assistance claim to the panel majority, as if we invented it for this appeal. In reality, Elmore spent years in the state PCR court developing evidence in support of his theory that he was the victim (and possible murderer Jimmy Holloway the beneficiary) of inept and corrupt law enforcement officers unchecked by incompetent defense counsel. We, in turn, simply fulfill our obligation to thoroughly review the trial and PCR evidence in conducting an AEDPA assessment of the state court's adjudication of Elmore's claim. In the process, we address the claim and evidence precisely as presented to

---

[52]Our dissenting colleague goes so far as to suggest that the state PCR court cannot possibly have acted unreasonably, because we are the first judges to say that Elmore was prejudiced by his lawyers' deficient performance. If that were the yardstick, our review would truly be the perfunctory exercise that the dissent advocates. But (thankfully for the cause of our system of justice) that is not the test, as illustrated by *Miller-El v. Dretke*, where the Supreme Court became the first court to proclaim the merit of Miller-El's Fourteenth Amendment jury claim. *See* 545 U.S. 231, 236-37 (2005) (ordering 28 U.S.C. § 2254 relief following claim's unanimous rejection by state trial court, state appeals court, federal district court, and federal court of appeals).

the state court. We do not, as the dissent prefers, follow the state court's misguided lead in recasting the claim into less cogent parts and minimizing (to the point of outright ignoring) important pieces of evidence. Neither do we credit Elmore's evidence nor endorse his innocence theory. Indeed, our only pronouncement is this: There is a reasonable probability that, had the 1984 jury heard the evidence that Elmore's lawyers deficiently failed to uncover, the verdict would have been "not guilty." We are not — and do not presume to be — the arbiters of any other question, including whether Elmore murdered Mrs. Edwards, whether he was framed by the SLED investigators, or whether the real perpetrator was Holloway.

Our dissenting colleague, by contrast, confidently declares Elmore to be guilty, the SLED team to be above reproach, and Holloway to be viciously and baselessly maligned. The dissent takes great umbrage that we would entertain any other possibility and thereby impugn the South Carolina criminal justice system and the late Mr. Holloway. If our opinion embarrasses anyone, so be it. It would be entirely inappropriate for us to pull our punches or take any such consideration into account. There are far greater interests at stake: the fairness of our judicial system and, more specifically, Elmore's Sixth Amendment right to the effective assistance of counsel.

## X.

Pursuant to the foregoing, we reverse the judgment of the district court denying relief and remand for the court to award Elmore a writ of habeas corpus unless the State of South Carolina endeavors to prosecute him in a new trial within a reasonable time.

*REVERSED AND REMANDED*

WILKINSON, Circuit Judge, dissenting:

It would be amusing, if it were not so very serious, to imagine for a moment the majority's visit to a haberdashery. The visit would be a fun one, because my friends in the majority would try on every hat in the shop, except, of course, the one that might conceivably fit. Here, the majority dons the headwear of the jury, the state trial court, the state appellate court, the state post-conviction relief (PCR) court, and the federal district court, but then inexplicably leaves the premises without a passing glance at the cap befitting federal appellate judges reviewing under AEDPA the considered judgment of a state court that a defendant's counsel was not ineffective and that there was no prejudice arising from that counsel's allegedly deficient performance.

The majority spends a considerable amount of time defending its conclusion that Edward Lee Elmore is entitled to habeas relief on his ineffective assistance of counsel claim. But as Mark Twain is reputed to have said, "The more you explain it, the more I don't understand it." *SEC v. Chenery Corp.*, 332 U.S. 194, 214 (1947) (Jackson, J., dissenting). Simply put, the majority's rejection of the South Carolina PCR court's determination that defense counsel's alleged deficiencies did not result in prejudice cannot be squared with the deferential standards required under AEDPA, the facts of this case, or Supreme Court precedent. And in the course of its decision, the majority unjustly impugns the criminal justice system of South Carolina, slanders a deceased man who simply had the misfortune of discovering his neighbor's mutilated body, and grants habeas relief to a prisoner whom overwhelming evidence suggests brutally raped and murdered an elderly woman in her home. For these reasons, I respectfully dissent.

## I.

### A.

Under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), Elmore must show not only that his "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, but also that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

According to *Strickland*, courts should resolve ineffective assistance claims under the prejudice prong whenever possible. *See id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *see also Fields v. Attorney Gen.*, 956 F.2d 1290, 1297 (4th Cir. 1992) ("If the defendant cannot demonstrate the requisite prejudice, a reviewing court need not consider the performance prong."). It is clear beyond peradventure that whatever defense counsel's alleged failings, the outcome of Elmore's 1984 trial would almost certainly have been the same.[1]

---

[1] In view of the fact that this case can be soundly resolved on the prejudice prong of *Strickland*, I see no need to go into the performance aspect of the case. By no means, however, do I concede the point that the state PCR court's finding that Elmore's "[c]ounsel was [not] 'deficient' . . . with respect to the second trial" represents an unreasonable application of *Strickland*. In fact, the majority itself points out the significant efforts defense counsel made in attacking the state's case. *See ante* at 30-33, 128-131. It is manifest that the problem here was not Elmore's counsel, but the fact that even the most sterling advocate cannot overcome an overwhelmingly adverse case. To scapegoat Elmore's counsel for not performing impossible feats seems to me a deeply flawed application of the *Strickland* decision.

## B.

Only if one is prepared to throw *Strickland* deference to the winds can prejudice to Elmore be discerned. The majority's approach here notwithstanding, we are neither the first court, nor the best positioned one, to consider Elmore's claim. In collateral review, state courts should not be subordinate courts, and the procedural history in fact places a heavy duty of deference upon us. The standard of review here is among the best known in all of law. As amended by AEDPA, 28 U.S.C. § 2254 provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted" unless the state court's decision either "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). Unless it falls under one of these narrow exceptions, we cannot set aside a state court's judgment on collateral attack.

It is not as though the state court missed the point. As the majority acknowledges, the state PCR court recognized that the clearly established law of *Strickland* governed Elmore's claims. *Ante* at 133. The majority nevertheless concludes that the PCR court both "acted contrary to" and "unreasonably applied" *Strickland* in its prejudice analysis. *Id.* at 161. Specifically, it believes the PCR court contravened *Strickland*'s mandate to "consider the totality of the evidence," *id.* at 154 (quoting *Strickland*, 466 U.S. at 695), and that, "[p]roperly applied, the totality-of-the-evidence standard results in only one reasonable conclusion," namely, that defense counsel's alleged errors resulted in prejudice. *Id.* at 157.

The Supreme Court and Congress notwithstanding, the majority's view is *de novo* in disguise. The PCR court's application of *Strickland*'s prejudice prong cannot fall under the

"contrary to" clause of § 2254(d)(1). To qualify under this provision, a state court must either "arrive[ ] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decide[ ] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). In dismissing Elmore's prejudice claim, the PCR court committed neither of these two errors. As for the first, according to *Strickland* itself, the prejudice inquiry is a "mixed question[ ] of law and fact," 466 U.S. at 698, and the majority's rejection of the PCR court's analysis is heavily focused on factual considerations. *See ante* at 157-160. As for the second, the majority fails to provide a materially indistinguishable precedent. At best, it offers a short string-cite of cases, a number of which involved *de novo* rather than deferential review. *See id.* at 154-155. At the end of the day, the majority's conflation of these two clauses only muddles the matter before us.

At bottom, the majority's two attacks on the PCR court are really a single claim that the state court unreasonably applied *Strickland* by refusing to find prejudice in this case. This conclusion, however, cannot be squared with the deference required under § 2254. When applying the "unreasonable application" clause, it is important to remember that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). As the Supreme Court has stated time and again, "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *See, e.g., Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). We simply cannot overturn on collateral attack a state court's conclusion that a claim lacks merit "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* (internal quotation marks omitted). This statute creates a "highly deferential standard for evaluating state-court rulings" that "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam) (internal quotation marks omitted).

It is not as though the Supreme Court has uttered these sentiments only once. It has repeated them time and time again, in part because actions of lower federal courts have made that repetition necessary. Standards of review are not advisory. They are not catechisms whose repetition is designed to make us numb. AEDPA commands federal courts to show respect for state court factual findings in order "to further the principles of comity, finality, and federalism." *Williams*, 529 U.S. at 436. These findings "shall be presumed to be correct," and can only be overcome "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The South Carolina courts did not kiss this case off. Despite having at its disposal a 183-page state PCR court opinion rejecting sixteen separate allegations of error, the majority takes it upon itself to adjudicate Elmore's *Strickland* claims anew and overturn a litany of state court factual findings. Like overreaching appellate courts in the past, the majority simply has given "§ 2254(d) no operation or function in its reasoning." *Richter*, 131 S. Ct. at 787.

If the requirements of § 2254 were not enough to send a strong cautionary signal, *Strickland* itself imposes an additional level of deference for reviewing ineffective assistance claims. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* at 788 (citations omitted). On the performance prong, courts are not permitted to "second-guess counsel's assistance" or to engage in an "intrusive post-trial inquiry" due to the fact that an appellate court's hindsight often fails to take account of the actual circumstances on the ground. *See Strickland*, 466 U.S. at 689-90. And as for the prejudice prong, there must be a "substantial, not just conceivable," likelihood that counsel's alleged errors led to a different result. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal quotation marks omitted).

These two prongs—and the deferential approach required by each — necessarily overlap. *See Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008) ("[D]eficient performance and preju-

dice questions may be closely related."). It is therefore unsurprising that courts regularly apply the "doubly deferential" standard of *Strickland* and AEDPA to both the performance and prejudice prongs. *See, e.g., Cullen*, 131 S. Ct. at 1410-11; *Foust v. Houk*, 655 F.3d 524, 534 (6th Cir. 2011). This makes good sense. If appellate courts must be wary of deeming counsel's conduct to be deficient, they should also be cautious before deciding that that conduct actually resulted in prejudice.

The majority pays lip service to these principles, but their ultimate role in its decision is limited to perfunctory opening remarks. *See ante* at 122-124. Had the majority begun its analysis by seriously applying the doubly deferential standard required by *Strickland* and AEDPA to the PCR court's adjudication of Elmore's prejudice claims, it would have quickly concluded that it could not grant relief. Instead, it decided to engage in what amounts to yet another trial of Elmore, only this time without a jury, live evidence, or the other accoutrements of adversarial process that give a trial its rightful name. It is not unusual that sound principles of legal structure fall into disrepair in a habeas case. *See, e.g., Richter*, 131 S. Ct. at 792 (reversing a federal appellate court's refusal to show deference to a state court's adjudication of a *Strickland* claim on collateral attack). But I am sorry to see an example so extreme.

## II.

Three basic facts demonstrate that the majority's rejection of the PCR court's prejudice analysis ignores the principles of deference set down by Congress and the Supreme Court. First, my friends in the majority stand in a lonely, lonely place. No court—either state or federal—has ever before found that any of defense counsel's alleged errors prejudiced Elmore. Second, unlike the juries that convicted Elmore and the PCR court that upheld that conviction, the majority has not heard a shred of witness testimony. Finally, the majority

disregards the actual evidence and spins a fanciful conspiracy theory that cannot be squared with the facts of this case. These are all symptoms of a court doing its own thing rather than one mindful of its role when assessing *Strickland* claims on collateral attack.

## A.

To begin, the majority's decision runs up against the striking fact that before today, no court had ever found that the conduct of Elmore's counsel resulted in constitutional prejudice. Instead, after examining this issue in extensive detail, the state PCR court, the federal magistrate judge, and the federal district court each concluded that the Elmore could not make this showing. This fact is significant because we can only reverse the PCR court's decision here if there is no possibility that "fairminded jurists could disagree." *Richter*, 131 S. Ct. at 786. While the previous federal opinions impose on us no duty of deference as state opinions do, *see Conner v. Polk*, 407 F.3d 198, 204 (4th Cir. 2005), they demonstrate that the majority has reached the remarkable conclusion that every single judge to have previously considered this issue has been unreasonable. The only reasonable conclusion, says the majority, is its own.

The majority focuses on four evidentiary issues to support its claim that the supposed failings of Elmore's counsel resulted in prejudice. *First*, it contends that had defense counsel more fully investigated Dr. Conradi's expert opinion regarding Mrs. Edwards's time of death, the jury would have discovered that it was more likely her murder occurred on Sunday afternoon rather than Saturday night. *Ante* at 158. But the state PCR court rejected this precise argument. It began by noting that even Elmore's own expert "conceded that there was a possibility that the time of death could have been on the Saturday night." It then reiterated the strong circumstantial evidence supporting a Saturday night time of death. Mrs. Edwards had planned to leave on a trip Sunday morning, a

trip she never had the opportunity to undertake. Instead, on Sunday, her car remained parked at her home. When her body was discovered Monday afternoon, the television set was on with a TV Guide open to Saturday evening. The Sunday and Monday newspapers were lying in her driveway. In light of this evidence, it is little wonder that the PCR court determined that Elmore "has failed to show a reasonable probability that had a pathologist be[en] retained in 1984, the result of the proceeding would have been not guilty."

Neither the magistrate judge nor the district court found this conclusion to be unreasonable. The magistrate judge, for instance, concluded that Elmore "has failed to show a reasonable probability that the result would have been different." And the district court pointed out that unlike Elmore's expert, Dr. Conradi — the forensic pathologist who performed Mrs. Edwards's autopsy and testified that the time of death was likely Saturday night—"had first-hand information from the autopsy which credibly supported her analysis," such as the limited extent of rigor mortis present when she examined the body. Moreover, the district court noted that Dr. Conradi "took into account factors that [Elmore's expert] assumed she had missed, such as body temperature, the extent of decomposition, and the fact that the body had been transported." In this battle of the experts, it is hard to see how the majority could dismiss the reasoned conclusions of every previous court and declare that Elmore's witness was the clear winner.

*Second*, the majority claims that had defense counsel pursued the theory that the police lied about discovering forty-five of Elmore's pubic hairs in Mrs. Edwards's bed, there was a reasonable probability that his client would have been acquitted. *See ante* at 158-159. Once again, every court to have previously considered the evidence has come to the opposite conclusion. After hearing testimony from the SLED agents who discovered the pubic hairs, the state PCR court determined that they "credibly testified about the existence and discovery of the hair." It then found that there was no

break in the chain of custody of that evidence, as the hairs were secured in a zip lock bag at the crime scene and delivered to Lieutenant Earl Wells who kept them until trial. The court concluded that Elmore's "bare assertions" that there was a break in the chain of custody raising the possibility of tampering were "without merit" and dismissed this *Strickland* claim.

The magistrate judge similarly refused to find prejudice and adopted the state court's finding that Elmore "has not shown a break in the chain of evidence with regard to the hair." The district court reached the same conclusion. Noting that "the PCR court made very specific factual findings regarding the credibility of the state's witnesses" and "the collection of hairs from the victim's bed" and had considered Elmore's arguments, it refused to overturn the state court's determination that Elmore had not been prejudiced. Observing that Elmore "has failed to establish that there was any break in the chain of custody," it concluded that the PCR court's determination here was simply "not a decision that was contrary to, or involved an unreasonable application of clearly established federal law." The majority should have followed that course today.

*Third*, the majority claims that defense counsel's decision not to investigate three unidentified fingerprints on Mrs. Edwards's toilet and exterior door frame was prejudicial. *See ante* at 159. During the PCR proceedings, Elmore's experts argued that these prints formerly considered unidentifiable were in fact identifiable, and not a match for Elmore. But as the PCR court concluded, this did not result in any constitutional prejudice. As it observed, the jury was well aware that Elmore's fingerprints were found only on Mrs. Edwards's outside doorframe and not within her house. Given that these new arguments would have not told the jury anything new, the PCR court concluded that Elmore's prejudice argument was so unconvincing as to "strain[ ] his own credibility."

For similar reasons, the magistrate judge found that Elmore was not prejudiced, noting that the experts at the PCR hearings disagreed "about the ability to identify one of those prints." The district court agreed and dismissed Elmore's "assertion that fingerprints of an unknown third party were found at the crime scene" as "incorrect." In particular, it observed that Elmore's own expert could not compare the toilet print with the victim's fingerprints and consequently was unable to rule out the distinct possibility that the print inside Mrs. Edwards's home was in fact Mrs. Edwards's own.

*Fourth*, the majority contends that defense counsel's lack of investigation into the presence of a Caucasian hair in "Item T"—the material found on Mrs. Edwards's chest that was originally (and mistakenly) identified as blue fibers — was prejudicial. *See ante* at 159 This evidence came to light late, after most state post-conviction proceedings had come to a close, and it ultimately extended litigation in state court by several years and necessitated a separate opinion.

That state court opinion, however, made clear that this new evidence did not amount to much. To start, the PCR court found that the initial failure to disclose the hair by SLED Agent Wells was not intentional. As it observed, Elmore's "position that Agent Wells knowingly withheld this evidence is refuted by . . . the fact that it was he, not another source, who discovered the missing evidence and reported the discovery" to the South Carolina Attorney General's Office. In addition, Wells repeatedly "offered himself for cross examination" in these new proceedings, but Elmore refused to take advantage of the opportunity. As the PCR court concluded, "I do not find that SLED Agent Wells knowingly failed to disclose the hair evidence and accept his sworn statement that his previous testimony was incorrect but was based upon his then recollection."

Moreover, the state court observed that there was only one strand of Caucasian hair in the set that did not belong to the

victim. Of course, a body lying on or flailing about the floor is bound to pick up a stray hair or two. As the PCR court concluded, "One hair from the victim's body from the bedroom floor that could have come from various sources does not mandate a new trial." The magistrate judge reached a similar conclusion and the district court did so as well, noting that a "single third-party Caucasian hair found on the victim's body is greatly outweighed by the substantial evidence against [Elmore]." As I will discuss in greater detail, that substantial evidence includes the pubic hairs belonging to Elmore found on the victim's bed, the blood matching Mrs. Edwards's blood type found on Elmore's clothes, his lack of a consistent alibi for his whereabouts on Saturday night, his lie to the police that he did not know Mrs. Edwards, and his confession to his cellmate. Against this mountain of evidence, Elmore is able to construct no more than a small hill.

On each one of these four claims of prejudice, the state PCR court, the magistrate judge, and the district court reached the opposite conclusion from the one the majority puts forth today. The majority, however, runs roughshod over these findings, dismissing, for example, the circumstantial evidence in support of Dr. Conradi's analysis as "staged," *ante* at 158, despite the fact that no court has ever found anything that would support this extreme allegation. And even though the majority admits that the "value of the toilet print to Elmore is somewhat circumscribed," it still contends that defense counsel's decision not to investigate this print fully resulted in prejudice because it constituted "evidence of police ineptitude and deceit." *Id.* at 159. I have no idea where the majority is coming up with these things. Disparaging rhetoric cannot substitute for evidence, the foundation on which the PCR court's factual findings rest. Nor can it displace the credibility determinations that are uniquely a trial court's to make. Such speculative reasoning does not exhibit deference of any kind, let alone the doubly deferential standard of review mandated by *Strickland* and AEDPA.

## B.

The majority not only disregards the considered judgment of three separate courts, but does so without hearing a single second of witness testimony. But with only the written record in front of us, we as appellate judges are in the worst possible position to evaluate witness credibility. As the Supreme Court has observed: "Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (citation omitted). We must therefore always approach a lower court's factual determinations with an eye toward our inherent limitations. This is especially true on collateral attack, where principles of comity and federalism command that we grant the factual findings of state courts great respect. *See Miller-El v. Cockrell*, 537 U.S. 322, 339-40 (2003).

In this case, however, these warnings have fallen upon deaf ears. Despite the fact that every jury and judge to have heard witness testimony has not been convinced of Elmore's innocence, the majority suggests that he was an innocent man framed by the police and prejudiced by his attorney's supposed failings. But unlike the two juries that convicted Elmore or the state PCR court that rejected his *Strickland* claims, the majority has observed not one of the following witnesses testify:

- Jimmy Holloway, the neighbor of Mrs. Edwards who discovered her mutilated body and the man the majority now suggests is responsible for her murder. *See ante* at 132, 158.

- Dr. Sandra Conradi, the forensic pathologist who performed Mrs. Edwards's autopsy and estimated that her time of death was Saturday night.

- Dr. Jonathan Arden, a New York forensic pathologist who neither performed Mrs. Edwards's autopsy nor spoke with Dr. Conradi, but who concluded that the likelihood of a Saturday night time of death was highly unlikely, though not "physically impossible."

- Lieutenant Frank DeFreese, the SLED fingerprint analyst who saw the pubic hairs in Mrs. Edwards's bed as well as lifted Elmore's fingerprint from the frame of the back door to Mrs. Edwards's home and an officer the majority now suggests committed perjury. *See id.* at 158-159.

- Four officers of the Greenwood Police Department who confirmed DeFreese's impression that Elmore's fingerprint on the door frame was "recent" or "fresh." *See id.* at 17-18.

- Ira Parnell, the SLED agent who assisted DeFreese at the crime scene by collecting forty-five of Elmore's pubic hairs from Mrs. Edwards's bed and who, according to the PCR court, "credibly testified about the existence and discovery of the hair."

- Lieutenant Thomas Henderson, the SLED agent who questioned Elmore about the blood on his shoes and the man the majority now suggests "plant[ed]" that evidence. *See id.* at 94.

- John C. Barron, the SLED serologist who determined that some of the blood on Elmore's clothing matched Mrs. Edwards's blood type and testified "without equivocation" that he maintained control of the stained clothing until trial.

- Rodger Morrison, an Alabama serologist who criticized Barron's analysis and hypothesized that

further testing could have ruled out the possibility that Mrs. Edwards's blood was on Elmore's clothes. *But see infra* note 2 (observing that DNA testing has since confirmed that the blood on Elmore's clothes matched Mrs. Edwards's DNA).

- Hayward Starling, a self-employed forensic scientist who criticized SLED's investigative procedures and claimed that the print lifted from the blood-smeared toilet was identifiable, but who "could not eliminate" the possibility that the print belonged to Mrs. Edwards.

- Lieutenant Earl Wells, the SLED chemist who examined the hair evidence and an agent the majority now accuses of "negligently or knowingly misreport[ing]" evidence despite the PCR court's findings to the contrary. *See ante* at 159.

- Skip Palenik, a self-employed microscopist who argued that the number of pubic hairs found on Mrs. Edwards's bed was atypical and unusual.

- James Gilliam, the inmate who testified that Elmore confessed to him that "he went there to rob the lady, and she started screaming, so he had to kill her," and whose later recantation the PCR court found lacked credibility.

- Arlie Capps, the jail administrator Elmore accuses of inducing Gilliam to testify falsely but whose testimony the PCR court found to be "consistently credible."

- Sergeant Alvin Johnson, the police officer who testified that neither he nor any other officer had ever discussed Elmore with Gilliam prior to

receiving Gilliam's letter detailing Elmore's confession.

- Mary Alice Harris (nee Dunlap), the former girlfriend of Elmore who threw his shirt in the trash when he appeared at her mother's home with a swollen lip after midnight on Sunday, January 17.

- Donnie, Susan, and Frances Mosley, the members of Dunlap's family who each confirmed Elmore's time of arrival that evening.

- Major James Coursey, the police officer who testified that at the time of his arrest, Elmore repeatedly denied knowing Mrs. Edwards until confronted with one of her checks made out to him.

- Dr. Jonathan Venn, the psychologist who contended that Elmore's statement that he did not know Mrs. Edwards was insignificant in light of his memory problems.

- Geddes Anderson, John Beasley, and Billy Garrett, the attorneys who represented Elmore in his three trials and who testified extensively about their defense strategies.

- Edward Lee Elmore, the defendant himself.

Even the above sources do not exhaust the list. Despite not hearing a second of testimony from this roster of witnesses—some of whom testified at trial, some of whom testified at the PCR proceedings, and some of whom testified at both—the majority treats Elmore's experts who never participated in the original investigation as unbiased oracles of truth, *see ante* at 36-67, while suggesting that some of the prosecution's key witnesses "were outright dishonest." *Id.* at 159. This analysis

ignores the Supreme Court's admonition that we are ill-equipped to engage in such sensitive credibility determinations. *See Marshall*, 459 U.S. at 434 ("[F]ederal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

Had the members of the majority actually been in court and then rendered its string of pejorative assessments, I would be prepared to credit them. But unless we are prepared to hold that trials and hearings are mere useless exercises, I would respect the views of those who were there. Without ever hearing a shred of witness testimony, the majority has effectively decided to take on the role of a jury in the sky and acquit Elmore. It does so despite the fact that no court before us has been in a worse position to evaluate Elmore's conviction and no court before us has doubted it. To invalidate it on largely factual grounds, as the majority does today, contravenes AEDPA and all that it stands for.

## C.

Finally, the majority disregards the actual evidence supporting Elmore's conviction. Given the strength of the case against Elmore, it is hard to believe that even a flawless defense attorney would have been able to obtain an acquittal here. And it is even harder to believe that any jury would have accepted the conspiracy theory concocted by Elmore and embraced by the majority today. Elmore's conviction has withstood nearly three decades of intense scrutiny from multiple juries and judges for the best of reasons: there is so much evidence that supports it.

## 1.

The case against Elmore was anything but a flimsy one. To start with, the physical evidence points directly to his guilt. The state PCR court found that forty-nine hairs were recov-

ered from Mrs. Edwards's bed. According to Lieutenant Wells, two of those hairs were consistent with Mrs. Edwards's head hairs, two of them were consistent with her pubic hairs, and forty-five of them were consistent with Elmore's pubic hairs. Elmore has since conceded that those forty-five pubic hairs belong to him. *Ante* at 48-49 n.16. His thumbprint was also found on the exterior frame of the back door to Mrs. Edwards's home and multiple police officers testified that the print was relatively "fresh." *See id.* at 17-18. And the jeans and shoes that Elmore admitted wearing on Saturday were spattered with blood that matched Mrs. Edwards's blood type, but not his own. On cross-examination, he could give no explanation of where this blood came from.[2]

If that were not enough, the prosecution also provided an overwhelming amount of circumstantial evidence of Elmore's guilt. First, Elmore had no consistent alibi for Saturday evening, the time in which Mrs. Edwards was murdered. On the day of his arrest, Elmore signed a written statement in front of Lieutenant Henderson stating that he was with his girlfriend Mary Alice Dunlap at a K-Mart "until nine-thirty p.m.," when she was picked up by her brother. According to this

---

[2]DNA testing now confirms that the blood on Elmore's jeans and shoes fully or partially matches Mrs. Edwards's DNA. The majority dismisses this latest installment of inculpatory evidence as "consistent with Elmore's position that the SLED agents . . . planted Mrs. Edwards's blood on his clothing." *See ante* at 128. It also assumes without deciding that *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), precludes consideration of this evidence given that it was developed following the first and second PCR orders. *See id.* at 126. For the sake of argument, I will address the majority on its own terms and rely only on the evidence available at the time of these PCR proceedings. Still, it is worth noting the lengths to which the majority has gone to grant Elmore relief. In the face of evidence that would seem to put Elmore's guilt beyond question, the majority embraces the only possible explanation that would preserve its claim he was innocent: the unfounded theory that he was framed by the police. At this point, I am skeptical that any evidence, no matter how probative, would ever be able to shake the majority's unquestioning and ill-supported faith in Elmore's innocence.

statement, Elmore then "stop[ped] only for a minute to get a beer and then went straight on" to see his girlfriend and her family, with whom he then stayed until "sometime before midnight." But at trial, Dunlap and her family members testified that Elmore left them a little before 10:00 p.m. and did not return until 12:30 in the morning, nursing a newly swollen lip. On the stand, Elmore changed his story as well, claiming that he "stayed awhile . . . talking" at a convenience store before going to see Dunlap "around ten-thirty or eleven." Evidently the jury — which again was far better positioned to evaluate Elmore's credibility than the majority — did not find these shifting alibis to be persuasive.

What is more, Elmore lied to the police about even knowing the victim. It is undisputed that Elmore knew Mrs. Edwards, having done household work for her on several occasions. In fact, on the day he was arrested he had a piece of paper in his wallet with her name and number on it. But when Elmore was arrested, he denied knowing who she was until the officers confronted him with checks she had written to him, at which point he changed his tune. He then told the arresting officer that "if in fact he did kill Mrs. Edwards, that he did not remember doing it."

Finally, this already strong case was further bolstered by Elmore's confession to his cellmate, James Gilliam. When Elmore was arrested, Gilliam was in jail for receiving stolen goods, and the two knew each other from having once lived in the same apartment complex. Gilliam testified that Elmore told him about how he had gone to Mrs. Edwards's house to rob her but "the lady started screaming and she wouldn't stop and so he had to kill her." Elmore also queried Gilliam about whether his efforts at eliminating the forensic evidence of the crime had been successful. Specifically, Elmore described how he had wiped his fingerprints and asked Gilliam "if you had sex with somebody and you washed up, could you tell that you have had sex with that person." Gilliam wrote a letter

to the police about this conversation and testified about it consistently throughout Elmore's three jury trials.

But in the state PCR proceedings, Gilliam changed course, testifying that Arlie Capps, a jail administrator, had come to him offering a deal if Gilliam could get a confession from Elmore and that Gilliam had invented the confession to reap those benefits. One of Gilliam's two stories is false, of course. But which? The question turns on credibility and thus fundamentally belongs to the state PCR court. *See, e.g., Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003) ("Credibility determinations . . . are presumed to be correct absent clear and convincing evidence to the contrary.") (internal quotation marks and citation omitted). The PCR court heard extensive evidence on this issue, including testimony from jail administrators, other prisoners, and Gilliam himself. Its conclusion was emphatic: "Why Gilliam chose to recant his testimony is not evident, but that does not mean that his new version has credibility and I hold that it does not." In particular, it found that "there has been no showing that there was any 'deal.'" Probing the inconsistencies in Gilliam's new story, the court called his recantation "illogically conflicting and incredible" and added that "[t]he gross speculation that Gilliam's testimony was scripted is pure fiction."

Thus, even if Elmore's counsel had provided ineffective assistance with respect to a particular evidentiary issue, the likelihood that that error changed the outcome of the trial is hardly "substantial." *See Cullen*, 131 S. Ct. at 1403. The state's case against Elmore was built on numerous pieces of evidence which subsequent findings did not draw into question. The irony of this case is that the majority lambasts the state PCR court for "considering less than the totality of the evidence," *ante* at 155, while ignoring or diminishing the state's total arsenal of evidence against Elmore at the same time. *See id.* at 160 (dismissing the "bloodspots" on Elmore's clothes, his "thumbprint on the back door frame," the evidence of his "guilty conscience," and "Gilliam's account of

Elmore's spontaneous jailhouse confession" as "flimsy"). By attempting to divide and conquer discrete evidentiary issues while ignoring the rest of prosecution's case, it is the majority — and not the PCR court — which has "unreasonably discounted evidence" by "minimizing its import and evaluating it piecemeal." *See id.* at 155. The unfairness of calling the state court out for what is manifestly the majority's own failing only underscores the injustice of today's decision.

2.

In the face of all this evidence, the majority is forced to fall back on Elmore's conspiracy theory that multiple members of the South Carolina law enforcement system framed Elmore. Once again, this accusation is not supported by the findings of any previous court. According to this account, Officers Coursey and Henderson removed the incriminating pubic hairs from Elmore while he was detained and then Agents Parnell and DeFreese lied about recovering this evidence from Mrs. Edwards's bed. *See id.* at 48-49 n.16, 132-133. Officer Henderson then "planted" blood matching Mrs. Edwards's blood type on Elmore's "pants and shoe." *See id.* at 95, 127. What is more, Agent DeFreese misreported the fingerprints on Mrs. Edwards's toilet and exterior door frame as unidentifiable, yet another example, as the majority puts it, of "police ineptitude and deceit." *Id.* at 159. According to Elmore, these prints belonged neither to him nor to Mrs. Edwards and would have been exculpatory if DeFreese had been honest. *Id.* at 35. Finally, SLED Agent Wells "negligently or knowingly misreported" the contents of Item T as being solely blue fibers. *Id.* at 159. Ultimately, the majority concludes, the "evidence leads one to distrust the competence or motivations of the police investigators." *Id.* at 160.

While this story may make for a good movie, it does not stand up as a piece of legal analysis or bear resemblance to reality. For one, the majority reverses multiple factual findings, including witness credibility determinations, made by

the state PCR court. Once again, we can only overcome these factual findings "by clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and we can only dismiss these credibility determinations if the PCR court made a "stark and clear" error. *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008). Such showings have not been made here.

With regard to the pubic hairs, Agents Parnell and DeFreese testified that Agent Parnell collected that evidence from Mrs. Edwards's bed. The majority attacks this testimony by treating the quantity of hair found on Mrs. Edwards's bed with incredulity and imputing ill motives for the agents' failure to photograph the bed or put the sheets in the record. *See ante* at 158-159. But the PCR court that heard this testimony expressly found that Parnell and DeFreese "credibly testified about the existence and discovery of the hair."

There was no "clear and convincing" evidence suggesting this determination was incorrect. 28 U.S.C. § 2254(e)(1). Agent Parnell consistently testified that he discovered "almost a rectangular area of hair" that was "approximately thirty inches across by approximately eighteen inches up and down" and "running diagonally across the bed," and the PCR court found this testimony to be credible. Parnell also repeatedly admitted that his decision not to photograph the bed was an "oversight," but not an act done for conspiratorial reasons. Parnell's account was additionally corroborated by Agent DeFreese, who, as the PCR court found, "testified that he was present and assisted Agent Parnell when the hair was seized from the victim's bed." And far from plotting to lie about the pubic hairs to incriminate Elmore, Parnell testified that he was "mistakenly under the opinion they were Caucasian" until Agent Wells informed him otherwise.

As for the decision not to take the sheets into evidence, Parnell explained that he believed they had little evidentiary value given the lack of stains. This is hardly proof of a police conspiracy. The PCR court put it directly: "the speculative

presentation of the other witnesses that they normally seize such items does not create a Sixth Amendment violation." And as for the quantity of pubic hairs, Agent Wells explained during Elmore's 1984 trial that only four of the hairs fell out naturally; the other forty-one were pulled out by force. One can only imagine the kind of battle between a rapist and his victim that would lead to such an injury.

Turning to the blood on Elmore's clothes, the PCR court rejected the notion that Agent Henderson had planted the incriminating blood on the basis of Agent Barron's testimony. The state court found that Barron testified "[c]learly" and "without equivocation" he "would not have given the [clothes] stains to Tom Henderson," but instead maintained control over the evidence until trial. The majority nevertheless seizes on a dispute in the PCR proceedings over whether the laboratory records suggest that Henderson removed these items from the lab prior to Barron's analysis. *See ante* at 61, 94-95. But the PCR court had already resolved this dispute in favor of Barron. After hearing witness testimony on the issue, the PCR court found that Elmore's clothes were brought to the SLED lab on January 20, 1982, whereupon "Barron received the evidence and cut out the specimens prior to the return of the coat and jeans to Tom Henderson" on February 3. The majority's dismissal of the state court's acceptance of Barron's interpretation without a compelling reason for doing so is yet another example of its refusal to show a modicum of deference.

As for Agent DeFreese's alleged misrepresentation of the fingerprint evidence, the state PCR court treated his earlier testimony that the prints were unidentifiable as an honest mistake at worst. While noting that it was "regrettable" that Agent DeFreese concluded the fingerprint on Mrs. Edwards's door frame was unidentifiable in 1982, the PCR court concluded that fact "does not support [Elmore's] rhetorical assault on his reporting and testimony." As the state court pointed out, DeFreese simply used a higher threshold for

identifying prints than one of Elmore's experts did. It then noted that even Elmore's own experts disagreed over how many prints were identifiable, but that this fact did not mean they somehow perjured themselves. After "viewing the credibility of the witnesses based upon the entire record," the PCR court determined that it "must reject [Elmore's] assertions" that DeFreese testified falsely.

As for Agent Wells's claim that the contents of Item T were solely blue fibers, the PCR court found that he did not "knowingly fail[ ] to disclose" this evidence. Of course, it is inconvenient for the majority's conspiracy theory that it was Agent Wells himself "who discovered the missing evidence and reported the discovery" to the South Carolina Attorney General's Office, *see ante* at 112, and that Wells repeatedly "offered himself for cross examination." But inconvenient facts are apparently momentary obstacles for the majority, which once again, without listening to any testimony, has decided peremptorily that law enforcement officers are bad actors despite findings to the contrary from the judicial officer who actually heard them.

Apart from ignoring its proper role in the context of collateral attack, the majority also fails to provide a plausible motive for this supposed conspiracy. At most, it claims that Henderson planted blood on Elmore's clothes because his mother was "a longtime neighbor of Mrs. Edwards" as well as an acquaintance of Jimmy Holloway. *See ante* at 44-45, 94. But it never explains why these local connections would compel Henderson to single out Elmore of all people to take the blame. Nor does it explain why four other law enforcement officers — Coursey, Parnell, DeFreese, and Wells — would decide to go along with Henderson's scheme. And it does not begin to explain why a jail administrator like Arlie Capps would induce an inmate to perjure himself in order to convict Elmore. The majority neither asks these questions nor provides any answers.

### 3.

If this rampant speculation were not enough, the majority then slanders a deceased and presumptively innocent man by essentially accusing him of the grisly murder of Mrs. Edwards. Following Elmore's lead, the majority suggests that Jimmy Holloway murdered his longtime neighbor and friend and then "staged" the "circumstantial evidence of a Saturday night death." *Ante* at 158. This charge is, to quote the PCR court, a "shocking assertion" and "gross speculation."

There are three possible reasons for pinning this heinous crime on Holloway. Not one stands up to the slightest scrutiny. First, according to Elmore's expert Vincent Scalise, Holloway's conduct surrounding his discovery of his mutilated neighbor was "very, very strange" and ultimately "suspect." But what exactly did Holloway do to incur such suspicion? On Monday, January 18, he stopped by Mrs. Edwards's house to check on his elderly neighbor. He noticed the Sunday and Monday newspapers laying on the ground, despite the fact she had told him she was leaving for a trip on Sunday morning. Concerned that she might be ill, Holloway knocked on the back door, which suddenly opened. Entering the residence, he noticed that the house was at high temperature and that the TV was on at a high volume. Venturing further, he discovered that Mrs. Edward's commode was stained with blood and that there was a knife and large amount of blood on the bedroom floor. At that point, Holloway went next door to the home of Mrs. Clark — another one of Mrs. Edwards's neighbors — to "see if something had happened to her and [if] she was in the hospital." Upon finding out Mrs. Edwards was not in the hospital, Holloway returned to the house with Mrs. Clark in tow. To avoid contaminating the scene, he carefully stepped around the pool of blood and donned a pair of woolen gloves before he opened the closet door. After he discovered his neighbor's mutilated body stuffed in the closet, Holloway left the house with Mrs. Clark and they called the police.

As the PCR court found, this behavior revealed nothing more than the fact that Holloway was a "legitimately concerned neighbor who feared that something had happened" to an elderly woman and friend. Even Scalise conceded as much, noting that many of Holloway's actions on Monday were those of a concerned neighbor and that it was "not unusual" for someone coming across a crime scene to get another person before proceeding any further. We should be the last to presume to dictate what the normal response of a worried neighbor stumbling upon evidence of foul play should be, particularly when the only court to hear testimony on the matter found that it was normal.

Second, as the majority points out, Agent Henderson "confirmed that Holloway had been an early suspect." *Id.* at 43. But the only reason for that classification was that Holloway discovered the body. According to Scalise himself, as a matter of basic police procedure, "in most cases" the first suspect is the "person that finds the body." There was nothing more to suggest Holloway's guilt, and Henderson soon ruled him out as a suspect as the evidence pointed increasingly to Elmore.

In any event, it would be helpful if the majority could explain exactly why Holloway would ever brutally rape and murder his longtime neighbor and friend. But it offers no possible motive to support this astonishing charge, nor is there any indication of one in the record. In contrast, Elmore had a very clear reason for murdering Mrs. Edwards that Saturday night. As he confessed to Gilliam, "he went there to rob the lady, and she started screaming, so he had to kill her."

The third and perhaps real reason for Elmore to pin the murder on Holloway is the simple fact that he is no longer alive. Unlike Elmore, who is still with us and represented by vigorous counsel, Holloway can no longer speak for himself nor has he anyone to argue on his behalf. But while it may be tempting to purchase Elmore's freedom at the cost of an innocent man's good name, it is profoundly unjust.

## D.

At the end of the day, no less than three separate courts have reviewed and rejected Elmore's claims of prejudice. And not one of them has ever made any finding that would suggest that any alleged errors by Elmore's counsel were prejudicial. Now, for the first time since Elmore's conviction over a quarter-century ago, two fine colleagues have come to the opposite conclusion without hearing a minute of witness testimony and in the face of all the evidence available. In spinning this tale of deceit, fabrication, perjury, and corruption, the majority has unfairly impugned the South Carolina criminal justice system — directly in the case of its law enforcement officers and indirectly in the case of the prosecutors and judges who turned a blind eye to malfeasance of this magnitude. Seldom have so many been besmirched by so few. If this framing of Elmore actually took place, it would be worth all the opprobrium the majority could heap upon it and more. But the legal system places its faith in evidence and those who see and hear it. While no system of factual findings is perfect, the regime of appellate highhandedness and speculation is far worse. This road is no path to justice, not in any whole and rounded sense. In light of all the evidence available, the notion that the state PCR court incorrectly applied *Strickland* is simply implausible. The idea that it committed an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 131 S. Ct. at 787, is beyond the pale.

## III.

This sad decision is only compounded by the fact that it could have been so easily averted had the majority paid attention to controlling precedent. Just last term, the Supreme Court in *Harrington v. Richter*, 131 S. Ct. 770 (2011), reversed a federal appellate court's use of the writ of habeas corpus to set aside a conviction on the grounds of ineffective assistance of counsel. I suppose we should be grateful that

this recent and relevant case merits a courtesy mention by the majority, for that is all that it gets.

*Richter* could not be more on point. Like Elmore, Richter was convicted in state court for murder despite his contention that another person — in his case, a drug dealer named Joshua Johnson — manipulated the physical evidence against him. *See Richter v. Hickman*, 578 F.3d 944, 976 (9th Cir. 2009) (en banc). Like Elmore, Richter sought relief from the state court system following his conviction on the basis of *Strickland*, arguing that his counsel provided ineffective assistance "for failing to present expert testimony" on the forensic evidence. *Richter*, 131 S. Ct. at 783. The California Supreme Court denied relief. *Id.* Then, like Elmore, Richter filed a habeas petition in federal district court, which again denied him relief. And, like Elmore, he was finally able to find judges who agreed with his position on appeal. *Id.*

The Supreme Court reversed. It was emphatic in its holding that "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 786 (internal quotation marks and citations omitted). Applying the doubly deferential approach mandated by *Strickland* and AEDPA, the Court concluded that the state court could have determined that Richter's counsel was effective even though he had "not consulted forensic . . . experts or introduced expert evidence." *Id.* at 788. As the Court observed, "Reliance on 'the harsh light of hindsight' to cast doubt on a trial that took place now more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent." *Id.* at 789 (quoting *Bell v. Cone*, 535 U.S. 685, 702 (2002)).

More importantly, the Supreme Court then held that the state court could reasonably have found that Richter was unable to show prejudice. The Court noted that apart from the forensic evidence, there was enough circumstantial evidence available to allow a state court to eliminate the possibility that

Richter was prejudiced. Noting Richter's "shifting story" and "the lack of any obvious reason" for Johnson to tamper with the physical evidence, the Court concluded that there was "ample basis for the California Supreme Court to think any real possibility of Richter's being acquitted was eclipsed by the remaining evidence pointing to guilt." *Id.* at 792.

The majority references *Richter*, as it must, but then proceeds to distinguish the case on the ground that the forensic evidence here "was always and obviously vital to the State's case." *Ante* at 146. My colleagues miss the larger point. If the California Supreme Court's application of *Strickland* in *Richter* was reasonable, then the South Carolina PCR court's application of *Strickland* here must be so as well.

For one, the PCR court's opinion was far better supported than the state court opinion in *Richter*. Whereas the California Supreme Court dismissed Richter's claim for relief in a one-sentence order, the PCR court here issued a 183-page opinion responding to Elmore's numerous claims. While a state court need not provide a justification for its decision for the purposes of § 2254(d), *Richter*, 131 S. Ct. at 784-85, when it "explain[s] its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).

More importantly, on the question of prejudice, the circumstantial evidence in Elmore's case provided more than an "ample basis" for the PCR court to conclude that any chance of Elmore's acquittal "was eclipsed by the remaining evidence pointing to guilt." *See Richter*, 131 S. Ct. at 792. In addition to Elmore's "shifting story" regarding his whereabouts on Saturday night as well as "the lack of any obvious reason" for Holloway to murder Mrs. Edwards and the police to frame an innocent man, *see id.*, the already-strong circumstantial evidence against Elmore was cemented, inter alia, by his confession to Gilliam, his pubic hair on Mrs. Edwards's bed, and the blood on his clothes matching Mrs. Edwards's

blood type. The problem with Elmore's case is the sheer strength of the evidence against him, not the failure of counsel to remove that boulder from the road. Perhaps the day will come when we all realize that habeas corpus confers no free-wheeling warrant to retry a case on appeal, *see id.* at 786, and the Supreme Court can rest from reiterating this basic point in case after case. Unfortunately, today's decision shows that we still have a long way to go.

IV.

Thus far, I have discussed facts and deference, for those are the most concrete failings of the majority's decision today. But the real injustice of this case occurs on an individual level. Thanks to the majority's efforts, Mr. Elmore may go free because the crime he committed took place almost three decades ago. Perhaps Elmore believes that because so much time has passed since the murder, he should simply be let go.

My distinguished colleagues in the majority respond to the dissent with rhetoric and a protestation that they are not doing what in fact they are doing—overturning factual findings and credibility determinations of the state system that painstakingly heard the evidence in this case. But at the end of the day, our system is indeed grounded on facts and evidence. If the state courts had defaulted in their job, that would be one thing, but it is hard to find a case that received a more thorough review under the well-settled Strickland standard than this one did. If respect is not accorded the careful conclusions and precise findings of the state court in the case at bar, then I am hard-pressed to see the circumstances in which the majority would extend respect. Contrary to my brothers' rejoinder, I have not the slightest hesitation in embarrassing any person or institution so long as that embarrassment is grounded in the raw materials of judicial process, not dispensed from the speculative perch on which we sit. The majority says it doesn't "credit Elmore's evidence," *ante* at 163, but it discredits the courts assigned to weigh that evi-

dence and assess it. Visiting reputational harm is not something federal courts do lightly. Before insinuating that law enforcement officers are "inept and corrupt," *id.* at 162, or that "the real perpetrator was Holloway," *id.* at 163, the majority should be able to point to some finding or some ruling by those who actually heard testimony that that might have been the case. It is little enough to ask.

Before this court grants Elmore relief, we should pay passing thought as to what happened to Dorothy Edwards on the night she was raped and murdered. According to Dr. Sandra Conradi, the forensic pathologist who performed Mrs. Edwards's autopsy, the body of the seventy-five-year-old victim "was covered with injuries of all sorts, including stab wounds, blunt traumatic injuries," "abrasions," and "bruises." Her lower arms were extensively damaged, most likely from her attempts to shield herself from attack. Despite her resistance, she was stabbed repeatedly in the head and neck and suffered multiple lacerations to her ears as well as the inside of her mouth. Her left cheek was crushed in as well. She also sustained thirty-three lesions on her chest area, most likely inflicted with a pair of bottle tongs, and two-thirds of those injuries occurred prior to her death. Her ribs were fractured, the front part of her chest had caved in, and her right lung was torn. After estimating Mrs. Edwards sustained roughly "seventy-five separate injuries," Dr. Conradi concluded that she could not recall, in her "fifteen years of experience, seeing as much trauma and as varied trauma as in this particular case."

The more heinous the crime, the more necessary it becomes not to lash out and affix blame, but the long, thorough layers of review accorded Mr. Elmore's case do not portray a system acting in vengeance or in haste. It is right and good to believe in mercy and forgiveness for those who commit even the most cruel and brutal acts. But that redemption is not rightfully ours to bestow, and the criminal justice system does not serve its own humane, protective purposes by slipping into amnesia

on something like this. Law does not permit it, nor should it. Not on this. Not on this.

I would affirm the judgment.